IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCTOR'S DATA, INC.,                    )
a Nevada corporation,                   )
                                        )
                    Plaintiff,          )
                                        )      No. 10 CV 3795
          v.                            )
                                        )      Honorable John J. Tharp, Jr.
STEPHEN J. BARRETT, M.D.,               )
NATIONAL COUNCIL AGAINST                )
HEALTH FRAUD, INC., and                 )
QUACKWATCH, INC., a dissolved           )
corporation,                            )
                                        )
                    Defendants.         )


## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF CONTENTS ……………………………………………..….II

TABLE OF CASES AND AUTHORITIES …………………………………IV

INTRODUCTION………………………………………………………………1

    I.    The Parties …………………………………………………………1

        A. Defendant Stephen Barrett, M.D. ("Dr. Barrett") …………………………1

        B. Defendant National Council Against Health Fraud, Inc. ("NCAHF") …………1

        C. Defendant Quackwatch, Inc. ("Quackwatch") …………………………………1

        D. Plaintiff Doctor's Data ("DDI") ………………………………………………1

    II.    Summary of the Case ………………………………………………………2

        A. DDI's Urine Test Report Form ………………………………………………3

ARGUMENT……………………………………………………………………6

    I.    Summary Judgment is Appropriate Because DDI's Alleged False and Defamatory Statements are Not Actionable ……………………….……6

        A.    Not Actionable – Single Publication Rule…………………………………6

        B.    Not Actionable – Fair Report Privilege……………………………………6

        C.    Not Defamatory – The 16 Remaining Allegations …………………………10

            1. Not Defamatory – DDI's "No Reference Range" Fiction……………11

                a.    There is No Legal Requirement to Include Irrelevant Reference Ranges…………………………………………………11

                b.    DDI's Disclaimer Defense is Disingenuous …..……………11

            2. Not Defamatory – True or Substantially True…………………………12

                a.    True or Substantially True Legal Standard……………………12

                b.    The Report as Fraud is at Least Substantially True Under the Illinois Consumer Fraud

and Deceptive Acts and Practices Law...........................13

      i.   Deception Under the Illinois Consumer Fraud Act ...14

      ii.  Misrepresentation, Concealment, Suppression
          or Omission of Material Facts Under
          the Illinois Consumer Fraud Act..........................16

c. Alleged Statements that are True or Substantially True........19

d. Statements Under the Innocent Construction Rule.............27

e. Statements Not Concerning DDI................................28

II.     Summary Judgment is Appropriate Because DDI Cannot Prove
       All Elements of the Causes of Action...........................................32

A. DDI Cannot Prove Damages......................................................32

B. DDI Cannot Prove Defamation *Per Se*.......................................34

C. DDI Cannot Prove Defamation *Per Quod* ..................................36

D. DDI Cannot Prove Intentional Interference with Existing Contracts ...................37

E. DDI Cannot Prove Intentional Interference with Prospective
Business Advantages....................................................................38

F. DDI Cannot Prove Violation of the Lanham Act..........................................40

    1. Plaintiff's Trademarks are not "Famous" Pursuant to the Lanham Act........40

    2. Defendants' use of the Plaintiff's Trademarks caused
       no Dilution of the Marks.....................................................42

    3. Defendants' use of the Plaintiff's Trademarks was "Fair Use"................42

G. DDI Cannot Prove Violation of the Illinois Trademark Registration and
Protection Act Dilution Claim.......................................................43

H. DDI Cannot Prove Conspiracy...................................................43

    1. The Illinois Intracorporate Conspiracy Doctrine...................................44

    2. No Facts Supporting a Conspiracy Claim........................................45

**CONCLUSION**..................................................................................**48**

## TABLE OF CASES AND AUTHORITIES

<u>**Case Law**</u>

*A-Abart Electric Supply, Inc. v. Emerson Electric Co.*
    956 F.2d 1399, 1404-04, (7th Cir. 1992)..............................................39

*All Star Championship Racing, Inc. v. O'Reilly Auto. Stores, Inc.*
    940 F. Supp. 2d 850, 873-874 (C.D. Ill. 2013).......................................35

*Anderson v. Vanden Dorpel*
    172 Ill. 2d 399, 416, (1996)...................................................27, 36

*BlueStar Mgmt. LLC v. Annex Club, LLC,*
    2010 U.S. Dist. LEXIS 71156, **22-23, 2010 WL 2802213 (N.D. Ill. July 12, 2010)...38

*Bryson v. News America Publications, Inc.*
    174 Ill. 2d 77, 87 (Ill. 1996)...................................................28

*Buckner v. Atlantic Plant Maintenance, Inc.*
    182 Ill. 2d 12, 24 (Ill. 1998)...................................................44

*Edelman v. Hinshaw & Culbertson*
    338 Ill. App. 3d 156, 168 (Ill. App. Ct. 2003)...................................44

*Everest Capital Ltd. v. Everest Funds Management, LLC*
    393 F.3d 755, 763 (8th Cir. 2005)...............................................41

*Frontline Communs., Inc. v. Comcast Corp.*
    2013 U.S. Dist. LEXIS 126919, *8-9, 2013 WL 4777370 (N.D. Ill. Sept. 5, 2013).......44

*Indep. Trust Corp. v. Stewart Info. Servs. Corp*
    665 F.3d 930, 938-939 (7th Cir. 2012).........................................44

*Int'l Mktg., Ltd. v. Archer-Daniels-Midland Co*
    192 F.3d 724, 731 (7th Cir. 1999)..............................................37

*Knorr Brake Corp. v. Harbil, Inc.*
    738 F.2d 223, 230 (7th Cir. 1984)..............................................44

*Madison v. Frazier*
    539 F.3d 646, 652-653 (7th Cir. Ill. 2008).....................................28

*McDavid Knee Guard, Inc. v. Stirling Mouldings Limited*
   2010 U.S. App. LEXIS 21088, \*\*16-17, 2010 WL 30000178, \*6 (Fed. Cir. 2010)…….39

*Muzikowski v. Paramount Pictures Corp.*
   322 F.3d 918, 924 (7th Cir. 2003)…………………………………………………… 36

*Muzikowski v. Paramount Pictures*
   477 F.3d 899, 904 (7th Cir. 2007) …………………………………………………27

*New York Times v. Sullivan*
   376 U.S. 254 (1964)……...…………………………………………………………1

*Owen v. Carr*
   113 Ill. 2d 273 (1986)...……………………………………..………………………64

*Pippen v. NBC Universal Media, LLC*
   734 F.3d 610, 615 (7th Cir. 2013)……………………………………………....7

*Pitale v. Holestine*
   2012 U.S. Dist. LEXIS 24631, \*\*9-10, 2012 WL 638755 (N.D. Ill. Feb. 27, 2012) …...27

*Price v. Philip Morris, Inc.*
   219 Ill. 2d 182, 233-34 (2005)...…………………………………………………14

*Sandholm v. Kuecker*
   2010 Ill. App. LEXIS 1095, \*\*26-27, 2010 WL 4102998, \*9 (2nd Dist. 2010) ………13

*Seith v. Chicago Sun-Times, Inc.*
   371 Ill. App. 3d 124, 134 (1st Dist. 2007)…………………….................................28

*Solaia Technology, LLC v. Specialty Publishing Company*
   221 Ill. 2d 558, 585 (2006)……………………….…………………………..…….8, 9

*Sullivan v. CBS Corp.*
   2002 U.S. Dist. LEXIS 6625, \*34, 2002 WL 554506 ( N.D. Ill. E.D. 2002) ………….41

*Syndicate Sales, Inc. v. Hampshire Paper Corp.*
   192 F.3d 633, 639 (7th Cir. 1999)…………………………………………………40

*Thane Intern., Inc. v. Trek Bicycle Corp.*
   305 F.3d 894, 911 (9th Cir. Cal. 2002)..………………………………………………41

*Top Tobacco, L.P. v. Midwestern Cash and Carry, LLC, et. al.*
   2014 U.S. Dist. LEXIS 7598, \*29, 2014 WL 243431 (N.D. Ill. E.D. Jan. 22, 2014)….. 40

v

*Top Tobacco, L.P. v. N. Atl. Operating Co.,*
    2007 U.S. Dist. LEXIS 2838, 2007 WL 118527 (N.D. Ill. Jan. 4, 2007)....................41

*Tuite v. Corbitt*
    224 Ill. 2d 490, 501-02, 866 N.E.2d 114, 121 (2006)..........................................34

## Statues

740 ILCS 165/1 (2013)..............................................................................6

815 ILCS 505/2.....................................................................................14

15 U.S.C. § 1125(c) ...................................................................40, 41, 42, 43

## Regulations

CFR § 493.129.................................................................................15, 16

## INTRODUCTION

I.      **The Parties**

A.      **Defendant Stephen Barrett, M.D. ("Dr. Barrett")**

Defendant Stephen Barrett, M.D., is a retired psychiatrist and has been a consumer advocate and medical journalist for decades. He owns and operates www.quackwatch.org and twenty-four (24) other consumer-protection websites; has written over 2,000 articles; and has edited and/or coauthored fifty-two (52) books, including the current standard textbook used in college courses on consumer health. Dr. Barrett is a "media defendant" as defined and established by the Supreme Court in *New York Times v. Sullivan*, 376 U.S. 254 (1964).

B.      **Defendant National Council Against Health Fraud, Inc. ("NCAHF")**

Defendant National Council Against Health Fraud, Inc. ("NCAHF") was a consumer advocacy organization that was founded in 1984, became inactive in 2002, and dissolved in 2011. Dr. Barrett served as vice-president of NCAHF, and from 2007 onward, was NCAHF's sole officer and director. NCAHF is a *New York Time v. Sullivan* media defendant.

C.      **Defendant Quackwatch, Inc. ("Quackwatch")**

Defendant Quackwatch, Inc. was a consumer advocacy organization that was founded in 1970 and dissolved in 2008, approximately two years before this lawsuit was filed. From about 1980 onward, Dr. Barrett was its sole officer and director. After Quackwatch was dissolved, Dr. Barrett assumed ownership of the Quackwatch service mark "Quackwatch (SM)," which is displayed on all Quackwatch pages alleged to be defamatory in this case.

D.      **Plaintiff Doctor's Data, Inc. ("DDI")**

DDI is a testing laboratory. Relevant to this suit, DDI performs tests for heavy metal on certain urine samples and reports some test results on a certain test report form that is criticized.

1

## II.    Summary of the Case

This case is about DDI's urine test report form. Much of understanding this case revolves around appreciating what this case is NOT about. There are many collateral issues between the parties that are contentious, but not relevant to any of the alleged causes of action.

The quality or accuracy of DDI's tests are NOT a part of this suit in any way. Plaintiff has admitted that it is not charging any Defendant for criticizing the accuracy of the test.

DDI tests normal, non-provoked, urine samples, which are NOT a part of this suit.

DDI also tests "provoked" urine samples, which are urine samples taken after the patient has been given a drug that artificially and temporarily increases the output of certain heavy metals in the urine. Typical of the metals increased are lead and mercury. The accuracy of DDI's measurements of provoked urine sample contents is NOT a part of this suit.

DDI reports its findings for both normal and provoked samples on a common report form. The standard report form includes "reference ranges" of heavy metal amounts in normal (average) urine, includes a graph the compares the tested amount of metals against the norm and graphically displays whether the test amount is essentially "normal," "elevated," or "very elevated," and the report includes multiple pages of additional information focused on mineral sources and toxicity.

The reporting of normal, non-provoked, urine samples on the report form is NOT a part of this suit. Rather, the reporting of test results of artificially increased, provoked, urine samples on the report form, comparing the heightened test results to normal reference ranges, and its potential to mislead users, **is** the core of this suit.

### A.    DDI's Urine Test Report Form

This case is all about DDI's toxic metal urine test result report form.  DDI reports the results of both its "provoked" and non-provoked urine toxic metals tests on the same report form.

This case is all about Plaintiff's DDI's report form used to report the results of the provoked urine toxic metals test.  Understanding this case requires understanding DDI's view of what its report form says.  There is no dispute that the first page of the report form looks like the following:



3

(Ex. 3.1[1].)

A "provoked" urine sample is one in which a "chelating agent" is administered prior to the test. The purpose of a chelating agent is to increase the excretion of toxic metals in the urine. It is well known and accepted that a chelating agent given prior to obtaining a urine sample will likely result in more metals in that urine sample than would be present in non-chelated, non-provoked, urine sample.

DDI admits that there are no standard scientifically accepted normal ranges for provoked urine tests. Yet, when reporting the results of provoked urine tests, DDI uses the form that contains normal "reference ranges" and even generates a vivid graphic representation of the comparison of the provoked results to the normal reference ranges.

Dr. Barrett's articles express his opinion that is critical of the report form. Specifically, Dr. Barrett criticizes the form as misleading because it compares provoked urine results, which are expected to be higher, to non-provoked standards; thereby making it likely that the form will report the metals levels as being "high" or "elevated." Fundamentally, Dr. Barrett criticizes the form for comparing "apples to oranges" – provoked test results to an un-provoked standard.

DDI defends its use of irrelevant reference ranges and graphs on the report form arguing that it is required by law, and that there is an effective disclaimer that "plainly" informs the reader of the provoked urine test report that the reader should "ignore" virtually everything on the form, except the raw test data.

Dr. Barrett, in Complaint Exhibit A, reports that people have not understood DDI's claimed "disclaimer" and that the report form is being used to convince people that they have elevated heavy metal content in their bodies. Further, after using, or misusing, the test report form to indicate high levels of metals, the report form is used to justify treating patients to

---

[1] All Exhibits cited in this Memorandum refer to the Exhibits attached to Defendants' Rule 56.1 Statement of Facts.

4

"detoxify" them. Finally, Dr. Barrett criticizes the practitioners who use the test report to justify detoxification for needless treatments and for using potentially dangerous and unnecessary drugs.

Dr. Barrett has never written that DDI is a knowing participant in the practitioner's treatments; however, Dr. Barrett has accurately summarized and quoted from lawsuits where that assertion has been alleged.

Dr. Barrett has accurately reported court findings and professional regulatory actions that have found that the use of the test report results to justify certain detoxification treatments is scientifically baseless and potentially harmful to the patient.

Dr. Barrett has expressed his opinion that state and federal regulatory agencies should investigate DDI's report form and require that it stop comparing provoked test results with normal non-provoked reference ranges. Further, Dr. Barrett has encouraged individuals who believe they were harmed through the use of the report form to contact appropriate regulatory agencies and competent legal counsel.

Defendants respectfully assert that DDI's lawsuit is based on blurring the distinction between Dr. Barrett's opinion critical of the report format and defamation of DDI itself. DDI blurs the distinction between Dr. Barrett providing accurate information to consumers to avoid unnecessary treatment through misuse of the test results with conspiracies by Dr. Barrett and others against DDI itself.

DDI has inserted itself in criticism and comment against others in order to justify this lawsuit. Lawsuits have been filed alleging that DDI knowingly conspired with others to make possible unnecessary medical treatment, and the courts will sort out that issue. However, Dr. Barrett has never accused DDI and others of conspiring to injure patients. DDI blurs the allegations in the other lawsuits with the writings of Dr. Barrett.

5

## ARGUMENT

**I.**     **Summary Judgment is Appropriate Because DDI's Alleged False and Defamatory Statements are Not Actionable**

In this lawsuit, DDI alleges 85 statements from 15 publications as being false and/or defamatory. (Ex. 1-3.) The allegations were made over several discovery response supplements. For convenience, a table is attached hereto as Exhibit 2, listing each alleged statement, the source publication of the statement, DDI's basis for alleging falsity, and Defendants' defenses.

Just listing the statements and the alleged falsity takes dozens of pages. Fortunately, many of the alleged statements are easily dismissed in groups from common flaws. As argued below, 33 statements are mere republications of earlier articles and are not actionable under the Illinois Single Publication Rule. Also, 35 more statements are not actionable under the fair report privilege. The remaining 16 alleged statements are also not actionable, but do not fall within large general groups for a variety of reasons. These remaining 16 statements are discussed more specifically below, addressing each of the allegations of falsity.

**A.**     **Not Actionable – Single Publication Rule**

Illinois has adopted the Uniform Single Publication Act, 740 ILCS 165/1, which states that a claim for relief for defamation is complete at the time of the first publication and that later circulation of the original publication does not trigger fresh claims.

> No person shall have more than one cause of action for damages for libel or slander or invasion of privacy or any other tort founded upon any single publication or exhibition or utterance, such as any one edition of a newspaper or book or magazine or any one presentation to an audience or any one broadcast over radio or television or any one exhibition of a motion picture. Recovery in any action shall include all damages for any such tort suffered by the plaintiff in all jurisdictions.

740 ILCS 165/1 (2013).

Some alleged statements are complete duplicates of other statements, and the single publication rule would apply to exclude the later republications. DDI's Alleged Statement (xx) is a verbatim later publication of the statement alleged as (l). Statement (xx) should be dismissed under the single publication rule. Similarly, DDI's Alleged Statement (ppp) is a verbatim later publication of the statement alleged as (xx). Statement (ppp) should also be dismissed under the single publication rule.

Dr. Barrett's writings were published on the Internet on his webpages. In later writings, Dr. Barrett sometimes cited to the original articles and included hyperlinks to those articles. Republication by hyperlink falls under the Illinois single publication rule prohibiting multiple actions for one publication. *Pippen v. NBC Universal Media, LLC*, 734 F.3d 610, 615 (7th Cir. 2013).

In six instances, DDI alleged actionable statements and then alleged one or more later publications with a hyperlink to the first one as additional defamation or actionable statements. An example of DDI using hyperlinks as separate defamations is in Statement (vv) in which the alleged defamation is as follows: "Item (a), *supra*, was republished by Dr. Barrett in [a later article]." DDI's allegation of falsity in support of defamation states: "Plaintiff incorporates its response to Item (a), *supra*, as though fully set forth herein." Defendants respectfully argue that the allegation in (vv) is a mere hyperlink to the original article, and, under the Illinois Single Publication Rule, statement (vv) is not actionable.

DDI alleges the following statements as mere hyperlinks to the same statement in earlier articles:

1. Statement (a) is alleged by mere hyperlink in the following Statements: gg, nn, oo, pp, rr, uu, vv, ww, yy, hhh, iii, kkk, lll, nnn, rrr, sss, ttt, uuu, vvv, www, xxx, yyy, zzz, aaaa, cccc, dddd, and hhhh.

2. Statement (k) is alleged by mere hyperlink in Statement oo.

3. Statement (n) is alleged by mere hyperlink in Statements oo and bbbb.

4. Statement (bb) is alleged by mere hyperlink in Statement oo.

5. Statement (dd) is alleged by mere hyperlink in Statements oo, jjj, mmm, and gggg.

6. Statement (ff) is alleged by mere hyperlink in Statement oo.

The following 33 statements that are alleged as mere hyperlinks should be dismissed pursuant to the Illinois Single Publication Rule: gg, nn, oo, pp, rr, uu, vv, ww, xx, yy, hhh, iii, jjj, kkk, lll, mmm, nnn, ppp, rrr, sss, ttt, uuu, vvv, www, xxx, yyy, zzz, aaaa, bbbb, cccc, dddd, gggg, and hhhh.

**B.  Not Actionable – Fair Report Privilege**

Illinois recognizes the "fair report privilege" and declined to limit that privilege by the "judicial action limitation," which extended the privilege to reporting beginning with the filing of a complaint. As discussed by the Illinois Supreme Court:

> A defamatory statement is not actionable if it is privileged; this is a question of law. [cite] There are two classes of privileged statements: those subject to an absolute privilege, and those subject to a conditional or qualified privilege. [cite] The fair report privilege is a qualified privilege, which promotes our system of self-governance by serving the public's interest in official proceedings, including judicial proceedings. [cites] Section 611 of the second Restatement of Torts provides: "The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported."

*Solaia Technology, LLC v. Specialty Publishing Company*, 221 Ill. 2d 558, 585 (2006).

Even if malice is alleged, the *Solaia* Court ruled that the privilege applies, stating, "We hold that the fair report privilege overcomes allegations of either common law or actual malice." *Solaia*, 221 Ill. 2d at 587. In summary, the Court stated:

> Thus, the fair report privilege has two requirements: (1) the report must be of an official proceeding; and (2) the report must be complete and accurate or a fair abridgement of the official proceeding.

*Id.* at 588.

Dr. Barrett published the exact text of a lawsuit filed by the Stemps against a clinic, treating practitioners, and Doctor's Data. The publication included a photocopy of the Petition filed in the lawsuit *Stemp v. Care Clinics, Inc.*, which was filed in Texas. DDI alleged this publication as Exhibit A to its Third Amended Complaint and asserted that it was defamed by allegations made within the lawsuit. No Defendant is a party to the *Stemp* lawsuit.

DDI has alleged 19 statements as either false or defamatory that are quoted directly from the Petition filed in the *Stemp* lawsuit. Specifically, the statements alleged that were quoted from the *Stemp* lawsuit are identified by Plaintiff as the following alleged statements: p, q, r, s, t, u, v, w, x, y, z, zz, aaa, bbb, ccc, ddd, eee, fff, and ggg. Plaintiff respectfully argues that statements quoted directly from a reproduction of a filed Petition fall 100% under the fair report privilege, and are therefore not actionable in the instant lawsuit.

DDI also alleges statements made by Dr. Barrett that are not direct quotes from official proceedings. These are not actionable because they are "fair abridgments" of the official proceedings. For example, Dr. Barrett correctly stated that the *Stemp* defendants had "been sued for fraud, negligence, and conspiracy in connection with the treatment of 43-year-old Ronald Stemp, who charges that he was improperly diagnosed . . . ." (*See* Alleged Statement (o).) In fact, the *Stemp* lawsuit includes causes of action for fraud, negligence, and conspiracy. Dr.

9

Barrett's description of the lawsuit is a "fair abridgement" of the official proceeding in accordance with the fair report privilege.

In addition to the alleged statements that were direct quotes from the *Stemp* lawsuit, DDI alleges statements as false and defamatory that are truthful and fair abridgments of other official proceedings. A full list of the statements that are fair abridgments are as follows:

> 1. Fair Abridgement of *Stemp v. Care Clinics*: h, n, o, cc, ee, and mm.
>
> 2. Fair Abridgement of Vowell, DK, <u>Decision</u>. *Snyder v. Secretary of the Department of Health and Human Service*, U.S. Court of Federal Claims, Office of Special Masters, Case No. 01-162V, filed Feb. 12, 2009: g and eeee.
>
> 3. Fair Abridgement of *Coman v. Usman*: i, k, m, mm, ooo, and qqq.
>
> 4. Fair Abridgement of *Pfister v. Treatment Facility*: mm.
>
> 5. Fair Abridgement of *Morschladt v. Panahpour*: mm.
>
> 6. Fair Abridgement of dePerio MA, Durgman S. <u>Evaluation of animony and mercury exposure in firefighters</u> Health Hazard Evaluation Report HETA 2009-0025 and HETA 2009-0076-3085, National Institute for Occupational Safety and Health, June 2009: ss and ffff.
>
> 7. Fair Abridgement of *Doctors Data, Inc. v. Barrett*: tt.

Defendants respectfully assert that the following 35 Alleged Statements should be dismissed pursuant to the Illinois Fair Report Privilege: g, h, i, k, m, n, o, p, q, r, s, t, u, v, w, x, y, z, cc, ee, mm, ss, tt, zz, aaa, bbb, ccc, ddd, eee, fff, ggg, ooo, qqq, eeee, and ffff.

## C.      Not Defamatory – The 16 Remaining Allegations

The 69 of the 85 statements discussed above were easy to rebut in large groups because they contained common fatal flaws. The 16 remaining alleged statements require more detailed explanations of why they are not actionable. Most of these last allegations simply allege multiple basis of falsity, which require attention to each basis. A few allege unique basis of falsity that require individual explanation.

10

### 1. Not Defamatory – DDI's "No Reference Range" Fiction

DDI's most prevalent fiction is that "there are no reference ranges on the report form." In order to understand DDI's assertion of falsity with regards to the "reference range," one must first understand DDI's unique logic. Apparently, in DDI's logic, since it believes it has disclaimed "using" reference ranges on its test report form, the reference ranges ceased to exist.

Of course, the report form itself belies this assertion. A mere glance reveals that nearly half of the front page involves reference ranges with a column specifically titled "Reference Range" values and a multi-colored graph comparing the test results with the stated Reference Range as either "Within Reference Range," Elevated," or "Very Elevated" above the reference range.

#### a. There is No Legal Requirement to Include Irrelevant Reference Ranges

DDI's fiction that "there is no reference range" on the form is based on its assertion that it was "required by law" to include on the form reference ranges that are applicable to normal non-provoked urine samples, even though those references are completely irrelevant, immaterial, and inapplicable to the artificially enhanced "provoked" urine samples. As discussed below, Defendants have thoroughly disproven the "legal requirement" claim, showing that there is no legal requirement to have reference ranges on the report form. Further, DDI violates the actual rule that requires that "pertinent" reference ranges be "available." DDI emphatically argues just that -- there are no pertinent reference ranges for provoked specimen tests. By admission, DDI's provoked urine test report includes reference ranges that are <u>not</u> pertinent.

#### b. DDI's Disclaimer Defense is Disingenuous

A closely related falsity to the "no reference range" claim is the falsity that the report form "plainly states" that there are no reference ranges. The "plainly stated" falsity theme is

11

based on DDI's argument that the form includes a "disclaimer" that "plainly" instructs the reader to ignore all reference range information. For example, DDI alleged the falsity of alleged statement (c), stating: "Dr. Barrett's statement is false because the form of plaintiff's report, which is dictated by law, plainly states that the reference ranges do not apply." (Ex. 1.)

The disclaimer does not state either that there are no reference ranges or that the clearly identified reference ranges should be ignored. The purported disclaimer affirmatively identifies the reference range, stating: "Reference ranges are representative of a healthy population under non-challenged or non-provoked conditions." There is no indication that non-provoked reference ranges are not relevant to the test report. Logically, no one would expect the report to include such detailed listing and analysis of reference ranges that are adjusted to the age and sex of the patient if they were not relevant in some way. The disclaimer identifies the source of the reference ranges – it does not state to ignore them.

The second part of the disclaimer that DDI asserts to "plainly state" to ignore the reference ranges is the following statement: "No safe reference levels for toxic metals have been established." Defendants respectfully submit that there is no logical reading of this sentence as an instruction to the user to ignore the clearly identified reference ranges. Rather, the clear message is that the detection of any amount of metal in the urine sample is not safe.

### 2. Not Defamatory – True or Substantially True

#### a. True or Substantially True Legal Standard

There is no libel *per se* if the alleged statement is true, substantially true, capable of an innocent construction, or an expression of opinion. As summarized by an Illinois Appellate Court:

> Several situations may render otherwise *per se* defamatory statements no actionable. For instance, a defendant is not liable for

12

> a defamatory statement if the statement is true; only substantial truth is required for this defense to apply. *J. Maki Construction Co. v. Chicago Regional Council of Carpenters*, 379 Ill. App. 3d 189, 203, 318 Ill. Dec. 50, 882 N.E.2d 1173 (2008). A *per se* defamatory statement is not actionable if it is reasonably capable of an innocent construction. *Solaia Technology, LLC v. Specialty Publishing Co.*, 221 Ill. 2d 558, 580, 304 Ill. Dec. 369, 852 N.E.2d 825 (2006). Likewise, if the *per se* defamatory statement constitutes an expression of an opinion, it may enjoy constitutional protection under the first amendment. *Solaia*, 221 Ill. 2d at 581, 304 Ill. Dec. 369, 852 N.E.2d 825.

*Sandholm v. Kuecker*, 2010 Ill. App. LEXIS 1095, **26-27, 2010 WL 4102998, *9 (2nd Dist. 2010).

### b.  The Report as Fraud is at Least Substantially True Under the Illinois Consumer Fraud and Deceptive Acts and Practices Law

Dr. Barrett has expressed his opinion criticizing the <u>test</u> as a fraud.  He has written: "The provoked urine toxic metals test is a fraud."  (Alleged Statement (l).)  The title of one of his articles on the subject is "How the 'Urine Toxic Metals' Test is Used to Defraud Patients." (Alleged Statement (a).)

The word "fraud" clearly refers to the test, and the test report format.  Defendants have never written that DDI committed a fraud, with the exception of Dr. Barrett accurately summarizing and quoting two lawsuits that allege fraud.  DDI does not allege any false statements that the test itself is not accurate, so it is understood by DDI that Dr. Barrett's statements about the test being a "fraud" is actually addressed to the test report form and how it is used to defraud people.

Is the statement that the report form used to report non-provoked urine test is a fraud true or substantially true?  Defendants respectfully assert that the report form is substantially truthfully summarized as being fraudulent under the Illinois Consumer Fraud Act.

Defendants respectfully argue that the report form, used by Plaintiff to report the results of its Provoked Urine Toxic Metals Test violates the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2. As such, it can be said to be a fraud.

Defendants are not asking the Court to find that the form violates the Consumer Fraud Act, only that it is substantially true, under the facts of this case, to say that it violates the Act. In other words, that Dr. Barrett's statement is substantially true under an analysis of the report form as is contemplated by the Act.

Section 2 of the Act states:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any <u>deception</u>, fraud, false pretense, false promise, <u>misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact</u>, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, <u>in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.</u> In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5 (a) of the Federal Trade Commission Act (15 U.S.C. Section 45).

815 ILCS 505/2 (emphasis added).

The Consumer Fraud Act was enacted to protect consumers and others against fraud, unfair methods of competition, and unfair or deceptive acts or practices in the conduct of any form of trade or commerce. *Price v. Philip Morris, Inc*. 219 Ill. 2d 182, 233-34 (2005).

### i. Deception Under the Illinois Consumer Fraud Act

DDI defends the test report form, when used to report results from provoked urine samples, as having plainly stated disclaimers required by law. This claim is disingenuous.

There is no legal requirement to include irrelevant reference ranges on a report form.

14

Without identifying the legal basis, DDI's corporate representative repeatedly asserted that the test report format, including irrelevant reference ranges, was required by law. (Ex. 6 at pp. 18-20.)

DDI's expert, Dr. Russell Jaffe, identified the relevant law (actually, a federal regulation) as CFR § 493.129. (Ex. 15 at p. 4.)

Contrary to DDI's assertion, the law, actually a Rule, does not require the inclusion of the irrelevant and potentially misleading reference ranges. In fact, the rule does not require that reference ranges appear on the face of the report at all. There are two relevant sections to the rule, one that identifies the information required to be on the test report (reference ranges are not required) and a following section that is not required, that states as follows:

(c) The test report must indicate the following:

    (1)    For positive patient identification, either the patient's name and identification number, or an unique patient identifier and identification number.

    (2)    The name and address of the laboratory location where the test was performed.

    (3)    The test report date.

    (4)    The test performed.

    (5)    Specimen source, when appropriate.

    (6)    The test result and, if applicable, the units of measurement or interpretation, or both.

    (7)    Any information regarding the condition and disposition of specimens that do not meet the laboratory's criteria for acceptability.

42 CFR 493.1291(c). Nowhere in the list of required information above is there a requirement that the report include reference ranges.

15

Reference ranges are discussed in 42 CFR 493.1291(c), above. Reference ranges are not discussed in what the report "must include." Rather, pertinent reference range information must only be "available." Particularly relevant is that the reference ranges must be "Pertinent," as follows from the Rule:

> (d) <u>Pertinent</u> ``reference intervals'' or ``normal'' values, as determined by the laboratory performing the tests, <u>must be available</u> to the authorized person who ordered the tests and, if applicable, the individual responsible for using the test results.

42 CFR 493.1291(c) (emphasis added).

DDI's claim of a legal requirement to include irrelevant reference ranges on the face of its provoked urine test results report is baseless and frivolous. DDI's report form, as it now exists, clearly violates the rule because the reference ranges are "not pertinent." DDI admits that the reference ranges are "not pertinent," "irrelevant," "inappropriate to look at," of no significance to the ordering doctor, and "should be ignored." (Ex. 5 at pp. 74-84.)

**The Deceptive Element:** DDI's report form is deceptive under the Illinois law in that it boldly uses reference ranges for normal non-provoked urine metals test levels and compares those reference ranges against provoked urine specimens expected to test at higher levels because of the provocation. There is no legal requirement for this comparison. It is contrary to the law that any reference range be "pertinent" and it renders the report form deceptive under the Illinois Consumer Fraud Act.

      ii.     **Misrepresentation, Concealment, Suppression or Omission of Material Facts Under the Illinois Consumer Fraud Act**

DDI asserts that a disclaimer plainly informs the reader of its test report form that the reference ranges are irrelevant and that they are to be ignored. As testified by DDI's corporate representative:

16

A.   The report clearly indicates that the reference ranges are for non-challenged, non-provoked conditions.  The graphing is a result of comparing the results to those reference ranges, as stated.  The disclaimer caution on the report is for the purpose of informing an informed reader of the report what to pay attention to and what not to pay attention to and hence the graphing in a provoked sample is not appropriate to look at.
         *   *   *
A.   These reports are prepared and created for non-challenged, non-provoked specimens.  There are no scientifically established accurate reference ranges for provoked specimens, and hence there is a caution clearly placed on the report and the commentaries that those portions of the report that would be affected by the doctor choosing to submit a provoked specimen are those that take precedence.

(Ex. 5 at pp. 80-81.)

DDI asserts falsity of Dr. Barrett's statements for having ignored the import of the disclaimer at the bottom of the report.  DDI extends its claim of what the disclaimer states to not only indicate that the reference ranges on the report form should be ignored, but also to state there are no reference ranges on the report form at all.

The DDI disclaimer, taken from the report form reproduced above, states as follows:

Toxic metals are reported as µg/g creatinine to account for urine dilution variations.  **Reference ranges are representative of a healthy population under non-challenged or non-provoked conditions.**  No safe levels for toxic metals have been established.

(Ex. 3.1.)

Defendants respectfully argue that there is nothing in the disclaimer above that plainly states that the reference ranges are to be ignored, do not apply, or that no reference ranges for provoked testing exist.

Defendants respectfully argue that if DDI really intended to convey to a reader of the report what DDI now contends, the "disclaimer" would be simple.  It would read something like:

"Only the raw test data above is relevant." Or, further and more expressly, DDI could have stated:

> Ignore everything on this report form except the raw data. Everything else is irrelevant and does not apply to these test results. In particular, ignore the reference range values, the graph of the reference ranges using the test values compared to the reference ranges, and ignore any additional pages of information as that also is irrelevant to these test results.

Or, DDI could have simply created a separate test report form for provoked urine samples, where the information to be ignored is not included. It should be quite easy to use a new form or, barring that, to clearly identify what on the form is irrelevant and should be ignored.

**The Concealment Element:** Defendants argue that the claimed real meaning of the disclaimer – to ignore the reference range numbers and graph – is concealed behind the vague language used. The sentence "Reference ranges are representative of a healthy population under non-challenged or non-provoked conditions" identifies the source of the reference range. It does not state the material fact to ignore the reference ranges. Therefore, it is true or substantially true that the DDI test report form was fraudulent as concealing a material fact that most of the report is irrelevant and should be ignored.

**The Suppression Element:** In his article alleged as Exhibit A in this lawsuit, Dr. Barrett identifies specific cases where patients have been injured or practitioners have been sanctioned for using the DDI report form for provoked urine testing to justify unnecessary treatment. To whatever extent DDI know of these cases before publication of Exhibit A, and certainly after publication, it is suppression of a material fact for DDI to fail to amend the "disclaimer" to state clearly that the reference range information was meaningless.

**The Omission Element:** Defendants respectfully argue that the material fact applicable to reporting provoked urine test results on a normal non-provoked urine test form is that the

18

reference range information is meaningless and should be ignored. DDI fails to state this material fact. DDI's omission of the material fact of the meaningless reference ranges – the fact that enables the report for to be misrepresented – renders it true or substantially true that the report form was fraudulent under the Illinois Consumer Fraud Act.

### c. Alleged Statements that are True or Substantially True

The following alleged statements are not actionable because they are factually true or substantially true,        in addition to other basis discussed where relevant, as follows:

**Alleged Statement (c):**

> "The report classifies the man's lead and mercury levels as 'elevated because they are twice as high as the upper limit of their 'reference ranges.'  However, this classification is misleading because:
> • The report states that the specimen was obtained after patient was given a 'provoking agent,' but the reference range is based on non-provoked tests.
> • The levels, whether provoked or not, are not high enough to conclude that the patient has a problem that requires attention.
> • Even if a problem exists, chelation may not be the best course of action."

> DDI's ALLEGATION: Dr. Barrett's statement is false because the form of plaintiff's report, which is dictated by law, plainly states that the reference ranges do not apply.

**DEFENDANTS' ARGUMENT:** This statement is not actionable because it is true. The facts quoted above about the report form are true. On the face of the form, it shows the test value for mercury at "6.3" with a reference range value of "< 3."  Further, the face of the report graphically shows the mercury level to be in the "elevated" range. All of this is true and readily apparent from looking at the report on the first page of the publication. (Ex. 3.1 at p. 1.)

This statement is not actionable as non-actionable opinion. Dr. Barrett states his opinion as to why the test report is misleading, and that chelation therapy "may not be the best course of action." Defendants respectfully argue that there is nothing in the statement cited above that is false or defamatory of DDI in any way, and that this allegation is frivolous.

19

**Alleged Statement (e):**

"The management at Doctor's Data knows that provoked testing artificially raises the urine levels and that the length of collection time greatly influences the result."

DDI's ALLEGATION: Dr. Barrett's statement is false because he implies plaintiff is manipulating or artificially manipulating test results through provocation or length of collection time, but plaintiff does not manipulate test results in either manner (or in any manner). Furthermore, plaintiff's test results are not artificial, false or contrived in any way.

**DEFENDANTS' ARGUMENT:** The statement is true with regards to the management at DDI knowing that provoked testing artificially raises the urine levels (of heavy metals) influences the result (of finding metals in the urine). DDI has admitted to these facts in discovery. "The chelation agents can increase the urinary excretion of the metals and elements." (Ex. 7 at p. 24.)

**Alleged Statement (f):**

"Despite all this, Doctor's Data's reports classify mercury values in the range of 5-10 µg/g as 'elevated' and further state that 'no safe reference levels for toxic metals have been established.'"

DDI's ALLEGATION: Dr. Barrett's statement is false because plaintiffs reports do not contain reference ranges for provoked sampling and plainly state that no reference range for provoked testing exists.

**DEFENDANTS' ARGUMENT:** This statement is not actionable at least because it is true. The report identifies the test result values as Dr. Barrett states, and the report form includes the statement Dr. Barrett quotes.

Defendants respectfully assert that DDI's claim that this statement is false based on DDI's "no reference range" fiction is a frivolous claim.

**Alleged Statement (l):**

"The provoked urine toxic metals test is a fraud."

DDI's ALLEGATION: Dr. Barrett's statement is false because plaintiffs test is not a fraud. Although Dr. Barrett purports to be reporting those allegations, the underlying

20

conspiracy allegations in the referenced lawsuit were caused by Dr. Barrett and are false.

**DEFENDANTS' ARGUMENT:** This statement is true or substantially true. This statement does not say that DDI was conspiring in a fraud. It clearly states that the test is a fraud. As argued *supra*, the test report itself violates the Illinois Consumer Fraud and Deceptive Practices Act. The test report is deceptively written with regard to the material fact of the reference ranges, specifically omitting or obfuscating that the stated reference ranges were inappropriate, immaterial, and should be ignored in their entirety.

This statement is also not actionable at least because it is merely hyperbole. A test cannot be charged with the crime of fraud. A test cannot act fraudulently. In context to this publication the definition of "fraud" with relation to this test would be understood by an ordinary person as to how it was used by practitioners to mislead patients. In context of the publication, "fraud" relates to it being misrepresentative of what it purports to be – the reference ranges and graphs of reference ranges appear to be valid and relevant, but in fact are invalid and not pertinent. Therefore the test and the report form fraudulently represents the results of the test, particularly when paired with a practitioner who uses the misleading nature of the test report in order to justify unnecessary medical treatment. DDI is not accused of fraud. Rather, the test is misrepresented via the report form by practitioners to mislead. Thus, Defendants' statement is true or substantially true.

**Alleged Statement (bb):**

"Shady clinic and lab under legal assault."

DDI's ALLEGATION: Although Dr. Barrett purports to be reporting allegations in a lawsuit, the underlying allegations in the referenced lawsuit were caused by Dr. Barrett and are false because plaintiff is not a shady lab.

21

**DEFENDANTS' ARGUMENT:** This statement is not actionable because it is true that legal actions had been filed against DDI. DDI's assertion that the lawsuits were "caused by" Dr. Barrett alleges nothing actionable. There is no evidence that Dr. Barrett did anything improper or illegal with regards to any suit filed against DDI.

Finally, "shady" is not actionable in that it is not a statement of fact that can be proven true or false. It is a mere hyperbole. "Shady" is also not actionable as the non-defamatory opinion of Dr. Barrett. Defendants respectfully argue that it is not possible to prove the truth or falsity of the sobriquet "shady."

**Alleged Statement (ff):**

> "Slate article blasts the urine toxic metals test. Slate magazine has published new information about the urine toxic metals test done by Doctors Data Laboratory. In February, Quackwatch posted a close look at how the 'Urine Toxic Metals' test is used to trick people into thinking that they have lead or mercury poisoning and need 'detoxification' with chelation therapy. (Barrett, S., How the 'Urine Toxic Metals' test is used to defraud patients. Quackwatch, 2/18/2009.) The heart of the process is 'provoked' testing in which a chelating agent is given before the specimen is obtained. This artificially raises the levels of heavy metals in the urine. The test report, a copy of which is given to the patient, states that its 'reference values' are for non-provoked specimens. However, if a test level exceeds the reference values, it is reported as 'elevated' even though it would be considered insignificant."

> DDI's ALLEGATION: Dr. Barrett's statement that plaintiff's report indicates elevated levels of heavy metals for provoked testing is false. Dr. Barrett's statement that plaintiff uses its urine toxic metals test to trick or defraud patients is false.

**DEFENDANTS' ARGUMENT:** This alleged statement is not actionable at least because it is true. Initially, Defendants respectfully submit that alleging that this statement is false because it states that DDI's report uses the term "elevated" for reference ranges, is disingenuous. Clearly, DDI's report form includes such a designation.

DDI's claim to have been defamed by this statement alleging that it "uses its urine toxic metals test to trick or defraud patents" is factually baseless. Nowhere in Exhibit A to the Third

Amended Complaint, the article referenced in the statement here, is DDI accused of tricking or defrauding patients. Further, nowhere in the present statement, (ff) quote above, is DDI accused of tricking or defrauding patients. DDI's claim of defamation by these statements is frivolous.

**Alleged Statement (hh):**

> "Doctor's Data, Inc. (DDI), a laboratory whose hair and urine tests have been used for decades to mislead consumers, is finally getting the negative attention it deserves. Since 2008, four lawsuits by aggrieved patients have included DDI as a co-defendant."

> DDI's ALLEGATION: These statements accuse plaintiff of conspiring to defraud patients and are false. Plaintiff does not use the test to defraud patients.

**DEFENDANTS' ARGUMENT:** Dr. Barrett's statement is not actionable with regards to the statement of DDI's tests being used to "mislead customers" because it is true. Exhibit A to the Third Amended Complaint chronicles many administrative findings against practitioners for wrongful treatment of patients justified by DDI's test reports. In addition, this statement is true that four lawsuits had been filed naming DDI as a co-defendant.

In addition, DDI's accusation that this statement accuses it of "conspiring to defraud patients" is baseless and frivolous. Given the truth of the administrative actions against practitioners misusing test results, and given the truth of the filing of four lawsuits including DDI as a co-defendant, there is no reasonable construction of this statement that DDI is accused of "conspiring to defraud patients." "Practitioners" are accused of misleading patients, and DDI is not a practitioner. DDI has been sued, but the statement does not state that it was for "conspiracy to defraud."

Still further, the publication of the existence and nature of the four lawsuits is not actionable under the fair reporting privilege.

23

**Alleged Statement (kk):**

"The sample report on DDI's Web site includes three pages of measurements and three pages of clinically useless biochemical tidbits, diagnostic speculations, pseudoscientific blather, and recommendations for further testing. Unfortunately for patients, amino acid analysis of urine does not provide basic information about the individual's general health, metabolism, nutrient status, or dietary adequacy, and the supplement recommendations lack a rational basis. It is not possible, for example, to figure out what people eat by looking at what they excrete. And finding a substance does not mean that it came from a single source or metabolic pathway."

DDI's ALLEGATION: These statements disparage the quality of plaintiffs testing and are false.

**DEFENDANTS' ARGUMENT:** This statement is not actionable at least as non-actionable opinion. Whether the document contains valuable information or "useless biochemical tidbits," scientific fact or "pseudoscientific blather" is clearly an expression of opinion that is not stating a fact capable of being proven true or false. The statement is also not actionable at least in that the description of the "sample report" on DDI's website is mere hyperbole.

Further, Dr. Barrett expresses his opinion regarding the medical field of urine analysis, something that a medical doctor should be allowed to do under free speech.

Dr. Barrett's evaluation of the sample report is a clear criticism. Defendants respectfully assert that it falls far short of an actionable provably false statement.

**Alleged Statement (ll):**

"Tests done after administering a 'metal detoxification' (chelating) agent are called 'provoked' tests and are bogus. So is the concept of 'hidden body stores.' Many people have harmless amounts of lead or mercury in their body. Provoked urine testing forces them to be excreted over a short period of time, which raises urine levels artificially and temporarily. The standard way to measure urinary mercury and lead levels is by collecting a non-provoked urine sample over a 24-hour period. Because most of the extra excretion takes place within a few hours after the chelating agent is administered, using a shorter collection period will yield a higher concentration. DDI's reports compare the artificially raise values to reference range that it says represents a healthy population under nonprovoked conditions. As a result many of its

reports say that the patient's level is 'elevated' or 'very elevated' when no problem exists. Practitioners use this deceptive presentation to frighten patients into undergoing chelation therapy. Several state licensing boards have disciplined practitioners for using provoked testing, and at least three lawsuits by victims are under way."

DDI's ALLEGATION: These statements accuse plaintiff of conspiring to defraud patients and are false. The statement that the report states that the level is "elevated" is false because plaintiff does not classify a provoked test with any reference range classification and plaintiffs report plainly states that no reference range for provoked testing exists. The statement with respect to the "shorter collection period" is false because it implies that plaintiff is artificially manipulating test results, but plaintiff does not manipulate test results in any manner.

**DEFENDANTS' ARGUMENT:** This statement is not actionable at least because it is true as to what DDI's report does. That report form does, in fact, compare the artificially raised metal levels after provocation to the reference range applicable to non-provoked specimens.

Dr. Barrett's statement is not of or concerning DDI as to DDI's baseless assertions that the article accuses it of "conspiring to defraud patients" and implying that DDI is "artificially manipulating test results." DDI does not specifically cite anywhere that specifically makes those allegations, nor could it. The statement clearly identifies that "practitioners use this deceptive presentation to frighten patients," and DDI is not a practitioner.

DDI's assertion of defamation from "manipulating test results" is contrary to the rule in this case. At the October 2, 2013, hearing it was definitively established that DDI made no claim that and Defendant questioned the accuracy of DDI's testing. DDI itself stated: "There's never been any question as to any part of the libel that we have cited that deals with the accuracy of the measurements, accuracy of the numbers." (Ex. 12 at p. 8.) It is frivolous for DDI to now assert defamation based on an allegation about the accuracy of its tests.

Finally, Defendants assert that the allegation of falsity based on the "no reference range" fiction is baseless.

25

**Alleged Statement (qq):**

"Dr. Barrett sued. Doctor's Data, a lab that performs tests for many chelation therapists, has sued Dr. Stephen Barrett. (Barrett S., <u>Why Doctor's Data is trying to muzzle me,</u> Quackwatch (7/2010)). The suit is primarily concerned about Barrett's article, '<u>How the urine toxic metals test is used to defraud patients</u>,' which describes how chelationists mislead patients into believing that they need treatment for heavy metal toxicity. The heart of the deception is 'provoked' testing, in which the practitioner administers a chelating agent before the urine specimen is obtained. This artificially raises the levels of lead, mercury, and/or other heavy metals in the urine. The test report states that its 'reference values' are for non-provoked specimens. However, if a provoked test level exceeds the reference valuesâ€" *[sic]* which it usually doesâ€" it *[sic]* is reported as 'elevated,' even though it should not be considered significant. Dr. Barrett's article also tabulates disciplinary actions, court decisions, and lawsuits related to provoked testing. Doctor's Data is asking for damages exceeding $10 million and a sweeping injunction against further criticism. Although it is unlikely to prevail, defending against the lawsuit could be costly. Contributions to Barrett's defense fund can be made through the <u>Quackwatch donations page</u>."

DDI's ALLEGATION: These statements accuse plaintiff of conspiring to defraud patients and are false. Plaintiff does not use the test to deceive patients, and plaintiff does not have reference ranges for provoked testing and its reports plainly state so.

**DEFENDANTS' ARGUMENT:** This alleged statement is not actionable at least because it is true. Although DDI alleges that the statement "accuse plaintiff of conspiring to defraud," it does not specify where it finds such an allegation. The statement clearly states that the referenced article is about "how chelationists mislead patients" and how "the practitioner administers the chelating agent." The actions are by the chelationists, not DDI. Dr. Barrett's description of the test report is entirely accurate, and nowhere does Dr. Barrett allege that DDI conspires with the chelationists. Dr. Barrett correctly states that the chelationists use DDI's test report and correctly state the contents of that report. Under the innocent construction rule, it is more likely that this statement would be read that DDI was not a party to the deception, but rather that its report was misused in some way. Therefore, there is no actionable falsity or defamation.

Apparently, DDI alleges falsity of Dr. Barrett's description of the report based on its "no reference range" fiction. This is a baseless assertion.

### d. Statements Under the Innocent Construction Rule

To the extent that the statement can naturally be read as innocent or as defamatory, the tie

goes to the speaker in the interest of protecting First Amendment expression. See *Muzikowski v.*

*Paramount Pictures*, 477 F.3d 899, 904 (7th Cir. 2007); *Anderson v. Vanden Dorpel*, 172 Ill. 2d

399, 412-13 (1996). Thus, the American Career College entry, standing alone, cannot be the

basis for defamation because it may be construed as targeting other persons. *Pitale v. Holestine*,

2012 U.S. Dist. LEXIS 24631, **9-10, 2012 WL 638755 (N.D. Ill. Feb. 27, 2012). The innocent

construction rule applies in this case.

**Alleged Statement (d):**

> "Neither Mayo Clinic nor any other legitimate national laboratory, has reference ranges for 'provoked' specimens. Further, the reference ranges for normal urine heavy metal levels used by Mayo Clinic and the largest national reference lab, Quest Diagnostics, are the same. [¶] In contrast, Doctor's Data uses reference values of less than 3 μg/g for mercury and 5 μg/g for lead."

> DDI's ALLEGATION: Dr. Barrett's statement is false because plaintiff does not have reference ranges for provoked specimens and plaintiffs report plainly states that no reference range for provoked testing exists; Dr. Barrett's statement is false also because plaintiff is a legitimate laboratory, not an illegitimate laboratory.

**DEFENDANTS' ARGUMENT:** This statement is not actionable at least because it falls under

the innocent construction rule. In addition, this alleged statement is quoted out of context and

does not accuse DDI of being an illegitimate laboratory. In context, this is a concatenation of

two paragraphs. The first paragraph, quoted in full, accurately states that no "legitimate"

laboratory has reference ranges for provoked [urine] specimens." In the next paragraph, Dr.

Barrett specifically notes that DDI does not use reference ranges for "non-provoked" specimens.

Therefore, it is frivolous for DDI to claim that Dr. Barrett accused it of being "illegitimate" for

having "provoked" reference ranges, when Dr. Barrett actually states that they do not. In

context, the two paragraphs read as follows:

> Neither Mayo Clinic nor any other legitimate national laboratory, has reference ranges for 'provoked' specimens. Further, the reference ranges for normal urine heavy metal levels used by Mayo Clinic and the largest national reference lab, Quest Diagnostics, are the same.
>
> In contrast, Doctor's Data uses reference values of less than 3 µg/g for mercury and 5 µg/g for lead. Standard laboratories that process non-provoked samples use much higher reference ranges [3,4], which means that if all other things were equal, Doctor's Data is far more likely than standard labs to report "elevated" levels. But that's not all. A disclaimer at the bottom of the above lab report states – in boldfaced type! – that "**reference ranges are representative of a healthy population under non-challenged or nonprovoked conditions.**" In other words, they should **not** be applied to specimens that were obtained after provocation.

(Ex. 3.1 at p. 2 (emphasis in original).)

Finally, Defendants argue that this statement is not false under DDI's "no reference range" fiction, which is discussed *supra*. A mere glance at the report form will show that reference range information comprises the majority of the page, and Dr. Barrett accurately quotes that information. DDI quoting this statement out of context and claiming to have been damaged by its publication is a frivolous claim.

**e. Statements Not Concerning DDI**

"Defamation is the publication of any statement that "tends to cause such harm to the reputation of another that it lowers that person in the eyes of the community or deters third persons from associating with [him]." *Seith v. Chicago Sun-Times, Inc.*, 371 Ill. App. 3d 124, 134 (1st Dist. 2007) (quoting *Bryson v. News America Publications, Inc.*, 174 Ill.2d 77, 87 (1996).) To prove a defamation claim, the evidence must show that a defendant made a false statement **concerning the plaintiff**, that there was an unprivileged publication of the defamatory statement to a third party by the defendant, and that the plaintiff suffered damages as a result. *Seith*, 371 Ill. App. 3d at 134; *Madison v. Frazier*, 539 F.3d 646, 652-653 (7th Cir. 2008)

(emphasis added). One of the required elements is that the statements at issue must concern the plaintiff.

The following alleged statements are alleged to be false under DDI's "no reference range" fiction, and other allegations that are also discussed below and shown to be not actionable:

**Alleged Statement (a):**

> "How the 'Urine Toxic Metals' Test Is Used to Defraud Patients."

> DDI's ALLEGATION: Dr. Barrett's statement is false because plaintiff does not use the urine toxic metals test to defraud patients. Dr. Barrett's statement also is false because plaintiff does not do any of the things plaintiff is accused of doing in the text of Exhibit A that are listed hereunder and are incorporated as though fully set forth herein.

**DEFENDANTS' ARGUMENT:** Dr. Barrett's statement – the title of an article he published – is not actionable because it neither mentions nor concerns DDI. The article that follows this title does not accuse DDI of defrauding patients. Portions of the article describe how named practitioners have used the test report to justify unnecessary treatment and the judicial and agency actions taken against those individuals. Nowhere in the article is DDI alleged to be a knowing part of any fraud, only those who use DDI's test report. In its allegation of falsity, DDI asserts: "Dr. Barrett's statement is false because plaintiff [DDI] does not use the urine toxic metals test to defraud patients." Defendants respectfully argue that not only does the alleged statement not accuse DDI of engaging in fraud, fraud is not alleged against DDI anywhere in the article itself. Accordingly, the accusation by DDI that it is defamed and damages by an accusation of fraud from this statement is frivolous.

**Alleged Statement (b):**

> "Many patients are falsely told that their body has dangerously high levels of lead, mercury, or other heavy metals and should be detoxified. This article explains how a urine test is used to defraud patients."

29

DDI's ALLEGATION: Dr. Barrett's statement is false because plaintiff does not tell or falsely tell patients their bodies have dangerously high levels of lead, mercury, or other heavy metals; false because plaintiff does not tell or falsely tell patients they should be detoxified; and false because plaintiff does not use a urine test to defraud patients.

**DEFENDANTS' ARGUMENT:** This statement is not actionable at least because it is not concerning DDI. In context, the article is about how practitioners use DDI's provoked test report to defraud their patients. Nowhere in the article is DDI accused of being a participant in the fraud.

**Alleged Statement (dd):**

"The test report, which typically states that the reported levels are elevated, is then used to claim that the child needs to be 'detoxified' with chelation therapy [6]"

DDI's ALLEGATION: Dr. Barrett's statement that plaintiffs report indicates elevated levels of heavy metals for provoked testing is false; Dr. Barrett's statement that plaintiff claims the test subject needs to be detoxified with chelation therapy is false.

**DEFENDANTS' ARGUMENT:** This statement is not of or concerning DDI. The alleged statement is taken out of context. In context, the subject of the article is CARE Clinics, and is part of a discussion of the practices of CARE Clinics, specifically its "Biomarkers" evaluation. In context, the article states:

> ***All patients [of CARE Clinics] underwent a provoked "urine toxic metals test" in which a urine sample is obtained after the patient receives a chelating agent. The chelating agent temporarily increases the excretion of mercury, lead, and/or other metallic substances that are present in trace amounts within the body.*** The test report, which typically states that the reported levels are elevated, is then used ***[by Care Clinics]*** to claim that the child needs to be "detoxified" with chelation therapy.

(Ex. 3.5 at p. 2 (additional text in bold italics).)

30

Further, DDI is only one of three labs noted as processing CARE Clinic's tests, stated without even criticism as follows: "The labs processing CARE's test included Doctors Data, Genovation, and The Great Plains Laboratory." (Ex. 3.5 at p. 2.)

A plain reading of the publication would indicate to anyone doing due diligence that the statements were misquoted and misrepresented. Defendants respectfully submit that the blatant mis-quoting of the statements above is evidence of the frivolousness of this case.

**Alleged Statement (ii):**

> "DDI's tests include several types of hair and urine tests that provide little or no medically useful information about the patient but serve as marketing tools for the practitioners who order them."

> DDI's ALLEGATION: These statements accuse plaintiff of conspiring to defraud patients and are false.

**DEFENDANTS' ARGUMENT:** DDI's accusation that this statement accuses it of "conspiring to defraud patients" is baseless and frivolous. Although DDI's tests are mentioned, the subject of the statement is the "practitioners" who use those tests as "marketing tools." There is no reasonable construction that DDI is accused of "conspiring to defraud patients."

**Alleged Statement (jj):**

> "The company's Web site states that neither test should be considered a stand-alone diagnostic but should be 'used in conjunction with patient symptoms and other laboratory tests.' As far as I can tell, however, practitioners who order these tests use them to justify the use of the products and services they recommend. The test reports include several pages of biochemical tidbits and speculations that practitioners can interpret for patients. Chiropractors, 'nutrition consultants,' naturopaths, and other offbeat practitioners use the nutrient-related test results as the basis for prescribing dietary supplements, and practitioners who offer chelation therapy or other 'detoxification' methods use the 'toxic element' levels to persuade people to be 'detoxified'."

> DDI's ALLEGATION: These statements accuse plaintiff of conspiring to defraud patients and are false. Plaintiff's report clearly indicates that the test should not be the sole basis of the diagnosis.

31

**DEFENDANTS' ARGUMENT:** DDI's accusation that this statement accuses it of "conspiring to defraud patients" is baseless and frivolous. There is no reasonable construction that DDI is accused of "conspiring to defraud patients."

## II. Summary Judgment is Appropriate Because DDI Cannot Prove All Elements of the Causes of Action

In addition to the arguments above that every alleged false or defamatory statement is not actionable for multiple reasons, Defendants also respectfully submit that DDI cannot prove any of its alleged causes of actions because one or more element of each action is unprovable or contrary to all evidence in the record, or admitted by DDI.

A fundamental element not provable in DDI's causes of action is damages. There is no credible evidence that DDI has suffered any damage attributable to any action of the Defendants. Moreover, as argued in more detail below, most of the alleged causes of action require proof of specific damages attributed to particular defendants. DDI's own damages expert fails to find any specific damages, as noted below.

### A. DDI Cannot Prove Damages

Because the lack of provable damages is central to all alleged causes of action, except defamation *per se*, Defendants discuss that issue separately here in order to save repetition in the discussions of the flaws in the individual causes of action.

DDI's damages expert, Mr. Grabowski, found millions of dollars in damages, all from the publication of the article identified as Exhibit A to DDI's Third Amended Complaint – none of the other alleged publications were mentioned. In his expert opinion, Mr. Grabowski states:

> Based on my analyses ... DDI's elemental testing business unit ('Elemental Testing") was economically harmed in and around the first quarter of 2009 as a result of certain actions (as set forth below) of Dr. Barrett and QuackWatch."

(Ex. 4 at p. 1.) Mr. Grabowski sets forth the "certain actions" that caused the harm as the publication of the first article only, stating as follows:

> In February 2009, Dr. Barrett, by and through Quackwatch, authored and posted an article titled "How the 'Urine Toxic Metals' Test Is Used to Defraud Patients" (the "Article").
>
>       * * *
>
> DDI asserts that the Article was intended to harm and caused damage to DDI's business by causing clients to reject having DDI analyze their samples. Additionally, DDI asserts that the Article postings on the internet have disrupted and will continue to disrupt the ability of Doctor's Data to conduct business as a result of internet search engines automatically discovering the alleged false reports against DDI. Ultimately, DDI claims that the actions of Dr. Barrett and QuackWatch have caused harm in the form of damage and injury to its business, reputation, and good will, and that DDI has sustained and will continue to sustain loss of revenues, profits, and market share. Therefore DDI is seeking a retraction of the article defaming DDI's reputation, and compensation as a result of lost profits related to the actions of Dr. Barrett by and through QuackWatch.

(Ex. 4 at p. 5.) Ultimately Mr. Grabowski determined the amount of damages allegedly suffered by DDI from the publication of the one article, stating:

> Based on the financial data provided, analyses of economic and industry data, and other analyses, facts, and data, DDI's Elemental Testing business unit was economically harmed in and around the first quarter of 2009 and continues to be harmed.

(Ex. 4 at p. 25.) Mr. Grabowski found damages between $8.3 and $10.4 million for the publication of the one article in 2009. No other article or publication was investigated. No specific statements were analyzed for special damages. No specific damages were ascribed to any individual tort or to the trademark dilution claims. No cause of action was specified, other than the broad sweeping description of DDI's claims, and the baseless assertion that the publication was "intended to harm and cause damage."

Defendant NCAHF was not named or discussed at all. All damages were assigned to Dr. Barrett and long-dissolved Quackwatch.

A fair reading of Mr. Grabowski's opinion is that all damages were caused by the publication of Dr. Barrett's one article in February 2009. No other damages are attributed to the defamation from the publication of any other article, the acts of contract and potential business interference, or to trademark dilution.

## B.    DDI Cannot Prove Defamation *Per Se*

Defendants' initial argument that DDI cannot prove Defamation *per se* is that none of the alleged statements are actionable, for the reasons argued *supra*. Under Illinois law, a statement is defamatory *per se* if it is "so obviously and naturally harmful to the person to whom it refers that a showing of special damages is unnecessary. *Owen v. Carr*, 113 Ill. 2d 273, 277 (1986). "In Illinois there are five categories of statements that are defamatory *per se*: (1) statements imputing the commission of a crime; (2) statements imputing infection with a loathsome communicable disease; (3) statements imputing an inability to perform or want of integrity in performing employment duties; (4) statements imputing a lack of ability or that otherwise prejudice a person in his or her profession or business; and (5) statements imputing adultery or fornication." *Tuite v. Corbitt*, 224 Ill. 2d 490, 501-02 (2006).

In the present case, the only arguable basis for defamation *per se* are under sections (1) or (4), above: "statements imputing the commission of a crime" or "statements imputing a lack of ability or that otherwise prejudice a person in his or her profession or business."

A recent summary of the applicable law is as follows:

> Even if a statement falls into one of the recognized categories of words that are actionable per se, it will not be found actionable per se if it is reasonably capable of an innocent construction." *Bryson v. News Am. Publications, Inc.*, 174 Ill. 2d 77, 672 N.E.2d 1207,

34

> 1215, 220 Ill. Dec. 195 (Ill. 1996). "The innocent construction rule
> requires courts to consider a written or oral statement in context,
> giving the words, and their implications, their natural and obvious
> meaning." *Id.* "If, so construed, a statement may reasonably be
> innocently interpreted or reasonably be interpreted as referring to
> someone other than the plaintiff, it cannot be actionable per se."
> *Id.* [editing marks omitted]. "The rigorous standard of the
> modified innocent construction rule favors defendants in per se
> actions in that a nondefamatory interpretation must be adopted if it
> is reasonable. The tougher standard is warranted because of the
> presumption of damages in per se actions." *Anderson v. Vanden
> Dorpel,* 172 Ill. 2d 399, 667 N.E.2d 1296, 1302, 217 Ill. Dec. 720
> (Ill. 1996). "In Illinois courts, this determination is made by the
> judge and it is regarded as a question of law." *Muzikowski v.
> Paramount Pictures Corp.*, 322 F.3d 918, 924 (7th Cir. 2003).

*All Star Championship Racing, Inc. v. O'Reilly Auto. Stores, Inc.,* 940 F. Supp. 2d 850, 873-874
(C.D. Ill. 2013).

The closest Defendants come to alleging a crime is the use of the work "fraud" in two

statements, discussed as follows:

First, in Alleged Statement (a): "How the 'Urine Toxic Metals' Test is Used to Defraud

Patients." (Ex. 3.1.) This is the title of an extensive article about the test report and how certain

practitioners have been found to have misused the test report form to justify unnecessary medical

treatment. It includes commentary accurately describing the test report form and cites to

administrative actions taken against some practitioners and civil actions brought by victims.

Second, in Alleged Statement (l) [repeated as (xx)]: "The provoked urine toxic metals

test is a fraud." (Ex. 3.2.) This is on a webpage and the entire statement underlined to designate it

as a hyperlink to the article alleged as Third Amended Complaint, Exhibit A.

Both statements above track back to the original article, Exhibit A to the Complaint.

Under a fair reading of either of these statements in context of the article, it is a reasonable

construction that the article is about how practitioners, not DDI, have misled patients by using

35

the report form.  Fraud is mentioned in the article, Exhibit A, in relation to DDI only once, and only then in the fair reporting of the filing of a civil suit.  Even in that report, Dr. Barrett did not single out DDI in an accusatory manner, stating simply:  "In 2009, 43-year-old Ronald Stemp sued Caquias [the practitioner], CARE Clinics, the clinic's owner, and Doctor's Data for fraud, negligence, and conspiracy."

Dr. Barrett was accurately reporting on allegations made by Stemp.  Further, calling a test a "fraud" is mere hyperbole.  A test cannot commit the crime of fraud.  As a matter of law, the innocent construction of these statements is that DDI was not specified by Dr. Barrett as the actor of a crime.  In context, the title of the article, Dr. Barrett summarily expressed his opinion criticizing the misuse of the test report with hyperbole.

### C.    DDI Cannot Prove Defamation *Per Quod*

Defendants' initial argument that DDI cannot prove Defamation *per quod* is that none of the alleged statements are actionable, for the reasons argued *supra*.  Statements are considered defamatory *per quod* if the defamation character of the statements is not apparent on its face, and extrinsic facts are required to explain the defamatory meaning.  *Anderson v. Dorpel*, 172 Ill. 2d 399, 416 (1996).

DDI has not pled or put forward credible evidence of special damages from its alleged defamation *per quod*, as is required by law.  A *per quod* action requires allegations of extrinsic facts showing the defamatory nature of the language, as well as allegations of specific facts establishing the plaintiff's special damages.  *Anderson*, 172 Ill. 2d at 416; *Muzikowski*, 322 F.3d at 927 ("[Plaintiff] did not itemize his losses or plead specific damages of actual financial injury. This is a required element of a *per quod* claim.")

36

DDI makes no distinction between statements alleged as defamation *per se* and those alleged as defamation *per quod*. Apparently, all allegations of defamation *per se* are also alleged as *per quod*. Moreover, DDI fails to allege any extrinsic facts showing the defamatory nature of the language. No credible evidence has been associated to any particular statement that could be understood to be an extrinsic fact. Finally, there is no evidence of special damages for any alleged statement.

All damages in DDI's expert report from Mr. Grabowski have been lumped together. His analysis assumed that Dr. Barrett's February 2009 article, Exhibit A to the Complaint, was solely responsible for what he claimed was a decreased rate of income to DDI after the article was published. Mr. Grabowski did not identify any particular alleged statements as having caused specific damages. Without any extrinsic proof of defamation and without any proof of damages, alleging defamation *per quod* is frivolous.

### D.  DDI Cannot Prove Intentional Interference with Existing Contracts

A plaintiff can recover for interference with existing contractual rights by proving: (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages. *Int'l Mktg., Ltd. v. Archer-Daniels-Midland Co.*, 192 F.3d 724, 731 (7th Cir. 1999) (cited by the Court in this case in its Memorandum Opinion and Order on Defendants' Motion to Dismiss (Nov. 22, 2011) [Doc. # 85, p. 21]).)

DDI admitted in discovery that it had no existing contracts that were breach by any action of the Defendants.

> Q.  Okay.  Are there any cancelled contracts, actual contracts that were cancelled, that are claimed as damages in this case?

A. I don't believe so.

Q. So is it your testimony now that there are no contracts that are claimed as damages?

[Objection]

A. I know of none.

(Ex. 14 at pp. 54-55.)

There were no contracts at all. Therefore there could be no damages from Defendants' alleged intentional interference.

None of the elements of this claim existed at the time DDI alleged it, and none have surfaced during discovery. This cause of action was factually baseless and frivolous *ab initio*. Plaintiff must have known at the time this case was filed that it had no existing contracts that were interfered with, because it must have known that it had no contracts whatsoever.

### E.    DDI Cannot Prove Intentional Interference with Prospective Business Advantages

For tortious interference with a prospective business relationship under Illinois law, a plaintiff must allege and prove: (1) [its] reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference. *BlueStar Mgmt. LLC v. Annex Club, LLC,* 2010 U.S. Dist. LEXIS 71156, **22-23, 2010 WL 2802213 (N.D. Ill. July 12, 2010).

A person is not liable for a claim of interference with prospective business advantage if he gives truthful information, without employing a wrongful means or is not motivated solely by malice or ill will. "[A] defendant who 'has not employed a wrongful means or is not motivated

38

solely by malice or ill will' but 'merely give truthful information to another,' is not liable for tortious interference with a prospective business advantage under Illinois common law." *McDavid Knee Guard, Inc. v. Stirling Mouldings Limited*, 2010 U.S. App. LEXIS 21088, **16-17, 2010 WL 30000178, *6 (Fed. Cir. 2010). The *McDavid Knee Guard* Court found that the representations in question were not false statements of fact, but rather opinions.

Under Illinois law, a party's interest in prospective economic advantage receives less protection than its enforceable rights. As held by the 7th Circuit Court of Appeals:

> An individual with a prospective business relationship has a mere expectancy of future economic gain; a party to a contract has a certain and enforceable expectation of receiving the benefits of the contract. When a business relationship affords the parties no enforceable expectations, but only the hope of ... benefits, the parties must allow for the rights of others. They therefore have no cause of action against a bona fide competitor unless the circumstances indicate unfair competition, that is, and unprivileged interference with prospective advantage.

*A-Abart Electric Supply, Inc. v. Emerson Electric Co.*, 956 F.2d 1399, 1404-04 (7th Cir. 1992).

In discovery, DDI admitted that it had a mere hope that people would use its services.

Q. Do you know of any prospective contracts specifically that were breached as a result of your alleged wrongful conduct by the defendant?
\* \* \*
A. I mentioned Tenscher.
\* \* \*
Q. So did he [Tenscher] tell you he would have brought you – brought you additional business and he wouldn't now because her read Dr. Barrett's work?

A. I did not discuss that with him. He merely wrote the Department of Justice in Oregon. We had to respond to them.

Q. So how do you know that he would have brought any additional work to you?

A. In my experience, as s clinic begins to do business with us, most of them over time end up doing significant additional work with us. **Not all, but most.**

Q. **So you hoped he would do work with you?**

A. **That's correct.**

Q. Is there any -- any document evidencing his intent to do work with you in the future?

A. No, sir.

(Ex. 14 at pp. 79-81.)

In addition to no reasonable expectancy, mere hopefulness, no damages have been specifically attributed to the actions of Defendants.

Finally, as argued above, nothing published by Defendants was not true or substantially true, or non-actionable opinion, and there is no evidence that any publication was directed to the potential clients of DDI, the practitioners. This cause of action was factually baseless and frivolous *ab initio*.

**F.     DDI Cannot Prove Violation of the Lanham Act**

To prove a dilution claim under the Lanham Act, 15 U.S.C.A. § 1125(c) (or amended Section 43(c) of the Lanham Act), a plaintiff must provide sufficient evidence that: 1) the mark is famous; 2) the alleged infringer adopted the mark after the mark became famous; 3) the infringer is likely to cause dilution; and 4) the defendant's use is commercial and in commerce. *Top Tobacco, L.P. v. Midwestern Cash and Carry, LLC, et. al.,* 2014 U.S. Dist. LEXIS 7598, *29, 2014 WL 243431 (N.D. Ill. Jan. 22, 2014) (citing S*yndicate Sales, Inc. v. Hampshire Paper Corp,* 192 F.3d 633, 639 (7th Cir. 1999).

**1.  Plaintiff's Trademarks are not "Famous" Pursuant to the Lanham Act**

The purpose of the anti-dilution statute is to protect owners of <u>famous</u> marks "from the erosion of the distinctiveness and prestige of a trademark caused by the sale of other goods or

services under the same name." *Sullivan v. CBS Corp.*, 2002 U.S. Dist. LEXIS 6625, *34, 2002 WL 554506 (N.D. Ill. 2002).

Under the Lanham Act: [A] mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner. In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors, including the following:

    (i)      The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties;

    (ii)     The amount, volume, and geographic extent of sales of goods or services offered under the mark;

    (iii)    The extent of actual recognition of the mark; and

    (iv)    Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C.A. § 1125(c)(2)(A).

The standard for "famous" is "rigorous," as the District Court for the Northern District of Illinois noted when citing an earlier case that required the mark to be a "household name." *Top Tobacco, L.P. v. N. Atl. Operating Co.*, 2007 U.S. Dist. LEXIS 2838, 2007 WL 118527 (N.D. Ill. Jan. 4, 2007) (citing *Thane Intern., Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 911 (9th Cir. Cal. 2002) ("[T]he mark must be a household name . . . [F]amousness is . . . a hard standard to achieve.") and *Everest Capital Ltd. v. Everest Funds Management, LLC*, 393 F.3d 755, 763 (8th Cir. 2005) ("The judicial consensus is that 'famous' is a rigorous standard."). Defendants respectfully argue that there is nothing in the record supporting a finding that DDI is a famous mark.

### 2. Defendants' use of the Plaintiff's Trademarks caused no Dilution of the Marks

DDI's expert report from Mr. Grabowski attributes no damages caused by dilution of any of DDI's claimed trademarks.

### 3. Defendants' use of the Plaintiff's Trademarks was "Fair Use"

Defendants' use of Plaintiff's trademarks was clearly "fair use" pursuant to the following "Exclusions" in the Lanham Act, § 1125(c)(3):

(1) Use of the mark in connection with "criticizing" "the famous mark owner or the goods or services of the famous mark owner" (§ 1125(c)(3)(A)(i));

(2) Use of the mark in connection with "commenting upon the famous mark owner or the goods or services of the famous mark owner" (§ 1125(c)(3)(A)(ii)); and

(3) Use of the mark in connection with "news reporting and news commentary" § 1125(c)(3)(B)).

Even assuming for argument that any of DDI's marks were "famous," which Defendants emphatically deny, all comments published by Dr. Barrett were directed to criticism of DDI's report form format and reporting of news of lawsuits and administrative actions against those who misuse the report form ambiguity to justify unnecessary medical treatment. Moreover, based on the legal actions and the obvious inherent ambiguity in the report form, Dr. Barrett opined on the legal actions and the need for more actions to avoid further harm.

Clearly Dr. Barrett in his writing was "criticizing" the goods of DDI in criticizing the report form format for reporting results of DDI's provoked urine toxic metals tests. Dr. Barrett's criticism of the form is the center of this litigation. These "criticisms" are excluded pursuant to Lanham Act, § 1125(c)(3)(A)(i).

To the extent that DDI is mentioned in the publications, it is as the owner of the mark associated with the "goods or services" of how it reports the results of provoked urine metal testing. These comments are excluded pursuant to Lanham Act, § 1125(c)(3)(A)(ii).

In each alleged publication, Dr. Barrett reports on legal actions taken based on use of the DDI report form, and comments on how the report form is used by practitioners to justify unnecessary medical treatment. These news reports and commentary are excluded pursuant to Lanham Act, § 1125(c)(3)(B).

There is no credible evidence that any of Dr. Barrett's writings are anything but "criticism" "commentary" and "news reporting and commentary" on harms from DDI's report form, its "goods or services." All of the writings are clearly excluded from the Lanham Act by Defendants' fair use of the trademarks.

### G. DDI Cannot Prove Violation of the Illinois Trademark Registration and Protection Act Dilution Claim

Defendants herein re-assert its arguments from the Lanham Act discussion *supra*, to argue that DDI has no cause of action under the Illinois Trademark Registration and Protection Act.

### H. DDI Cannot Prove Conspiracy

As argued above, DDI cannot prove any of its torts. Therefore, DDI cannot prove conspiracy to do those torts. There are additional flaws in DDI's conspiracy allegations.

> In Illinois, a civil conspiracy is defined as "'a combination of two or more persons for the purpose of accomplishing by concerted action either an unlawful purpose or a lawful purpose by unlawful means.'" *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 720 N.E.2d 242, 258, 241 Ill. Dec. 787 (Ill. 1999), quoting *Buckner v. Atlantic Plant Maintenance, Inc.*, 182 Ill. 2d 12, 694 N.E.2d 565, 571, 230 Ill. Dec. 596 (Ill. 1998). A plaintiff must allege facts establishing both (1) an agreement to accomplish such a goal and (2) a tortious act committed in furtherance of that

43

> agreement. *McClure*, 720 N.E.2d at 258. * * * Stated
> differently, "[t]here is no such thing as accidental, inadvertent or
> negligent participation in a conspiracy."

*Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 938-939 (7th Cir. 2012).

### 1. The Illinois Intracorporate Conspiracy Doctrine

Under the Illinois intracorporate conspiracy doctrine, a plaintiff may not establish a

"conspiracy" between a corporate entity and its own supervisor-agents.

> The intracorporate conspiracy doctrine provides that an agent
> acting within the scope of his employment cannot conspire with
> the principal or with other agents because the acts of an agent are
> considered to be the acts of the principal. *Milliman v. McHenry
> County*, 11 C 50361, 2012 U.S. Dist. LEXIS 151570, at *11-12
> (N.D. Ill. Oct. 22, 2012). Therefore, Illinois law is clear that a civil
> conspiracy does not exist between a corporations' own officers or
> employees. *Id.* There are two exceptions to the intracorporate
> conspiracy doctrine when: (1) a conspirator acts out of self-interest
> rather than in the principal's interest; or (2) the scope of the act
> goes beyond the conspirator's official duties. *Bryant v. QuiBids
> LLC*, No. No. 11-cv-1013, 2012 U.S. Dist. LEXIS 14658 (N.D. Ill.
> Feb. 3, 2012).

*Frontline Communs., Inc. v. Comcast Corp.*, 2013 U.S. Dist. LEXIS 126919, *8-9, 2013 WL

4777370 (N.D. Ill. Sept. 5, 2013).

"Because the acts of an agent are considered in law the acts of the principal, there can be

no conspiracy between a principal and an agent." *Edelman v. Hinshaw & Culbertson,* 338 Ill.

App. 3d 156, 168 (1st Dist. 2003) (citing *Buckner v. Atlantic Plant Maintenance, Inc.*, 182 Ill. 2d

12, 24 (Ill. 1998).

Defendants note that under Illinois law, "a civil conspiracy cannot exist between a

principal and his agent, but it can exist among corporations." *Knorr Brake Corp. v. Harbil, Inc.*,

738 F.2d 223, 230 (7th Cir. 1984). However, in the present case, of the two named corporations,

one of them, Quackwatch, had been dissolved years before the alleged incident, and it could not have conspired with the other corporate Defendant, NCAHF, as alleged.

At all times relevant to this case, Dr. Barrett was the Vice President of NCAHF, and absent extreme facts not alleged or supported by credible evidence, Dr. Barrett could not have conspired with NCAHF as a matter of law.

### 2. No Facts Supporting a Conspiracy Claim

The evidentiary record in this case is clear, and without credible challenge, that Dr. Barrett was contacted by individuals who were frightened by the test reports or believed that were injured by medical treatment initiated, at least in part, based on findings in DDI's provoked urine toxic metals test report.

> A ... Sometimes people have contacted me and said, "Hey, I want to know if I'm, like, toxic." I say, "Well, send me your lab work." How many people have done that, where I wound up looking at urine toxic metal tests, not just from Dr. Doctor's Data but others as well? I don't know. Maybe 20. Maybe more.

(Ex. 8 at pp. 109-110.) Similarly, he stated in the following Interrogatory Answer:

> When people contact me with concerns about provoked urine testing, I customarily speak with them and make recommendations only by phone. What takes place after that depends on what the person wants. In some cases, I ask that a copy of the test report be sent to me. In a few cases, I have asked for various medical records as well. In most cases, they merely want reassurance that they are not actually toxic. In cases where the caller is extremely worried about toxicity or health, I recommend the obvious strategy that standard urine or blood testing be done. In cases . . . where the medical care has obviously been extraordinarily improper and the cost has been very high, I commonly suggest that the person consult with an attorney who can evaluate the facts and make a determination whether legal remedies are proper. I have been particularly concerned about cases where children have been chelated for years on end despite not the slightest evidence of either toxicity or exposure.

(Ex. 13.)

45

The evidentiary record is equally clear that, at the individual's request, Dr. Barrett suggested that the people contacting him contact the relevant state and federal agencies regarding their case, and that Dr. Barrett sometimes suggested competent, knowledgeable legal counsel for the individuals to consult regarding their legal rights.

> Q. Why do you refer cases to Mr. Wilzig?
> A. Because he is a competent attorney
> Q. And you don't get any reward for it at all?
> A. Just the satisfaction of trying to do something good.

(Ex. 8 at p. 90.)

One of the suggested legal counsel was Attorney David Wilzig, who had represented Dr. Barrett personally previously, and who was known by Dr. Barrett. Attorney Wilzig independently investigated and accepted representation of two people allegedly injured by DDI. One was James Coman, whom Dr. Barrett referred to Mr. Wilzig. The other was a woman named Morschladt, with whom Dr. Barrett has never communicated. Wilzig did not file cases on behalf of everyone who contacted him at the suggestion of Dr. Barrett.

> Q. Wilzig wasn't interested in a class action?
> A. Apparently he wasn't interested. I mean, he talked about it, but at some point he became uninterested, but he didn't tell me, and so I would occasionally refer somebody and nothing would happen, obviously.

(Ex. 8 at p. 102.)

At one point, Dr. Barrett believed that Attorney Wilzig was preparing a class action lawsuit against DDI. At his deposition, he testified:

> A. I mentioned to you that Mr. Wilzig said that he was interested in a class action suit, and apparently he lost interest and he didn't tell me, so that for a period of time I sent him material that I thought was relevant.

(Ex. 8 at p. 310.) However, Mr. Wilzig testified that Dr. Barrett was mistaken:

> Q. . . . were you at the time in '09 interested in a class action suit

46

> against Doctor's Data?
> A. I have never in my entire life filed a class action suit.
> Q That is not my question. My question is were you at the time interested in bringing a class action?
> A. No.

(Ex. 9 at p. 128.) Regardless, DDI suffered no injury from the fact that a class action lawsuit was not filed against it.

Attorney Wilzig spoke with many individuals with knowledge of DDI, not as part of a conspiracy, but rather as part of his ethical obligation to represent his established clients (Coman and Morschladt) by seeking out potentially relevant information and witnesses.

> Q. So, apparently, you have told Barrett in this e-mail that you are interested in cases with a view to a potential class action?
> A. I told Barrett to tell them that I am prosecuting cases against Doctor's Data, which is true, in March 15 1st, 2011 and would be interested in investigating their case with a view to potential class action. Could they e-mail their information to me at davidwilzig.com. That is what is said. That is correct. I don't know why I put in potential class action. I have never done a class action. I was certainly gathering witnesses. That is what I was doing. And I was prosecuting cases against Doctor's Data.

(Ex. 9 at p. 204.)

The record is clear that Dr. Baratz's involvement relevant to DDI was limited to his providing his expertise to Dr. Barrett in researching his articles for accuracy, and to Mr. Wilzig as a medical expert in the Coman and Morchladt cases.

> Q. And the paragraph A says that work included scientific issues, particular witness issues, and design of strategy. Do you see that?
> A. Yes.
> Q. Is that the type of work that Dr. Baratz would provide for you?
> A. Absolutely.

(Ex. 9 at p. 61.)

Nothing in the fact record in this case indicates that Dr. Barrett did anything more than give his opinions to people who called him, suggest remedies through proper governmental

agencies, and suggest contacts for competent legal counsel. Attorney Wilzig did nothing more than his job of independently evaluating and bringing legal action on behalf of those injured, regardless of how the first contact was made. Dr. Baratz is a medical expert and merely functioned as such in fact-checking Dr. Barrett's article and in assisting Mr. Wilzig in representing his clients.

## CONCLUSION

In this Motion, Defendants have examined and argued against 85 separate allegations of false and defamatory statements applied to nine causes of action. DDI has done virtually nothing to refine or define its case against Defendants, and it has been up to Defendants to find DDI's case and rebut it. Defendants recognize the need for brevity in this motion, and also note that because of the extent of the allegations, much of their evidence, arguments, and legal analysis had to be truncated. Should this Court require more facts, evidence, or legal analysis on any point raised in this Motion, Defendants respectfully request the opportunity to further expand on those points.

WHEREFORE, Defendants respectfully request that this Court enter judgment in their favor and dismiss all actions pending against them by Plaintiff, and further request any and all such other relief as this Court deems just and reasonable in this matter.

Dated: February 19, 2014

Respectfully Submitted,

STEPHEN J. BARRETT, M.D., THE NATIONAL COUNCIL AGAINST HEALTH FRAUD, INC., AND QUACKWATCH, INC.,

Defendants,

By: /s/ Michael K. Botts

One of Their Attorneys

Local counsel:
Peter M. Katsaros, Esq. (#3122661)
Ashley L. Orler (#6297339)
Anita J. Pancholi (#6311288)
GOLAN & CHRISTIE LLP
70 W. Madison St., Ste. 1500
Chicago, Illinois 60602
(312) 263-2300

Counsel *pro hac vice*:
Michael K. Botts, Esq. (D.C. Bar #417717)
MICHAEL K. BOTTS, ATTORNEY AT LAW
1629 K Street NW, Suite 300
Washington, DC 20006
(703) 780-1295