**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DOCTOR'S DATA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 10 C 03795 |
| | ) | |
| STEPHEN J. BARRETT, M.D., NATIONAL | ) | Judge John J. Tharp, Jr. |
| COUNCIL AGAINST HEALTH FRAUD, | ) | |
| INC., and QUACKWATCH, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Doctor's Data, Inc. ("DDI"), brings a claim under § 43 of the Lanham Act, 15 U.S.C. § 1125, as well as state law claims for defamation and related torts against Stephen J. Barrett, M.D. ("Barrett"), the National Council Against Health Fraud, Inc. ("NCAHF"), and Quackwatch, Inc. ("Quackwatch"). This opinion addresses DDI's motion for partial summary judgment ("PMSJ," Dkt. 242) and the defendants' motion for summary judgment on all counts ("DMSJ," Dkt. 248).[1] For the reasons stated below, the Court denies DDI's motion for partial summary judgment, grants the defendants' motion for summary judgment in part, and denies the defendants' motion for summary judgment in part.

---

[1] In addition, the defendants have filed four *Daubert* motions to bar the testimony of DDI's experts (Dkts. 232, 233, 234, and 237), and DDI has filed its own *Daubert* motion to bar certain opinions of the defendants' expert (Dkt. 235). The Court does not now address the *Daubert* motions because ruling on the motions would not affect the Court's summary judgment rulings and because those rulings may moot various aspects of the challenged opinions and may affect the settlement posture of the case. Accordingly, the Court dismisses the pending *Daubert* motions without prejudice. The parties will have the opportunity to modify the motions, if necessary, and refile some or all of them following evaluation of the summary judgment rulings and further discussion with the Court in the status hearing to be scheduled following the issuance of this opinion.

## BACKGROUND

Pursuant to Rule 56, a court shall grant summary judgment if the moving party shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, the Court construes all genuinely disputed facts in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 378-80 (2007); *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013). The facts in this background section, and the further details that will subsequently be introduced as needed, are primarily drawn from the undisputed (or not properly disputed) facts in the parties' Local Rule 56.1 statements and responses.[2] *See generally Senske v. Sybase, Inc.*, 588 F.3d 501, 503 n.1 (7th Cir. 2009) (party must cite to evidence that directly contradicts opponent's assertions to demonstrate a genuine fact dispute); *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 237 (7th Cir. 1991) ("[T]he nonmovant in a summary judgment action may not rest on general denials or lack of knowledge . . . to contest the movant's evidence."); *Ortega v. Chi. Pub. Sch. of the Bd. of Educ.*, No. 11 C 8477, 2015 WL 4036016, at *2 (N.D. Ill. June 30, 2015) (responses that claim

---

[2] The parties' Local Rule 56.1 filings are as follows: DDI's Statement of Undisputed Material Facts ("PSOF"), Dkt. 244; Defendants' Response to PSOF ("Resp. to PSOF"), Dkt. 269, at 1-29; Defendants' Statement of Additional Undisputed Material Facts ("DSOAF"), Dkt. 269, at 29-32; Defendants' Statement of Undisputed Material Facts ("DSOF"), Dkt. 250; DDI's Response to DSOF ("Resp. to DSOF"), Dkt. 273, at 1-9; DDI's Statement of Additional Undisputed Material Facts ("PSOAF"), Dkt. 273, at 10-29; Defendants' Response to PSOAF ("Resp. to PSOAF"), Dkt. 293. DDI argues that the Court should deny the defendants' motion for summary judgment because the defendants' statement of facts does not conform with the requirements of Local Rule 56.1. *See* Resp. to DMSJ, Dkt. 274, at 6. Similarly, the defendants object to DDI's statements of facts as violating Local Rule 56.1. *See* Resp. to PSOF, Dkt. 269, at 1; Resp. to PSOAF, Dkt. 293, at 1-2. Although the parties' statements of facts are not fully compliant with Local Rule 56.1, the Court declines to deny the summary judgment motions on that basis. To the extent any portions of the statements of facts are materially non-compliant with Local Rule 56.1 (or Fed. R. Civ. P. 56), the Court will disregard those portions.

"insufficient knowledge" or otherwise "neither admit nor deny" certain statements of facts are insufficient to create a genuine dispute).

The plaintiff, DDI, is a clinical laboratory that is organized as a corporation under Nevada law and has its principal place of business in Illinois. *See* DSOF, Dkt. 250, ¶ 4; PSOAF, Dkt. 273, at 12, ¶ 12; Third Amended Complaint (the "Complaint" or "TAC"), Dkt. 224, ¶ 4.[3] DDI's business involves analyzing urine, blood, and other samples for health care practitioners. One of the tests that DDI performs is designed to assess the levels of heavy metals present in a patient's urine. For this test, physicians submit urine samples to DDI which are either "provoked" or "non-provoked"; a provoked sample is one the physician collects after administering a "chelating agent," which temporarily increases the patient's excretion of heavy metals. DDI uses the same form to report the test results for both provoked and non-provoked samples. *See* DSOF, Dkt. 250, ¶ 4; PSOAF, Dkt. 273, at 12-14, ¶¶ 12-14, 19, 23; *see also* DMSJ Mem., Dkt. 249, at 2; Resp. to DMSJ, Dkt. 274, at 3. *See generally* Ex. 56 to DSOF, Dkt. 273-59 at 2-3 (explaining the effects of chelation on metal levels in urine). The form reports the heavy metal levels in the patient's urine, lists "reference ranges" of typical heavy metal levels in non-provoked samples, and graphically classifies each of the patient's levels as "within reference range," "elevated," or "very elevated" based on those non-provoked reference ranges. *See* Pl.'s DMSJ Ex. 11, Dkt. 273-21 (blank DDI report form); Ex. 11 to PSOF, Dkt. 244-11 (DDI report form with sample entries); Ex. 3.15 to DSOF, Dkt. 250-16, at 2 (article displaying a DDI report

---

[3] Pincite citations for court documents cited in this opinion generally refer to the documents' internal pagination or paragraph numbering; where such information is not clearly provided, the pincites refer to the CM/ECF page numbers.

form for a patient's provoked sample); *see also* PSOAF, Dkt. 273, at 13-14, ¶¶ 21-22; PMSJ Mem., Dkt. 243, at 6-7, 10; DMSJ Mem., Dkt. 249, at 2-3.[4]

Defendant Barrett is a retired psychiatrist who owns and operates numerous health care consumer advocacy websites, including www.quackwatch.com, www.quackwatch.org, www.ncahf.com, www.ncahf.org, www.casewatch.org, and www.autism-watch.org; he has criticized heavy metal urine testing and DDI's report form on his websites and related email listservs. *See* DSOF, Dkt. 250, ¶¶ 1, 4; DMSJ Mem., Dkt. 249, at 1; Answer to TAC, Dkt. 225, ¶¶ 9, 16, 26-28. Defendants NCAHF and Quackwatch were not-for-profit corporations that focused on health care consumer advocacy; NCAHF dissolved after the instigation of this lawsuit, while Quackwatch dissolved before the case began. NCAHF was organized under California law and headquartered in California, while Quackwatch was organized under Pennsylvania law and had its principal place of business in Pennsylvania. *See* DSOF, Dkt. 250, ¶¶ 2-3; PSOAF, Dkt. 273, at 10-12, ¶¶ 4, 7, 10; Answer to TAC, Dkt. 225, ¶¶ 10, 14. Barrett resides in, and is a citizen of, North Carolina. *See* Answer to TAC, Dkt. 225, ¶¶ 7-8.

DDI sued Barrett, NCAHF, and Quackwatch in June 2010, alleging that the defendants disseminated misleading and defamatory statements about DDI, as exemplified in seven articles included with the complaint. *See* Original Complaint, Dkt. 1. DDI eventually filed a Second Amended Complaint ("SAC," Dkt. 24) which appended the same seven articles and contained the following counts: restraint of trade, deceptive business practices, and trademark dilution under the Lanham Act (Count I); trademark dilution under the Illinois Trademark Registration and Protection Act ("ITRPA"), 765 ILCS 1036/65(a) (Count II); unfair competition under the

---

[4] Although some of the portions of DDI's statement of additional facts that are cited in this paragraph rely for support on the opinions of DDI experts who are the target of pending *Daubert* motions, the defendants do not dispute (or properly dispute) the relevant aspects of the cited factual statements.

Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2 (Count III); unfair competition under the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2 (Count IV); defamation *per se* (Count V); defamation *per quod* (Count VI); tortious interference (Count VII); fraud (Count VIII); civil conspiracy (Count IX); corporate officer and board member personal liability (Count X); and "injunctive relief" (Count XI). The defendants filed an answer to the SAC asserting affirmative defenses based on the Illinois statute of limitations for defamation actions and the doctrine of laches. *See* Answer to SAC, Dkt. 25, at 39-40. Subsequently, the defendants moved to dismiss the SAC. *See* Mtn. to Dismiss SAC, Dkt. 38.

In November 2011, Judge Chang (who was then presiding in this case) granted the defendants' motion to dismiss the SAC in part. He dismissed Count I to the extent it stated a claim for false advertising and dismissed Counts III, IV, VI, VIII and XI in their entirety. Counts II, V, VII, IX, and X survived in full, while Count I survived "solely with respect to the trademark dilution claim under § 43(c)." Mem. Op., Dkt. 85, at 26-27. Discovery on the remaining counts began in December 2011.[5] During discovery, DDI identified a number of additional publications by the defendants that allegedly contained misleading and defamatory statements about DDI. *See* DDI's First Supplemental Interrogatory Responses ("First Supp. Resp."), Dkt. 273-58; DDI's Second Supplemental Interrogatory Responses ("Second Supp. Resp."), Dkt. 294-1.[6] DDI also produced new information relating to damages, in light of which the Court granted DDI leave to file another amended complaint to reinstate a revised version of

---

[5] In June 2012, while discovery was proceeding, the case was reassigned to this Court's docket.

[6] DDI updated its interrogatory responses pursuant to an order by Judge Change which directed DDI to "supplement [its] interrogatory answers by identifying each and every allegedly defamatory statement, and doing so without incorporating by reference some other document that has statements that are not alleged to be defamatory." 5/9/12 Order, Dkt. 121.

its defamation *per quod* claim (Count VI). *See* 11/20/13 Order, Dkt. 223; *see also* Mem. Op., Dkt. 85, at 20 (dismissing Count VI for failure to plead special damages).

DDI filed the TAC in November 2013.[7] In addition to including Count VI as contemplated by the Court's order, DDI included three of the other dismissed counts (Counts III, IV, and VIII) in order to "preserve [its] appellate rights" with respect to those counts. TAC, Dkt. 224, at 22 n.18, 26 n.19, 34 n.20. As discussed in further detail below, DDI also included Count I without acknowledging the partial dismissal of that count or revising its text in light of that dismissal. *See* TAC, Dkt. 224, at 16-19. The Complaint thus purports to present active claims for violating the Lanham Act (Count I); trademark dilution under ITRPA (Count II); defamation *per se* (Count V); defamation *per quod* (Count VI); tortious interference (Count VII); civil conspiracy (Count IX); and corporate officer and board member personal liability (Count X).[8] The defendants answered the TAC in December 2013 and asserted affirmative defenses based on the statute of limitations and the doctrine of laches (as they had in their answer to the SAC). *See* Answer to TAC, Dkt. 225, at 41-42.

---

[7] Although the current Complaint discusses the same seven articles referenced in the prior complaints and states that those articles are attached as Exhibits A through G, DDI did not actually include those exhibits with its filing. The exhibits are, however, included with all three previous complaints, as well as many of the parties' summary judgment filings. For ease of reference, the Court will cite the versions of the articles included as Exhibits A through G to the Second Amended Complaint (Dkts. 24-1 through 24-7), and will refer to those articles as "Article A," "Article B," "Article C," "Article D," "Article E," "Article F," and "Article G," respectively. In addition, although DDI identified a number of additional allegedly defamatory publications during discovery, the Complaint does not include or specifically reference those newly identified publications. The parties' summary judgment filings have treated those publications as at issue in this litigation, however, and the Court will follow suit.

[8] The Court has subject matter jurisdiction of the Lanham Act claim under 28 U.S.C. § 1331 and subject matter jurisdiction of the remaining claims under 28 U.S.C. § 1332(a) and 1367(a).

6

DDI has now filed a motion for summary judgment on its defamation *per se* claim and the defendants' asserted affirmative defenses (Dkt. 242), while the defendants have moved for summary judgment on all pending claims (Dkt. 248).

## DISCUSSION

### A. Defendants' Motion for Summary Judgment—Count I (Lanham Act)

As noted above, Judge Chang's 2011 memorandum opinion in this case dismissed Count I of the SAC to the extent it stated a claim for false advertising. Mem. Op., Dkt. 85, at 14. The court began by analyzing DDI's allegations and determining that Count I appeared to assert claims based on two of the four main categories of unfair competition claims under § 43 of the Lanham Act: false advertising under § 43(a) and trademark dilution under § 43(c). Mem. Op., Dkt. 85, at 9-10. With respect to the false advertising claim, the court ruled that DDI lacked standing and could not proceed on that claim. Mem. Op., Dkt. 85, at 14. As for the trademark dilution claim, the court found that the allegations in support of the claim were "scarce" but were "sufficient to put [the defendants] on notice" of the claim, so DDI could proceed with Count I on that basis. Mem. Op., Dkt. 85, at 14-17. In summarizing its rulings, the court reiterated that "the Lanham Act claim survives solely with respect to the trademark dilution claim under § 43(c)." Mem. Op., Dkt. 85, at 27.

Despite Judge Chang's clear statements on this matter, DDI's current Complaint and summary judgment filings do not acknowledge that Count I has been limited to trademark dilution. *See, e.g.*, TAC, Dkt. 224, at 16-19 (labeling Count I as "Restraint of Trade, Deceptive Business Practices and Tradename Dilution under Lanham Act"); PSOF, Dkt. 244, ¶ 11. The defendants did not overlook the court's 2011 ruling, however, and, accordingly, their summary judgment opening brief treats Count I as presenting a claim only for trademark dilution under

§ 43(c). *See* DMSJ Mem., Dkt. 249, at 40. In its response, DDI clarifies for the first time that it is *not* claiming trademark dilution under § 43(c) of the Lanham Act, and that Count I is directed solely at false advertising under § 43(a) of the Lanham Act. *See* Resp. to DMSJ, Dkt. 274, at 94 ("DDI's third amended complaint quoted [§ 43(a)] as the basis for its claim. Inexplicably, Defendants argue summary judgment is appropriate because DDI cannot prove the elements of a violation of [§ 43(c)]. . . . DDI has not proceeded on this statutory basis . . . ."). Given the allegations of the Complaint, and Judge Chang's prior ruling, there is nothing "inexplicable" about the fact that the defendants' motion is directed at § 43(c), but putting DDI's misplaced indignation aside, the Court construes DDI's statements in its response brief as a motion to voluntarily dismiss Count I to the extent it can be read to state a trademark dilution claim under § 43(c), and grants that motion. *See generally* Fed. R. Civ. P. 41(a)(2). Accordingly, since Count I has already been dismissed except to the extent it stated a trademark dilution claim, Count I is now dismissed in its entirety with prejudice and the defendants' motion for summary judgment on Count I is denied as moot.

## B. Defendants' Motion for Summary Judgment—Count II (Trademark Dilution Under ITRPA)

Although DDI does not advance a claim for trademark dilution under the Lanham Act, it does seek to hold the defendants liable for trademark dilution under ITRPA, which provides that the owner of a mark which is famous in Illinois is entitled to relief "against another person's commercial use of a mark or tradename, if the use . . . causes dilution of the distinctive quality of the mark." 765 ILCS 1036/65(a).[9] Dilution of a trademark's distinctiveness generally occurs

---

[9] Claims for trademark dilution under ITRPA are very similar to federal trademark dilution claims under § 43(c) of the Lanham Act. *See* 15 U.S.C. § 1125(c)(1) (entitling the owner of a famous mark to relief against another person's "use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark"); *see also Manley v. Boat/U.S., Inc.*, 75 F. Supp. 3d 848, 855 (N.D. Ill. 2014) (describing ITRPA and

when consumers are led to mistakenly associate the plaintiff's famous mark with the defendant's inferior product or service, or when a famous mark appears on different goods and services and therefore no longer serves as a unique identifier of the plaintiff's product or service. *See Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 466 (7th Cir. 2000); *see also Ill. High Sch. Ass'n v. GTE Vantage Inc.*, 99 F.3d 244, 247 (7th Cir. 1996), *as amended* (Dec. 3, 1996) ("[Antidilution statutes] protect the trademark owner from the erosion of the distinctiveness and prestige of a trademark caused by the sale of other goods or services under the same name (for example, the use of 'Tiffany & Co.' as the name of a hamburger stand, or simply a proliferation of borrowings that . . . are so numerous as to deprive the mark of its distinctiveness and hence impact) . . . ."). To succeed on a trademark dilution claim, "proof of actual dilution is required, either through survey, financial, or circumstantial evidence." *Sullivan v. CBS Corp.*, 385 F.3d 772, 779 (7th Cir. 2004).[10]

DDI contends that Barrett's websites are commercial in nature and that the defendants violated ITRPA by referencing "Doctor's Data" in the challenged publications and including DDI's logo on the first page of one of the publications. *See* PSOAF, Dkt. 273, at 10, ¶ 2 ("Barrett

---

Lanham Act trademark dilution claims as similar); *Top Tobacco, L.P. v. Midwestern Cash & Carry, LLC*, No. 11 C 4460, 2014 WL 243431, at *8 (N.D. Ill. Jan. 22, 2014) (same). But there are some notable differences between the statutes, including that the Lanham Act only requires a **likelihood** of dilution and that ITRPA only requires the mark to be famous **in Illinois**. *See Top Tobacco*, 2014 WL 243431, at *8 n.5 (noting that ITRPA requires actual dilution but the Lanham Act does not); *Arcadia Grp. Brands Ltd. v. Studio Moderna SA*, No. 10 C 7790, 2011 WL 3584469, at *3 (N.D. Ill. Aug. 15, 2011) (finding allegations of fame that were sufficient for a Lanham Act trademark dilution claim to also be sufficient for ITRPA's "famous in Illinois" standard). *Compare* 765 ILCS 1036/65(a), *with* 15 U.S.C. § 1125(c)(1). *See Top Tobacco*, 2014 WL 243431, at *8 n.5 (noting that ITRPA requires actual dilution but the Lanham Act does not).

[10] Although the defendants argue that "[a] fundamental element not provable in DDI's causes of action is damages" and that "the lack of provable damages is central to all alleged causes of action, except defamation *per se*," DMSJ Mem., Dkt. 249, at 32, damages are not one of the elements of an ITRPA trademark dilution claim. Evidence of financial damages can, however, be used to establish the "proof of actual dilution" element of such a claim. *See Sullivan*, 385 F.3d at 779.

. . . entices readers of his blogs to send him donations"); PSOAF, Dkt. 273, at 27, ¶ 70 ("DDI's trademark is prominently displayed in [Article A] and all of its countless re-publications, revisions, and hyperlinks."); Resp. to DMSJ, Dkt. 274, at 37 ("[Article A] prominently displays on its first page DDI's trademark and name."); *see also* TAC, Dkt. 224, at 21, ¶ 64 (alleging that the defendants have diluted DDI's "trade name and trademark . . . by plastering Plaintiff's name on their websites and connecting Plaintiff's name to false and outrageous statements . . . for their own financial gain"). The defendants argue that summary judgment on the ITRPA claim is appropriate because (1) DDI has not established that the defendants' use of the trademarks caused dilution; (2) DDI has not established that its trademarks are famous; and (3) the defendants' use of the trademarks was within the context of news reporting and commentary, which is not actionable under ITRPA, *see* 765 ILCS 1036/65(b). DMSJ, Dkt. 248, at 3; DMSJ Mem., Dkt. 249, at 40-43.

The Court agrees that DDI has failed to present sufficient evidence of dilution of the distinctiveness of its trademarks to withstand summary judgment. DDI has provided no indication that any of the challenged publications led readers to confuse DDI with a different testing laboratory or to associate DDI's name or logo with another type of product or service. In responding to the defendants' arguments regarding dilution, DDI has pointed only to the facts that: (1) Article A contains DDI's logo and name; and (2) the report by DDI's damages expert, Roger Grabowski, stated "DDI's Elemental Testing business unit was significantly harmed and DDI's trademark value was diluted," Resp. to DMSJ, Dkt. 274, at 37; PSOAF, Dkt. 273, ¶¶ 70, 76; *see also* Grabowski Report, Ex. 4 to DSOF, Dkt. 251-2, at 15. The inclusion of DDI's logo and name in Article A is evidence that the defendants *used* DDI's trademarks, but it does not demonstrate that their actions *diluted* those trademarks. And the single reference in

Grabowski's 34-page expert report to "trademark value," unaccompanied by any discussion of that concept or any breakdown of damages estimated to be traceable to trademark dilution, is insufficient to raise a genuine issue of material fact on this question.[11] *Cf. Sullivan*, 385 F.3d at 779 (affirming summary judgment for defendant where plaintiff "failed to present any evidence of actual dilution" on ITRPA and Lanham Act trademark dilution claims); *Games Workshop Ltd. v. Chapterhouse Studios, LLC*, No. 10 C 8103, 2012 WL 5949105, at *18 (N.D. Ill. Nov. 27, 2012) (granting summary judgment on an ITRPA trademark dilution claim where plaintiff failed to present any evidence that defendant "diluted [plaintiff's] marks through its use of them").

Taken together, the allegations and evidence pertaining to Count II may suggest that DDI's reputation was damaged by the defendants' use of its trademarks and that DDI suffered financially as a result of that reputational damage. But causing consumers to think less highly of a trademarked product or service—even if accomplished through false or misleading statements—is not equivalent to diluting the distinctiveness of that product or service. Allegations solely of the former nature point not to trademark dilution but to defamation and other similar claims; *those* claims are discussed below. Accordingly, summary judgment on Count II is appropriate because DDI has not sufficiently established that the defendants' use of DDI's logo and name has diluted those trademarks.[12]

### C. Defendants' Motion for Summary Judgment—Count V (Defamation *Per Se*) and Count VI (Defamation *Per Quod*)

During discovery, DDI identified 85 allegedly defamatory statements that were published by one or more of the defendants. *See* First Supp. Resp., Dkt. 273-58 (identifying 51 defamatory

---

[11] In light of this finding, the Court's analysis of Count II is not dependent on the outcome of the defendants' *Daubert* motion to bar Grabowski's testimony (Dkt. 232).

[12] Given this finding, it is unnecessary to address the defendants' alternate arguments that DDI's trademarks are not famous and that defendants' use of the trademarks was within the context of news reporting and commentary.

statements); Second Supp. Resp., Dkt. 294-1 (revising information about several previously identified statements and adding additional statements, for a total of 85 statements).[13] DDI asserts that all 85 statements are actionable both as defamation *per se* (Count V) and as defamation *per quod* (Count VI). *See, e.g.*, Resp. to DMSJ, Dkt. 274, at 33-34 (stating that defendants' "numerous websites and other publications . . . . are subsumed in [the] *per quod* count"); Second Supp. Resp., Dkt. 294-1, at 7-9 (indicating that all 85 statements identified as defamatory are alleged to be defamatory *per se*). The defendants seek summary judgment on both of DDI's defamation claims with respect to all 85 statements.[14]

"A defamatory statement is a statement that harms a [party's] reputation to the extent it lowers the [party] in the eyes of the community or deters the community from associating with [the party]." *Green v. Rogers*, 234 Ill. 2d 478, 491, 917 N.E.2d 450, 459 (2009). Notably, "[t]he republisher of a defamatory statement [originally] made by another is himself liable for defamation even if he gives the originator's name." *Brennan v. Kadner*, 351 Ill. App. 3d 963, 970, 814 N.E.2d 951, 959 (2004) (citing *Owens v. CBS Inc.*, 173 Ill. App. 3d 977, 994, 527 N.E.2d 1296, 1308 (1988)); *see also* Restatement (Second) of Torts § 578 (1977). Under Illinois law, the elements of a defamation claim for both *per quod* and *per se* actions are "that the

---

[13] In its interrogatory responses, DDI labeled each statement with a letter identifier (*e.g.*, "a," "b," "c," "aa," "aaa," "aaaa," etc.). The Court will therefore refer to the statements by their respective letter identifiers, as the parties did in their briefs. Although DDI's second supplemental responses contained 86 letter identifiers (ending with "hhhh"), DDI intentionally left statement "aa" blank, *see* DDI's Second Supp. Resp., Dkt. 294-1, at 2, so there are actually only 85 statements at issue. In addition, although DDI's initial interrogatory responses identified two allegedly defamatory statements in Article G, *see* Initial Interrogatory Responses ("Initial Resp."), Dkt. 269-2, at 5 (identifying statements (k) and (q)), DDI supplemental interrogatory responses superseded its initial responses and did not identify any allegedly defamatory statements in Article G. Accordingly, that article is no longer at issue for purposes of DDI's defamation claims.

[14] DDI's motion for partial summary judgment on Count V is addressed in Section D, *infra*.

12

defendant made a false statement about the plaintiff, that the defendant made an unprivileged publication of that statement to a third party, and that this publication caused damages." *Green*, 234 Ill. 2d at 491, 917 N.E.2d at 459; *see also Kapotas v. Better Gov't Ass'n*, 2015 IL App (1st) 140534, ¶ 34, 30 N.E.3d 572, 587-88 (explaining that although "substantial truth" is an affirmative defense to defamation, the Illinois Supreme Court has repeatedly held falsity to be an element of such a claim, such that it is plaintiff's burden to plead and establish lack of truth).[15]

The two types of defamation claims differ only with respect to the plaintiff's burden to plead and prove damages. In a defamation *per se* action, damage to a corporate plaintiff is presumed if the statement imputes the commission of a criminal offense, impugns the plaintiff's competence or integrity, or otherwise prejudices the plaintiff in its business.[16] *See Neuros Co. v.*

---

[15] Despite the fact that Illinois courts generally refer to "an unprivileged publication" when setting out the elements of a defamation claim, privilege is treated as an affirmative defense in Illinois defamation actions. *See Garrido v. Arena*, 2013 IL App (1st) 120466, ¶ 25 n.2, 993 N.E.2d 488, 498 n.2 (explaining this "quirk" of Illinois defamation law); *see also Vasarhelyi v. Vasarhelyi*, No. 09 C 2440, 2010 WL 1474652, at *3 (N.D. Ill. Apr. 7, 2010); *Anderson v. Beach*, 386 Ill. App. 3d 246, 248-49, 897 N.E.2d 361, 365 (2008). Thus, at the pleading stage a plaintiff is not required to plead facts demonstrating that a statement is unprivileged, and at the summary judgment stage the defendant has the burden of establishing that a privilege applies. The plaintiff, however, has the burden of establishing abuse of, or exceptions to, any applicable defamation privileges. *See Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 790 (N.D. Ill. 2012); *Garrido*, 2013 IL App (1st) 120466, ¶ 25 n.2, 993 N.E.2d 488 at 498 n.2; *Perik v. JP Morgan Chase Bank, U.S.A., N.A.*, 2011 IL App (1st) 093088-U, ¶ 53; *Anderson*, 386 Ill. App. 3d at 251, 897 N.E.2d at 367; *see also Ray v. Clements*, 700 F.3d 993, 1007 (7th Cir. 2012) (party arguing that exception to affirmative defense applies has burden to prove exception); *Costello v. Grundon*, 651 F.3d 614, 630 (7th Cir. 2011) (same). *See generally Laouini v. CLM Freight Lines, Inc.*, 586 F.3d 473, 475 (7th Cir. 2009) (defendant has burden of proof on affirmative defenses at summary judgment); *PNC Bank, N.A. v. Chi. Title Land Trust Co.*, No. 11 C 5393, 2012 WL 1660637, at *1 (N.D. Ill. May 11, 2012) (same).

[16] In a defamation *per se* action brought by an individual, damage is presumed for five categories of statements:

> (1) statements imputing the commission of a crime; (2) statements imputing infection with a loathsome communicable disease; (3) statements imputing an inability to perform or want of integrity in performing employment duties; (4) statements imputing a lack of

*KTurbo, Inc.*, 698 F.3d 514, 519 (7th Cir. 2012); *Republic Tobacco, L.P. v. N. Atl. Trading Co.*, 254 F. Supp. 2d 985, 998-99 & n.16 (N.D. Ill. 2002). In a defamation *per quod* action, damage to the plaintiff's reputation is not presumed and the plaintiff must plead and prove special damages. *Tuite v. Corbitt*, 224 Ill. 2d 490, 501, 866 N.E.2d 114, 121 (2006); *see also Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 227 Ill. 2d 381, 390, 882 N.E.2d 1011, 1018 (2008) ("special damages [are] actual damages of a pecuniary nature").

A number of affirmative defenses apply to both defamation *per se* and defamation *per quod* claims under Illinois law. Statements that do not contain verifiable facts—such as rhetorical hyperbole or opinions—are not actionable as defamation; it is a question of law whether a statement is factual in nature. *Madison v. Frazier*, 539 F.3d 646, 654 (7th Cir. 2008). In addition, a statement that is not technically true in every respect but is "substantially true" does not constitute defamation; this is a question for trial unless no reasonable jury could find that substantial truth was not established. *Global Relief Found., Inc. v. N.Y. Times Co.*, 390 F.3d 973, 982, 987 (7th Cir. 2004). Further, statements that are privileged cannot support a defamation claim. *Solaia Tech., LLC v. Specialty Publ'g Co.*, 221 Ill. 2d 558, 585, 852 N.E.2d 825, 839 (2006). As relevant here, the fair report privilege protects publication of defamatory statements in a report of an official proceeding, provided that the report is "complete and accurate" or is "a fair abridgement" of the proceeding; it is generally a question of law whether the fair report privilege applies.[17] *Id.* at 585, 588, 852 N.E.2d at 842, 843; *see also Missner v. Clifford*, 393 Ill.

---

ability or that otherwise prejudice a person in his or her profession
or business; and (5) statements imputing adultery or fornication.

*Tuite v. Corbitt*, 224 Ill. 2d 490, 501, 866 N.E.2d 114, 121 (2006).

[17] Since the availability of the fair report privilege hinges not on the reporter's status but on the accuracy and fairness of the report, the privilege applies regardless of whether the reporter is part of the established press. *See, e.g., Missner v. Clifford*, 393 Ill. App. 3d 751, 761, 914

App. 3d 751, 763, 914 N.E.2d 540, 551 (2009) (indicating that applicability of a privilege is ordinarily a question of law, unless there are genuine issues of material fact); *Solaia Tech., LLC v. Specialty Pub. Co.*, 357 Ill. App. 3d 1, 7, 826 N.E.2d 1208, 1213 (2005) ("The question of whether a publication is privileged under the fair report privilege is generally a question of law, particularly where there is no dispute about the content of the document on which the publication is based."), *rev'd in part*, 221 Ill. 2d 558, 852 N.E.2d 825 (2006). Finally, defamation claims are subject to a one-year statute of limitations. 735 ILCS 5/13-201. Based on the single publication rule, codified at 740 ILCS 165, that statute of limitations begins to run when the communication containing the defamatory statements is first published; it is not restarted by subsequent distributions of the original communication. *See Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 615-16 (7th Cir. 2013); *Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 436-38 (7th Cir. 2009).

An additional affirmative defense applies solely in the defamation *per se* context. Even if a statement falls within one of the defamation *per se* categories,[18] the statement is not actionable as defamation *per se* if it is reasonably capable of an innocent construction. *Tuite*, 224 Ill. 2d at 502, 866 N.E.2d at 121; *see also Madison*, 539 F.3d at 653-54. In applying the innocent construction rule, "courts must interpret the words 'as they appeared to have been used and

---

N.E.2d 540, 550 (2009) ("Both media and nonmedia reporters may claim protection under the privilege."). Therefore, to the extent DDI argues that the defendants cannot invoke the fair report privilege because they are not "media defendants," *see* Resp. to DMSJ, Dkt. 274, at 1-2, 15-16, that argument is incorrect. *See, e.g.*, *Huon v. Breaking Media, LLC,* 75 F. Supp. 3d 747, 762-63 & n.16 (N.D. Ill. 2014) (indicating that bloggers may assert fair report privilege).

[18] Although it is a question for the jury whether a statement falls within a recognized defamation *per se* category, many statements clearly qualify or clearly do not qualify as defamation *per se*, so courts often find that a reasonable jury could only answer the question in one way. *See Kolegas v. Heftel Broad. Corp.*, 154 Ill. 2d 1, 11, 607 N.E.2d 201, 207 (1992) ("There can be no dispute that the comments fall into two of the . . . categories of statements that are considered defamatory *per se* . . . ."); *Seitz-Partridge v. Loyola Univ. of Chi.*, 2013 IL App (1st) 113409, ¶ 36, 987 N.E.2d 34, 46 ("[N]o reasonable jury could find that the claim fit within one of the [defamation *per se*] categories established by Illinois law. . . .").

according to the idea they were intended to convey to the reasonable reader.'" *Tuite*, 224 Ill. 2d at 512, 866 N.E.2d at 123 (quoting *Bryson v. News Am. Publ'ns, Inc.*, 174 Ill. 2d 77, 93, 672 N.E.2d 1207, 1217 (1996)). "[I]f, as so construed, the statement may reasonably be innocently interpreted or reasonably be interpreted as referring to someone other than the plaintiff it cannot be actionable *per se*." *Id.* at 503, 866 N.E.2d at 122 (quoting *Chapski v. Copley Press*, 92 Ill. 2d 344, 352, 442 N.E.2d 195, 199 (1982)) (internal quotation marks omitted). The determination of whether a statement is reasonably capable of an innocent construction is a question of law. *Id.* at 510, 866 N.E.2d at 126.

The defendants' principal arguments for summary judgment on DDI's defamation *per se* and *per quod* claims are: (1) that DDI has failed to establish that certain statements are false; (2) that DDI has failed to establish that certain statements are about DDI; and (3) that at least one of the following affirmative defenses applies to many of the statements: lack of factual nature, the fair report privilege, the single publication rule, and substantial truth. The defendants also argue that summary judgment in their favor is appropriate on the *per quod* claim with respect to all 85 challenged statements because DDI has failed to establish that it suffered special damages. In addition, the defendants argue that some of the statements are not actionable as defamation *per se* because they are protected by the innocent construction rule or do not fall within a defamation *per se* category.[19]

---

[19] The Court takes into consideration the defendants' arguments regarding DDI's defamation claims that are presented through their opening brief and the summary table attached as an exhibit to their statement of facts. *See* DMSJ Mem., Dkt. 249; Defenses Table, Ex. 2 to DSOF, Dkt. 250-2. In their reply, the defendants also advance an additional broad argument regarding DDI's defamation claims, contending that the defendants are "media defendants," that the challenged statements are on "matter[s] of public concern," and that DDI was therefore required to establish that the challenged statements were made with "actual malice." Reply to DMSJ, Dkt. 292, at 1, 7-8. *See generally N.Y. Times Co. v. Sullivan,* 376 U.S. 254, 280 (1964) (explaining that a statement is made with "actual malice" when made "with knowledge that it

As an initial matter, the defendants' reliance on the single publication rule is misplaced. The defendants contend that the rule makes subsequent distributions or republications of defamatory statements not actionable as defamation. *See* DMSJ Mem., Dkt. 249, at 6-8. In fact, however, the rule does not affect whether individual statements are actionable as defamation. Rather, it governs when the statute of limitations begins to run and when res judicata applies for tort claims that are based on a publication. *See* 740 ILCS 165/1 ("No person shall have more than one cause of action for damages for libel or slander or invasion of privacy or any other tort founded upon any single publication . . . ."); 740 ILCS 165/2 (barring repeated suits "by the same plaintiff against the same defendant founded upon the same publication"). The Seventh Circuit has explained that the rule "provides that a claim for relief for defamation is complete at the time of first publication; later circulation of the original publication does not trigger fresh claims." *Pippen*, 734 F.3d at 615-16. But although subsequent distributions of a publication "are of no consequence to the creation or existence of a cause of action," such distributions **can** be relevant to the question of damages for claims that are not disposed of on res judicata or statute

was false or with reckless disregard of whether it was false"). The Court will not consider that argument, however, because the defendants failed to adequately raise it in their opening brief and related filings, which asserted only that Barrett and NCAHF qualify as media defendants under the *New York Times* standard, that the fair report privilege overcomes allegations of actual malice, and that two of the challenged statements are not actionable as defamation based on the defense of "free speech." *See* DMSJ Mem., Dkt. 249, at 1, 9; Defenses Table, Ex. 2 to DSOF, Dkt. 250-2, at 6, 27. *See generally Hernandez v. Cook Cnty. Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011) ("It is well established in our precedents that 'skeletal' arguments may be properly treated as waived, as may arguments made for the first time in reply briefs. The underlying concern is to ensure that the opposing party is not prejudiced by being denied sufficient notice to respond to an argument." (citations omitted)). Although the defendants also raised an actual malice argument in their response to DDI's motion for summary judgment, that argument—and DDI's response to that argument in its reply brief—addressed the necessity of proving actual malice where the defamatory statements are about a ***public figure***. *See* Resp. to PMSJ, Dkt. 268, ¶¶ 119-20; Reply to PMSJ, Dkt. 294, at 13-15. Thus, DDI did not have an opportunity to respond to the defendants' argument about proving actual malice where the defamatory statements are about a ***matter of public concern***, and that argument is consequently deemed waived.

of limitations grounds. *Blair v. Nev. Landing P'ship*, 369 Ill. App. 3d 318, 324-25, 859 N.E.2d 1188, 1193 (2006) (quoting *Founding Church of Scientology of Washington, D. C. v. Am. Med. Ass'n*, 60 Ill. App. 3d 586, 588, 377 N.E.2d 158, 160 (1978)) (internal quotation marks omitted); *see also* 740 ILCS 165/1 ("Recovery in any action shall include all damages for any such tort suffered by the plaintiff . . . ."). Thus, the single publication rule is of import only where res judicata or statute of limitations defenses are at issue. Here, although the defendants raised the statute of limitations as an affirmative defense when answering the Complaint, they have not sought summary judgment on that ground. Therefore, the single publication rule cannot provide a basis for granting their motion for summary judgment, and the Court need not further address the parties' arguments on that subject.

That leaves for consideration the defendants' four other asserted affirmative defenses (lack of factual nature, the fair report privilege, substantial truth, and innocent construction), as well as their arguments that DDI has failed to establish certain elements of its defamation claims. DDI's response brief raises two general objections to the defendants' asserted affirmative defenses to the defamation claims. First, DDI argues that the defendants waived those affirmative defenses by failing to assert them at the pleading stage. Second, DDI argues that, based on Judge Chang's prior choice-of-law ruling in this case, the defendants may not rely on Illinois defenses to DDI's defamation claims. *See* Resp. to DMSJ, Dkt. 274, at 1, 5-7.

With respect to DDI's waiver argument, although Rule 8(c) requires affirmative defenses to be raised in the pleadings, "a delay in asserting an affirmative defense waives the defense only if the plaintiff was harmed as a result." *Curtis v. Timberlake*, 436 F.3d 709, 711 (7th Cir. 2005). Here, there is no indication that DDI suffered any harm from the fact that the defendants did not assert the affirmative defenses they now rely on at the pleading stage. DDI has had an

18

opportunity to substantively respond to those affirmative defenses in its response to the defendants' motion for summary judgment, and has taken advantage of that opportunity. *See* Resp. to DMSJ, Dkt. 274, at 10-26, 32-33. In addition, DDI was aware of most of the defendants' affirmative defenses when it filed the current Complaint, since the defendants had raised those same defenses in previous filings and court-ordered communications. *See, e.g.*, Resp. to DDI's Settlement Demand, Ex. H to Reply to DMSJ; Dkt. 292-1, at 33-36 (summarizing the defendants' defenses of lack of factual nature, substantial truth, and the innocent construction rule in a December 2011 letter to DDI's counsel); Mtn. to Dismiss Mem., Dkt. 55, ¶ 14 ("[E]verything alleged in the suit to be false is either absolutely true, substantially true, or a clearly non-actionable statement of opinion."); Mtn. to Dismiss Mem., Dkt. 55, ¶ 73 ("There is no libel *per* se if the alleged statement is true, substantially true, capable of an innocent construction, or an expression of opinion."); *see also* Resp. to Mtn. to Dismiss, Dkt. 56, at 15 (acknowledging defendants' motion to dismiss arguments that "truth, innocent construction, and expressions of opinion are defenses to libel").[20]

Accordingly, the defendants have not waived the affirmative defenses they assert in seeking summary judgment on DDI's defamation claims. *Cf. Curtis*, 436 F.3d at 711 ("Curtis was not prejudiced; he was aware of the [affirmative defense] issue even when he filed his complaint, and he confronted the defense in responding to the motion for summary judgment."); *Williams v. Lampe*, 399 F.3d 867, 871 (7th Cir. 2005) ("[W]here the plaintiff has an opportunity

---

[20] Although the defendants do not appear to have explicitly mentioned the fair report privilege prior to moving for summary judgment, they alluded to that theory in discussing other affirmative defenses. *See, e.g.*, Resp. to DDI's Settlement Demand, Ex. H to Reply to DMSJ, Dkt. 292-1, at 41 ("The suit was filed exactly as reported."); Resp. to DDI's Settlement Demand, Ex. H to Reply to DMSJ, Dkt. 292-1, at 42 (describing a challenged statement as forming part of "a news report of a suit" that "accurately characterized" the allegations in the suit). And, in any event, DDI has had an adequate opportunity to respond to that affirmative defense.

to respond to a late affirmative defense, he cannot establish prejudice merely by showing that the case has progressed significantly since the defendants answered his complaint.").

DDI's choice-of-law argument is based on Judge Chang's prior ruling that the defendants' statements are not protected by Illinois' anti-SLAPP statute. *See* Mem. Op., Dkt. 85, at 4-8. The court reasoned that although Illinois law governs DDI's defamation claims, different state law could govern the defendants' affirmative defenses to those claims since Illinois courts follow the doctrine of *depecage*, which involves subjecting each issue in a case to a separate choice-of-law analysis. Judge Change also noted that in Illinois, "a choice-of-law determination is only necessary when there is a conflict of laws and the difference will affect the outcome of the case." Mem. Op., Dkt. 85, at 5 (citing *Townsend v. Sears, Roebuck & Co.*, 227 Ill. 2d 147, 155-56, 879 N.E.2d 893, 898-99 (2007)).[21] Since DDI had identified an outcome-determinative conflict between North Carolina law and Illinois law (namely, that North Carolina does not have an anti-SLAPP statute), the court proceeded to perform a choice-of-law analysis to determine if Illinois' anti-SLAPP statute applied, ultimately determining that it did not. Based on that ruling, DDI now argues that the defendants' motion for summary judgment on DDI's defamation claims should be denied because, *inter alia*, the defendants failed to cite North Carolina law in support of their asserted affirmative defenses. *See* Resp. to DMSJ, Dkt. 274, at 1, 5.

Notably, DDI has only identified a difference between North Carolina law and Illinois law with respect to one of the four affirmative defenses under consideration—the innocent construction rule. *See* Resp. to DMSJ, Dkt. 274, at 27 ("North Carolina law does not recognize

---

[21] Judge Change also explained that Illinois' choice-of-law rules apply to the case since Illinois is the forum state. Mem. Op., Dkt. 85, at 5 (citing *Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009)).

the Innocent Construction Rule.").[22] Since the party seeking a choice-of-law determination bears the burden of demonstrating that there is an outcome-determinative difference, *Bridgeview Health Care Ctr., Ltd. v. State Farm Fire & Cas. Co.*, 2014 IL 116389, ¶ 14, 10 N.E.3d 902, 905, the Court need not perform a choice-of-law analysis regarding the defendants' affirmative defenses of lack of factual nature, fair report privilege, and substantial truth. And since none of the Court's rulings on DDI's defamation claims rely on the innocent construction rule, *see infra*, the choice-of-law issue regarding that affirmative defense is moot.[23]

With these initial matters resolved, the Court can proceed to analyze the defendants' specific arguments for summary judgment regarding the 85 challenged statements. In general, the fundamental dispute between the parties concerns the manner in which DDI presents the results of urine tests of provoked specimens. DDI maintains that it accurately states that the comparisons it reports are to non-provoked samples and that physicians understand the differences between provoked and non-provoked samples. Barrett contends, however, that referring patients who have provided provoked samples to standards applicable to non-provoked tests is highly misleading and permits unscrupulous physicians and other purported health care practitioners to convince patients to undergo expensive, but unnecessary, detoxification treatments. The disputes in this case center primarily on the extent to which the defendants' statements assert that Doctor's Data is a witting participant in these schemes. DDI contends that the characterizations of the role it plays in the diagnosis and treatment of metals toxicity are

---

[22] DDI also states that North Carolina's law on the fair report privilege is not well-developed, but it does not identify any specific inconsistencies between North Carolina law and Illinois law on this affirmative defense. *See* Resp. to DMSJ, Dkt. 274, at 10.

[23] The defendants raise the innocent construction rule only with respect to statements (a), (d), (l), (qq), and (xx). *See* DMSJ Mem., Dkt. 249, at 13, 20-21, 26-27, 35-36. In the analysis below, the Court grants summary judgment for the defendants on DDI's defamation claims with respect to these statements based on reasons other than the innocent construction rule.

defamatory. But, as will be seen, for the most part the statements that are likely to cause reputational harm concern the doctors (rather than DDI) or appear in reports which are protected by the fair report privilege (*e.g.*, reports of lawsuits filed against DDI and others). And most of the remaining statements are either true descriptions of the report form or expressions of opinion about the form. Accordingly, the Court concludes that most of the allegedly defamatory statements are not actionable. But since context is an important consideration in evaluating an allegedly defamatory statement, the specific challenged statements are grouped by publication and considered in detail below.[24]

### 1. Article A—Statements (a), (b), (c), (d), (e), (f), (g), (h), (i), and (j)

Article A is an article published on www.quackwatch.com titled "How the 'Urine Toxic Metals' Test Is Used to Defraud Patients"; Barrett is credited as the author, and a line at the bottom indicates that the article was revised on March 14, 2010.[25] *See* Article A, Dkt. 24-1. As printed out for purposes of this lawsuit, Article A spans six pages, including approximately one page of footnotes. An image of a redacted DDI urine toxic metals report appears on the first page of the article, next to the following introductory text:

> Many patients are falsely told that their body has dangerously high levels of lead, mercury, or other heavy metals and should be "detoxified" to reduce these levels. This article explains how a urine test is used to defraud patients.

---

[24] The Court has attempted to reproduce quotations from the challenged publications and from DDI's listing of allegedly defamatory statements as accurately as possible, including original typefaces and paragraph formatting. Due to the frequency of grammatical and other errors in the quoted material, the Court has not flagged all errors with the common signal "[sic]." All emphases in quoted passages appear in the originals unless otherwise indicated.

[25] Although the "How the 'Urine Toxic Metals' Test Is Used to Defraud Patients" article on www.quackwatch.com has been revised numerous times, the Court uses "Article A" to refer exclusively to the March 14, 2010, version of the article. The original version of the article was published in February 2009. *See* DMSJ Mem., Dkt. 249, at 37; Answer to TAC, Dkt. 225, ¶ 35; PMSJ Mem., Dkt. 243, at 24; *see also* Defs.' PMSJ Ex. A, Dkt. 269-1 (version of Article A dated February 19, 2009); Ex. 61 to Reply to PMSJ, Dkt. 294-4 (same).

> The report pictured to the right is a "urine toxic metals" test from Doctor's Data, a Chicago-based laboratory that caters to nonstandard practitioners. The patient who gave it to me was told that his mercury and lead levels were high and should be reduced with EDTA chelation therapy.
>
> The report classifies the man's lead and mercury levels as "elevated["] because they are twice as high as the upper limit of their "reference ranges." However, this classification is misleading because:
>
> - The report states that the specimen was obtained after patient was given a "provoking agent," but the reference range is based on non-provoked tests.
> - The levels, whether provoked or not, are not high enough to conclude that the patient has a problem that requires attention.
> - Even if a problem exists, chelation may not be the best course of action.

Article A, Dkt. 24-1, at 1.

Below the introductory portion of Article A is a lengthy section labeled "Why Provoked Testing Is a Scam." It explains that small amounts of mercury and lead are commonly found in urine, that urine lead and mercury levels can be artificially raised by administering a provoking agent, and that urine levels typically are expressed as micrograms of lead or mercury per gram of creatinine ("μg/g") and are compared to the testing laboratory's reference range. Article A, Dkt. 24-1, at 2. The section continues in relevant part:

> Neither Mayo Clinic, nor any other legitimate national laboratory, has reference ranges for "provoked" specimens. Further, the references ranges for normal urine heavy metal levels used by Mayo Clinic and the largest national reference lab, Quest Diagnostics, are the same.
>
> In contrast, Doctor's Data uses reference values of less than 3 ug/g for mercury and 5 ug/g for lead. Standard laboratories that process non-provoked samples use much higher reference ranges [3,4], which means that if all other things were equal, Doctor's Data is far more likely than standard labs to report "elevated" levels. But that's not all. A disclaimer at the bottom of the above lab report states—in boldfaced type!—that "**reference ranges are representative of a healthy population under non-challenge or nonprovoked conditions**." In other words, they should **not** be

applied to specimens that were obtained after provocation. Also note that the specimen was obtained over a 6-hour period, not the standard 24-hour period, which raised the reported level even higher.

The management at Doctor's Data knows that provoked testing artificially raises the urine levels and that the length of collection time greatly influences the results. . . .

Despite all of this, Doctor's Data's reports classify mercury values in the range of 5-10 µg/g as "elevated" and further state that "no safe reference levels for toxic metals have been established." Practitioners typically receive two copies of the report, one for the practitioner and one to give to the patient. Very few patients understand what the numbers mean. They simply see "elevated" lead or mercury, and interpret the "no safe levels" disclaimer to mean that any number above zero is a problem. The patient is then advised to undergo "detoxification" with chelation therapy, other intravenous treatments, dietary supplements, or whatever else the practitioner happens to sell.

. . . .

Doctors who offer chelation therapy as part of their everyday practice typically claim that it is effective against autism, heart disease and many other conditions for which it has no proven effectiveness or plausible rationale [7]. One such case was described in a 2009 decision by the U.S. Court of Federal Claims which found no credible evidence that childhood vaccinations cause autism. In that case, Colton Snyder underwent chelation therapy after a Doctor's Data urine test report classified his urine mercury level as "very elevated." After noting that the urine sample had been provoked (with DMSA) and that provocation artificially increases excretion, the Special Master concluded that a non-provoked test would have placed the result in the normal range. . . .

In March 2009, Arthur Allen tried to interview an official at Doctor's Data but received no response to his request. However, he did manage to talk with someone at the company who said that the lab was doing about 100,000 of the tests per year. When he asked about the reference range problem, he was told there was no way to establish a reference range for provoked specimens, because provocation might be done with various chelating agents, at varying doses. "The tests are ordered by physicians, so they can interpret the results," the employee said. "They do what they want with this information." [9]

Despite provocation, the toxic urine test report sometimes shows no elevated levels. But that doesn't deter the doctors who are intent on chelating children. They simply tell parents that the children have trouble excreting heavy metals and the test may not

24

> detect "hidden stores." In other words, no matter what the test shows, they still recommend chelation.

Article A, Dkt. 24-1, at 2-3.

The next section of Article A, labeled "Regulatory Actions and Civil Suits," contains two mentions of DDI:

> Several state licensing boards have taken action against doctors who used provoked urine testing as a prelude to chelation. In some of these cases, the test was of major importance in the public documents that describe the board actions. In the rest, the board action emphasized other misconduct and the test was either briefly mentioned or I learned of its relevance through other means. There have also been at least four civil suits.
>
> . . . .
> - In 2009, 43-year-old Ronald Stemp sued Caquias, CARE Clinics, the clinic's owner, and Doctor's Data for fraud, negligence, and conspiracy. The suit petition states that Stemp originally sought help for memory loss, inability to sleep, difficulty concentrating, and depression. After taking a urine toxic metals test and several other tests, he was falsely diagnosed with heavy metal poisoning and advised to undergo intravenous chelation therapy.
>
> . . . .
> - In March 2010, James filed suit on behalf of his 7-year-old son against Anju Usman, M.D., Daniel Rossignol, M.D., and Doctor's Data. Among other things, the complaint indicated that—based on the results of provoked urine testing—the boy was inappropriately treated for nonexistent metal toxicity for more than four years [25].

Article A, Dkt. 24-1, at 4-5.

The last section of Article A, labeled "The Bottom Line," includes the following text:

> The urine toxic metals test described above—whether provoked or not—is used to persuade patients they are toxic when they are not. I believe that several agencies can and should do something to stop this deception.
> - If the FDA has jurisdiction over the software used to generate the test reports, it could ban its use. State

25

- licensing boards could prohibit the use of provoked testing and discipline practitioners who use it.
- State laboratory licensing agencies could prohibit testing of provoked specimens or order Doctor's Data to raise its reference ranges and to stop comparing provoked test results to these non-provoked ranges.

Article A, Dkt. 24-1, at 5. The article concludes by stating: "I recommend avoiding any practitioner who uses the urine toxic metals test as described above. If this test has been used to trick you, please send me an e-mail describing what happened and include your phone number." Article A, Dkt. 24-1, at 5.

DDI alleges that ten portions of Article A—statements (a) through (j)—are defamatory. *See* First Supp. Resp., Dkt. 273-58, at 1-2 (identifying statements (a) through (j) in Article A); Second Supp. Resp., Dkt. 294-1, at 1-2 (revising information about statements (c) and (d)). For the reasons explained below, the Court grants summary judgment for the defendants on DDI's defamation *per se* and defamation *per quod* claims with respect to all ten challenged statements.

### *Statements (a) and (b)*

Statements (a) and (b) appear on the first page of the article. Statement (a) is the article's title, "How the 'Urine Toxic Metals' Test Is Used to Defraud Patients," while statement (b) is the article's opening paragraph: "Many patients are falsely told that their body has dangerously high levels of lead, mercury, or other heavy metals and should be 'detoxified' to reduce these levels. This article explains how a urine test is used to defraud patients." First Supp. Resp., Dkt. 273-58, at 1. The defendants argue that summary judgment in their favor is appropriate with respect to both statements because, *inter alia*, the statements are not about DDI. *See* DMSJ Mem., Dkt. 249, at 13, 29-30, 35-36. *See generally BASF AG v. Great Am. Assurance Co.*, 522 F.3d 813, 820 (7th Cir. 2008) (noting that Illinois defamation law "require[s] that a false statement by made *about the plaintiff*" (citing *Solaia Tech.*, 221 Ill. 2d at 579, 852 N.E.2d at 839)). DDI contends

that although the statements do not explicitly mention DDI, they are clearly about DDI when read in the context of Article A as a whole. *See* Resp. to DMSJ, Dkt. 274, at 27-30.

Accordingly, the Court considers the context of statements (a) and (b). Article A provides the following information about how DDI's urine toxic metals test is used and how patients learn of their diagnoses and treatment recommendations: (1) practitioners planning to use the test start by administering a provoking agent to their patients; (2) the practitioners then collect urine specimens from their patients after some period of time has passed since provocation (typically 24 hours); (3) the practitioners submit the provoked urine specimens to DDI for toxic metals testing; (4) DDI performs the tests and reports the results to the requesting practitioners; (5) some practitioners show a copy of the report to their patients, who generally have difficulty understanding the information in the report; (6) some practitioners advise their patients to pursue treatments for metal toxicity based on the test results; and (7) many of the treatments recommended by such practitioners are unnecessary. When read in this context, statements (a) and (b) are not about DDI; rather, they are about ***practitioners*** who order the urine toxic metals test and reference the test results when recommending treatments to their patients. This reading is strongly reinforced by the final paragraph of Article A, which reads: "I recommend avoiding ***any practitioner who uses*** the urine toxic metals test as described above. ***If this test has been used to trick you***, please send me an e-mail describing what happened and include your phone number." Article A, Dkt. 24-1, at 5 (emphases added). The specific language employed in statements (a) and (b) therefore speaks to the use of DDI's test by some health care practitioners to defraud patients, not to the related, but distinct, question of whether DDI intended its reports

to be used in a fraudulent manner.[26] Summary judgment is therefore granted for the defendants on DDI's defamation claims with respect to statements (a) and (b). *Cf. Huon v. Breaking Media, LLC*, 75 F. Supp. 3d 747, 765 (N.D. Ill. 2014) (finding that several statements were not actionable as defamation because they were not about the plaintiff); *Dry Enterprises, Inc. v. Sunjut AS*, No. 07 C 1657, 2008 WL 904902, at *8 (N.D. Ill. Mar. 31, 2008) (finding that statement attributed to defendant Patriquin could not support a defamation claim because it did not concern any of the plaintiffs).

### *Statement (c)*

Statement (c) appears in the introductory section of Article A and reads as follows:

> The report classifies the man's lead and mercury levels as "elevated because they are twice as high as the upper limit of their "reference ranges." However, this classification is misleading because:
> - The report states that the specimen was obtained after patient was given a "provoking agent," but the reference range is based on non-provoked tests.
> - The levels, whether provoked or not, are not high enough to conclude that the patient has a problem that requires attention.
> - Even if a problem exists, chelation may not be the best course of action.

---

[26] DDI points to various emails that purportedly show that Barrett intended statements (a) and (b) to "concern" DDI. *See* Resp. to DMSJ, Dkt. 274, at 28-30. But the relevant question is whether the statements can be reasonably construed to accuse DDI of defrauding patients, not whether Barrett **intended** the statements to do so. *Cf. Schivarelli v. CBS, Inc.*, 333 Ill. App. 3d 755, 766, 776 N.E.2d 693, 702 (2002) (affirming dismissal of defamation claim since publication as issue could not reasonably be understood to concern plaintiffs); *Flip Side, Inc. v. Chicago Tribune Co.*, 206 Ill. App. 3d 641, 654, 564 N.E.2d 1244, 1252 (1990) ("The communication . . . must be reasonably understood to be a false communication of fact about the plaintiff."); *Beresky v. Teschner*, 64 Ill. App. 3d 848, 851, 381 N.E.2d 979, 981 (1978) (noting that it is a question of law whether allegedly defamatory material can be reasonably understood to concern the plaintiff); *cf. also Brummett v. Taylor*, 569 F.3d 890, 892-93 (8th Cir. 2009) (indicating that evidence of defendant's intent for statements to implicate plaintiff is irrelevant to the question of whether the statements concern plaintiff). *See generally Green*, 234 Ill. 2d at 491, 917 N.E.2d at 459 (stating the elements of defamation under Illinois law).

Second Supp. Resp., Dkt. 294-1, at 1. DDI asserts that this statement is false to the extent it suggests that DDI's report classification is misleading and that DDI compares provoked urine results to reference ranges for non-provoked specimens. *See* Second Supp. Resp., Dkt. 294-1, at 1; Resp. to DMSJ, Dkt. 274, at 21-22.

The defendants argue, *inter alia*, that the description of the report classification as misleading is non-actionable opinion. *See* DMSJ Mem., Dkt. 249, at 19. A statement is constitutionally-protected opinion if it cannot reasonably be interpreted as stating actual facts about the plaintiff, when viewed "from the perspective of an ordinary reader." *Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 227 Ill. 2d 381, 398, 882 N.E.2d 1011, 1022 (2008); *see also Giant Screen Sports v. Canadian Imperial Bank of Commerce*, 553 F.3d 527, 535 (7th Cir. 2009); *Hadley v. Doe*, 2015 IL 118000, ¶ 33, 34 N.E.3d 549, 558. To determine whether a statement is factual in nature, Illinois courts consider "whether the statement has a precise and readily understood meaning; whether the statement is verifiable; and whether the statement's literary or social context signals that it has factual content." *Hadley*, 2015 IL 118000, ¶ 41, 34 N.E.3d at 559 (citing *Solaia Tech*, 221 Ill. 2d at 581, 852 N.E.2d. at 840). If it is clear that the speaker is expressing a subjective view or interpretation, such as when the speaker discloses the facts forming the basis for the statement, the statement is not actionable as defamation. *See Giant Screen Sports*, 553 F.3d at 535; *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 727 (7th Cir. 2004); *see also Brenner v. Greenberg*, No. 08 C 826, 2009 WL 1759596, at *3 (N.D. Ill. June 18, 2009) ("[W]hen the speaker also states the factual basis for the opinion . . . . the speaker may be liable for any false statement of facts, but not for the statements of opinion made on the basis of those facts."); *Hadley v. Doe*, 2014 IL App (2d) 130489, ¶ 48, 12 N.E.3d 75, 90-91 ("[W]hen the facts underlying a statement of opinion are disclosed, readers will understand

that they are getting the author's interpretation of those facts . . . ."), *aff'd*, 2015 IL 118000, 34 N.E.3d 549.

Since the description of DDI's report classification as misleading in statement (c) is immediately followed by the factual basis for that assertion, and the report under discussion is shown to the right of the statement, it is clear that the "misleading" comment is Barrett's interpretation of the report.[27] Accordingly, the description of the report classification as misleading is an expression of opinion and is not actionable as defamation. *Cf. Minuti v. Johnson*, No. 02 C 4551, 2003 WL 260705, at *4 (N.D. Ill. Feb. 5, 2003) (finding comments to be non-actionable opinion in part because the publication at issue "set[] out many of the facts that form[ed] the basis of" defendant's remarks); *Ocytko v. Alliance Printers & Publishers Inc.*, No. 1-03-2352, 2004 WL 3761662, at *11-13 (Ill. App. Ct. Dec. 21, 2004) (finding statements that plaintiff "lied to and misled" individuals and organizations to be non-actionable opinion given the statements' context).

As for the suggestion in statement (c) that DDI's reports compare provoked results to non-provoked reference ranges, the defendants argue, *inter alia*, that there is no genuine issue of material fact as to the falsity of this aspect of statement (c). *See* DMSJ Mem., Dkt. 249, at 19; *see also* DMSJ Mem., Dkt. 249, at 4, 11-12, 16-17 (disputing DDI's theory as to the falsity of many of defendants' statements describing DDI's reports and reference ranges). Since falsity is one of the elements of a defamation claim, *Green*, 234 Ill. 2d at 491, 917 N.E.2d at 459, it is DDI's burden to establish that there is a genuine dispute about this question. In the section of its response brief discussing statement (c), DDI argues that it is false to state that its report

---

[27] DDI argues that this comment is "fact-based" and therefore does not qualify as opinion. *See* Resp. to DMSJ, Dkt. 274, at 22. But it is the comment's transparently "fact-based" nature that makes it clear that the comment contains Barrett's interpretation of the stated facts.

"compares provoked urine results to non-provoked reference ranges . . . . for all the reasons explained above." Resp. to DMSJ, Dkt. 274, at 22. Problematically, the prior arguments regarding falsity in DDI's brief are directed exclusively at whether it is false to describe DDI's report as fraudulent, deceptive, or misleading—not at whether it is false to describe the report as comparing provoked test results to non-provoked reference ranges. *See* Resp. to DMSJ, Dkt. 274, at 16-21.[28] Nevertheless, in light of DDI's interrogatory responses, which assert that statement (c) is false because DDI's report "plainly states that the reference ranges do not apply," Second Supp. Resp., Dkt. 294-1, at 1, the Court construes DDI to be arguing that it is false to describe DDI's report as comparing provoked test results to non-provoked reference ranges because the report includes a bolded sentence noting that "[r]eference ranges are representative of a healthy population under non-challenge or non-provoked conditions." *See, e.g.*, Article A, Dkt. 24-1, at 1 (showing this language at the bottom of the patient's report); Pl.'s DMSJ Ex. 11, Dkt. 273-21 (blank DDI report form containing this language at the bottom); *see also* Resp. to DMSJ, Dkt. 274, at 16-21 (relying heavily on this "qualifying language" as evidence of the falsity of statements describing the report as fraudulent, deceptive, or misleading); 2013 Fields Dep., Ex. 5 to DSOF, Dkt. 250-17, at 75-84 (deposition testimony of DDI executive Doug Fields discussing the effect of the "caution" placed on the report).

---

[28] The closest DDI comes to directly presenting evidence that it is false to describe its report as comparing provoked results to non-provoked reference ranges is in its reply brief for its own summary judgment motion. In that brief, DDI argues that an Indiana state court "found DDI did . . . not 'compare' unprovoked reference ranges." Reply to PMSJ, Dkt. 294, at 9; *see also* Ex. 15 to PSOF, Dkt. 244-15 (copy of order granting DDI's motion for summary judgment in the Indiana case). The decision DDI cites to, however, does not support DDI's argument, as the Indiana state court did not making a finding about whether DDI's report compares provoked results to non-provoked reference ranges. Rather, the court found that "Plaintiff's arguments that Doctor's Data used an inapplicable, inappropriate, and/or scientifically invalid reference range and methodology, even if proven true, do not constitute any knowing misrepresentation of fact as required to support a claim of actual fraud." Ex. 15 to PSOF, Dkt. 244-15, at 2-3.

A reasonable jury could certainly find that DDI's qualifying language adequately puts report recipients on notice that the reference ranges and graphical classifications displayed next to the test results should be given less weight, or possibly even no weight, if the urine sample at issue was provoked.[29] But no reasonable jury could find that the inclusion of DDI's qualifying language—language that provides information relevant to interpreting the comparisons in the report—makes the comparisons in the report cease to exist, such that it is false to state that the report compares provoked results to non-provoked reference ranges. And the evidence in the record amply demonstrates that DDI's report contains the comparisons in question. DDI admits that it uses the same report format for provoked and non-provoked samples and that it therefore reports the results of provoked tests alongside the reference ranges for non-provoked samples. *See* Resp. to DMSJ, Dkt. 274, at 4, 18. DDI even cites testimony of its own experts referring to DDI's "use of reference ranges for unprovoked urine" on its reports of provoked urine results. Resp. to DMSJ, Dkt. 274 at 18; *see also* PSOAF, Dkt. 273, at 21-23, ¶¶ 49-50, 54. Further, DDI executive Doug Fields provided deposition testimony stating that the graphing on the report reproduced in Article A "is a result of comparing the results to [the non-provoked] reference ranges" and is "a comparison of the measured amount against a reference range for non-provoked samples." 2013 Fields Dep., Ex. 5 to DSOF, Dkt. 250-17, at 80, 84.

---

[29] DDI overstates the clarity of its proviso when it asserts that the qualifying language in the report "plainly states that the reference ranges do not apply [to provoked test results]." Second Supp. Resp., Dkt. 294-1, at 1 (discussing statement (c)); *see also* Resp. to DMSJ, Dkt. 274, at 4 ("[The report] includes qualifying language—in bold lettering—stating that the reference range is inapplicable if the specimen was provoked urine."). The actual text of the qualifying language merely notes that "[r]eference ranges are representative of a healthy population under non-challenge or non-provoked conditions." This statement does not necessarily convey the impression that the reference ranges and associated graphical classifications have ***no*** relevance for provoked tests.

Providing a report form that compares provoked test results to non-provoked reference ranges and explains that the reference ranges are based on non-provoked specimens may very well be, as DDI maintains, an appropriate and non-deceptive method of reporting provoked test results. But what matters for present purposes is that there is no genuine issue of material fact that this *is* DDI's method. In light of the evidence in the record, no reasonable jury could find that it is false to suggest that DDI's provoked test reports compare provoked results to non-provoked reference ranges, and the defendants are therefore entitled to summary judgment on this aspect of statement (c). *Cf. Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 698-99 (7th Cir. 2006) (affirming grant of summary judgment for defendants on defamation claim where plaintiff "failed to produce evidence suggesting that the statements were false"); *Bell v. Greyhound Lines Inc.*, No. 12 C 449, 2013 WL 5162885, at *12-13 (N.D. Ill. Sept. 13, 2013) (granting summary judgment for defendants on defamation claim since challenged statements were subject to qualified privilege and plaintiff had not "pointed to record evidence creating a genuine issue of material fact with respect to the[ir] truth or falsity"); *Horrell v. Merrill Lynch, Pierce, Fenner, & Smith Inc.*, No. 03 C 4996, 2006 WL 2735448, at *6 (N.D. Ill. Sept. 22, 2006) (granting summary judgment for defendants with respect to allegedly defamatory statements since plaintiff "failed to put forth evidence that the statements were false").

Since the description of DDI's report classification as misleading is non-actionable opinion and there is no genuine dispute that DDI's report compares provoked results to non-provoked reference ranges, summary judgment is granted for the defendants on DDI's defamation claims based on statement (c).

### *Statement (d)*

DDI identifies the following material in the "Why Provoked Testing Is a Scam" section

of Article A as statement (d):

> Neither Mayo Clinic, nor any other legitimate national laboratory, has reference ranges for "provoked" specimens. Further, the reference ranges for normal urine heavy metal levels used by Mayo Clinic and the largest national reference lab, Quest Diagnostics, are the same.
>
> In contrast, Doctor's Data uses reference values of less than 3 ug/g for mercury and 5 ug/g for lead.

Second Supp. Resp., Dkt. 294-1, at 1-2. DDI argues that statement (d) is false to the extent it

asserts that DDI has reference ranges for provoked test results and that DDI is not a legitimate

laboratory. *See* Second Supp. Resp., Dkt. 294-1, at 2; Resp. to DMSJ, Dkt. 274, at 26-27. The

defendants argue, *inter alia*, that the statement cannot reasonably be read to convey these

accusations when considered in context. *See* DMSJ Mem., Dkt. 249, at 27-28 ("[I]t is frivolous

for DDI to claim that Dr. Barrett accused it of being 'illegitimate' for having 'provoked'

reference ranges, when Dr. Barrett actually states that they do not."); Defenses Table, Ex. 2 to

DSOF, Dkt. 250-2, at 2-3.

Notably, the last sentence of statement (d) is the opening sentence of a longer paragraph

in Article A. That paragraph reads in relevant part:

> In contrast, Doctor's Data uses reference values of less than 3 ug/g for mercury and 5 ug/g for lead. Standard laboratories that process non-provoked samples use much higher reference ranges [3,4], which means that if all other things were equal, Doctor's Data is far more likely than standard labs to report "elevated" levels. But that's not all. A disclaimer at the bottom of the above lab report states—in boldfaced type!—that "**reference ranges are representative of a healthy population under non-challenge or nonprovoked conditions**." In other words, they should **not** be applied to specimens that were obtained after provocation.

Article A, Dkt. 24-1, at 2. The two paragraphs containing statement (d) thus indicate: (1) that no "legitimate" laboratories have reference ranges for provoked specimens; (2) that the "3 ug/g" and "5 ug/g" figures reflect DDI's non-provoked reference ranges for mercury and lead; (3) that DDI's non-provoked reference ranges are lower than those used by "standard" laboratories such as Mayo Clinic and Quest Diagnostics; and (4) that a DDI report on a provoked specimen displayed DDI's non-provoked reference ranges along with a note explaining that they were based on non-provoked specimens. Therefore, considered in context, statement (d) does not state that DDI has reference ranges for provoked specimens. As for the "legitimate laboratory" aspect of statement (d), nowhere does the statement refer to DDI as an illegitimate lab; rather, it offers comparisons (the accuracy of which are not disputed) between DDI and several other labs, as well as between labs that have reference ranges for provoked specimens and those that do not. If DDI suffers in the comparisons, that does not make the factually accurate statements defamatory. Viewed in context, statement (d) simply does not contain the accusations which DDI alleges are false. Accordingly, summary judgment for the defendants is appropriate on DDI's defamation claims based on statement (d).

### Statement (e)

Statement (e) consists of a single sentence from the "Why Provoked Testing Is a Scam" section of Article A: "The management at Doctor's Data knows that provoked testing artificially raises the urine levels and that the length of collection time greatly influences the results." First Supp. Resp., Dkt. 273-58, at 2. The defendants argue, *inter alia*, that this statement does not have a defamatory meaning and that there is no genuine issue of material fact as to its falsity. *See* DMSJ Mem., Dkt. 249, at 20; Defenses Table, Ex. 2 to DSOF, Dkt. 250-2, at 3. DDI does not challenge the truthfulness of the statement itself; DDI instead contends that, given its context,

statement (e) falsely implies that DDI intentionally manipulates test results through provocation or collection time in order to deceive patients into believing they need unnecessary treatment. *See* First Supp. Resp., Dkt. 273-58, at 2, Resp. to DMSJ, Dkt. 274, at 22-23.

As previously explained in the discussion of statements (a) and (b), Article A indicates: (1) that DDI processes tests of urine specimens submitted by practitioners, (2) that the practitioners handle the collection process (and thus control when the specimens are collected and whether they are provoked or non-provoked), (3) that DDI provides reports of the test results to practitioners, and (4) that some practitioners reference the test results when recommending unnecessary treatments to their patients. Article A also states that the patient whose report is shown on the first page of the article "was told that his mercury and lead levels were high and should be reduced with EDTA chelation therapy." Article A, Dkt. 24-1, at 1. In addition, the paragraph immediately preceding statement (e) points out that the patient's report was based on a provoked specimen "obtained over a 6-hour period, not the standard 24-hour period." Article A, Dkt. 24-1, at 2. The length of the collection period and the fact that the patient's specimen was provoked are noted on the report itself. *See* Article A, Dkt. 24-1, at 1.

Viewed in the context of this information, statement (e) does not convey the defamatory implication that DDI alleges—*i.e.*, that DDI manipulates test results in order to trick patients into believing that they need unnecessary treatment. According to Article A, DDI's role consists of testing urine specimens submitted by practitioners and providing reports to those practitioners— reports that appropriately include any information in DDI's possession about provocation and collection timing, factors which DDI knows to be relevant to interpreting the test results.[30]

---

[30] DDI asserts that practitioners often do not inform DDI whether the specimens submitted are provoked or non-provoked. *See* Resp. to DMSJ, Dkt. 274, at 4; PSOAF, Dkt. 283, at 7-8, ¶ 18.

Although statement (e) perhaps helps convey the impression that the deceptive conduct of some practitioners would be impeded if DDI refused to process provoked urine specimens or reported provoked urine results differently, that is not a defamatory implication about DDI (nor is it the implication that DDI claims statement (e) conveys). Accordingly, summary judgment is granted for the defendants on DDI's defamation claims with respect to statement (e).

### *Statement (f)*

Statement (f) also appears in the "Why Provoked Testing Is a Scam" section of Article A. It reads: "Despite all of this, Doctor's Data's reports classify mercury values in the range of 5-10 μg/g as 'elevated' and further state that 'no safe reference levels for toxic metals have been established.'" First Supp. Resp., Dkt. 273-58, at 2. The defendants argue, *inter alia*, that this statement does not have a defamatory meaning and that there is no genuine issue of material fact as to its falsity. *See* DMSJ Mem., Dkt. 249, at 20; Defenses Table, Ex. 2 to DSOF, Dkt. 250-2, at 4. DDI asserts that statement (f) is false because DDI's reports "do not contain reference ranges for provoked sampling and plainly state that no reference range for provoked tests exists." First Supp. Resp., Dkt. 273-58, at 2; *see also* Resp. to DMSJ, Dkt. 274, at 23. DDI's arguments miss the mark, however, as statement (f) does not state that DDI's reports contain reference ranges for provoked tests. In fact, the paragraph in which statement (f) appears does not mention provocation at all, and the preceding material in Article A indicates that DDI does not have reference ranges for provoked specimens (as explained in the discussion of statement (d), *supra*). Since statement (f) does not convey the suggestion about reference ranges that DDI alleges is defamatory, summary judgment is granted for the defendants on DDI's defamation claims based on this statement.

### *Statement (g)*

Statement (g) is an excerpt from another sentence in the "Why Provoked Testing Is a Scam" section of Article A. It reads: "Colton Snyder underwent chelation therapy after a Doctor's Data urine test report classified his urine mercury level as 'very elevated.'" First Supp. Resp., Dkt. 273-58, at 2. The sentence following this statement in Article A reveals that Snyder's urine sample had been provoked. *See* Article A, Dkt. 24-1, at 3. The defendants argue, *inter alia*, that there is no genuine issue of material fact as to the falsity of statement (g). *See* Defenses Table, Ex. 2 to DSOF, Dkt. 250-2, at 4-5. DDI asserts that statement (g) is false to the extent it indicates that DDI's report on Snyder's provoked specimen provided a classification for his test results. DDI does not contest that the report displayed a classification; instead, its theory is that statement (g) is false because the classification clearly did not apply to Snyder's results since the report included DDI's standard qualifying language. *See* First Supp. Resp., Dkt. 273-58, at 2. But even assuming that the qualifying language at the bottom of Snyder's report adequately apprised readers that the mercury level classification shown in the report should be disregarded (see the discussion of qualifying language in the analysis of statement (c), *supra*), it remains undisputed that the report displayed the classification in question. Accordingly, there is no genuine issue of material fact regarding the falsity of the suggestion in statement (g) that Snyder's report provided a classification for his test results. Summary judgment is therefore granted for the defendants on DDI's defamation claims with respect to this statement.

### *Statement (h)*

Statement (h) is a modified version of the *Stemp* lawsuit description in the "Regulatory Actions and Civil Suits" section of Article A. The original text in Article A reads:

> In 2009, 43-year-old Ronald Stemp sued Caquias, CARE Clinics,
> the clinic's owner, and Doctor's Data for fraud, negligence, and

> conspiracy. The suit petition states that Stemp originally sought
> help for memory loss, inability to sleep, difficulty concentrating,
> and depression. After taking a urine toxic metals test and several
> other tests, he was falsely diagnosed with heavy metal poisoning
> and advised to undergo intravenous chelation therapy.

Article A, Dkt. 24-1, at 5. DDI identifies the following excerpt from this paragraph as statement

(h): "In 2009, 43-year-old Ronald Stemp sued . . . Doctor's Data for fraud, negligence, and

conspiracy. . . . After taking a urine toxic metals test and several other tests, he was falsely

diagnosed with heavy metal poisoning and advised to undergo intravenous chelation therapy."

First Supp. Resp., Dkt. 273-58, at 2 (alterations by DDI).

The defendants argue, *inter alia*, that there is no genuine issue of material fact as to the

falsity of statement (h). *See* Defenses Table, Ex. 2 to DSOF, Dkt. 250-2, at 5. DDI does not deny

that Stemp's lawsuit asserted claims for fraud, negligence, and conspiracy, but contends that the

allegations in the lawsuit were false and that the defendants are liable for republishing those false

allegations. *See* First Supp. Resp., Dkt. 273-58, at 2 ("[T]he underlying fraud, negligence and

conspiracy allegations in the Stemp lawsuit . . . are false."). *See generally Brennan*, 351 Ill. App.

3d at 970, 814 N.E.2d at 959 (explaining liability for republication). The only factual allegations

that appear in statement (h) are that Stemp took "a urine toxic metals test and several other tests"

and that he was subsequently "falsely diagnosed with heavy metal poisoning and advised to

undergo intravenous chelation therapy." DDI has pointed to no record evidence that these

allegations are false.[31] Accordingly, the defendants are entitled to summary judgment on DDI's defamation claims with respect to statement (h).[32]

### *Statement (i)*

Statement (i) is the *Coman* lawsuit description in the "Regulatory Actions and Civil Suits" section of Article A:

> In March 2010, James Coman filed suit on behalf of his 7-year-old son against Anju Usman, M.D., Daniel Rossignol, M.D., and Doctor's Data. Among other things, the complaint indicated that— based on the results of provoked urine testing—the boy was inappropriately treated for nonexistent metal toxicity for more than four years.

First Supp. Resp., Dkt. 273-58, at 2.[33] The defendants argue, *inter alia*, that statement (i) is a fair abridgment of Coman's complaint and is therefore protected by the fair report privilege.[34] *See DMSJ Mem.*, Dkt. 249, at 8-10. *See generally Solaia Tech.*, 221 Ill. 2d at 585, 852 N.E.2d at

---

[31] In addition, the Court notes that the allegations reproduced in statement (h) do not contain defamatory assertions ***about DDI***. As the Court previously explained in analyzing statements (a), (b), and (e), Article A indicates that it is ***practitioners*** who review the reported test results and make treatment recommendations to patients—DDI's role is to conduct tests when requested by practitioners and report the results.

[32] As the defendants argue, *see* DMSJ Mem., Dkt. 249, at 8-10, statement (h) is also protected by the fair report privilege. DDI does not deny that the *Stemp* lawsuit was filed as described and contained the factual allegations summarized in statement (h), *see, e.g.*, First Supp. Resp., Dkt. 273-58, at 2, and DDI's sole argument against application of the fair report privilege to statement (h)—that Article A includes additions that impute DDI's "guilt," *see* Resp. to DMSJ, Dkt. 274, at 12—is unavailing since the article cannot reasonably be construed to contain any such improper commentary, for substantially the same reasons explained in the discussion of statement (i), *infra*.

[33] The original version of the *Coman* lawsuit description in Article A includes a footnote call number at the end that directs readers to a footnote citing the *Coman* complaint. *See* Article A, Dkt. 24-1, at 5-6.

[34] One of the defendants' other arguments is that there is no genuine issue of material fact as to the falsity of the portion of statement (i) that describes the filing of the *Coman* lawsuit. *See* Defenses Table, Ex. 2 to DSOF, Dkt. 250-2, at 5-6. Although that is a viable argument, the Court addresses the defendants' argument based on the fair report privilege instead since they raise that argument with respect to the entirety of statement (i), including the reporting of the allegations in the *Coman* suit.

839. DDI does not deny that Coman filed the lawsuit as described, *see, e.g.*, First Supp. Resp., Dkt. 273-58, at 2-3, but instead argues that the fair report privilege does not protect statement (i) for two reasons.

First, DDI argues that the fair report privilege does not protect this statement because the defendants abused the privilege by including improper commentary imputing DDI's probable "guilt" of the allegations in the *Coman* complaint. *See* Resp. to DMSJ, Dkt. 274, at 15. *See generally Solaia Tech.*, 221 Ill. 2d at 590, 852 N.E.2d at 845 ("The reporter is not privileged . . . to make additions of his own that would convey a defamatory impression . . . ." (quoting Restatement (Second) of Torts § 611 cmts. f (1977)) (internal quotation marks omitted)). This argument is unavailing, however, since no reasonable jury could find that Article A contains any such improper commentary about the *Coman* lawsuit. *Cf.* Resp. to DMSJ, Dkt. 274, at 13, 15 (discussing applicability of fair report privilege to statement (i) and other challenged statements but identifying only a sentence about the *Coman* lawsuit ***in Article B*** as improper commentary). The description of the suit in statement (i) is neutrally worded, as is the paragraph introducing the "Regulatory Actions and Civil Suits" section, *see* Article A, Dkt. 24-1, at 4 (stating that several lawsuits had been filed "against doctors who used provoked urine testing as a prelude to chelation"), and there are no other references to the *Coman* lawsuit in the text of Article A.

DDI's second theory as to why the fair report privilege does not protect statement (i) is based on the rule that a person may not confer the privilege upon a third person by making a defamatory publication "under a collusive arrangement with that person for the purpose of conferring the privilege upon him." *Solaia Tech.*, 221 Ill. 2d at 588, 852 N.E.2d at 844 (quoting

Restatement (Second) of Torts § 611 cmts. c (1977) (internal quotation marks omitted)).[35] Although DDI's arguments on this point are not clearly presented, DDI apparently contends that a collusive agreement to confer the privilege on the defendants existed between the defendants, Coman, and David Wilzig, the lawyer who filed the complaint on Coman's behalf.[36] *See* Resp. to DMSJ, Dkt. 274, at 13-15, 38-39; *see also* PSOAF, Dkt. 273, at 17-18, ¶¶ 35-40. DDI has introduced evidence that: (1) Barrett encouraged Coman to get in touch with Wilzig after Coman emailed Barrett a copy of a complaint he filed with the Illinois licensing board regarding his son's treatment, *see* Pl.'s DMSJ Ex. 25, Dkt. 273-25, at 1977; Pl.'s DMSJ Ex. 37, Dkt. 273-37; (2) Barrett, Coman, and Wilzig communicated about Coman's son's treatment history prior to the filing of the *Coman* lawsuit, *see* Pl.'s DMSJ Ex. 25, Dkt. 273-25, at 1969-72, 1975-76; (3) Robert Baratz, a medical expert who served as Barrett's "main consultant," wrote the physician's affidavit that was attached to the *Coman* lawsuit, *see* Pl.'s DMSJ Ex. 12, Dkt. 273-12; Pl.'s DMSJ Ex. 13, Dkt. 273-13, at 221; and (4) Barrett published reports about the *Coman* lawsuit shortly after its filing on March 3, 2010, *see* Article B, Dkt. 24-2, at 1-2 (describing the suit and

---

[35] A related limitation on the fair report privilege is that a person cannot self-confer the privilege "by making the original defamatory publication himself and then reporting to other people what he had stated." *Solaia Tech.*, 221 Ill. 2d at 588, 852 N.E.2d at 844 (quoting Restatement (Second) of Torts § 611 cmts. c (1977) (internal quotation marks omitted)).

[36] DDI actually states that the defendants are seeking to confer the privilege upon Coman and Wilzig. *See* Resp. to DMSJ, Dkt. 274, at 13. But given that Coman and Wilzig are not parties to the present case, the Court understands DDI to have intended to state that the defendants sought to have the privilege conferred upon themselves through the filing of the *Coman* complaint by Coman and Wilzig. Notably, since the "collusive arrangement" rule is an exception to the fair report privilege, *cf. Missner*, 393 Ill. App. 3d at 764, 914 N.E.2d at 553 (2009) (referring to the related rule barring a person from conferring the privilege on himself as an exception to the privilege), it is DDI's burden to establish that the fair report privilege does not protect the defendants' reporting of the *Coman* lawsuit based on this exception. *Cf. Ray*, 700 F.3d at 1007 ("[T]he burden is rightfully on the petitioner, as the party seeking application of an equitable exception to the [affirmative defense of untimeliness].""); *Costello*, 651 F.3d at 630 ("[W]hereas the burden of establishing the affirmative defense of illegality would be on the Borrowers, the Trustee bore the burden of proving the good-faith non-reliance exception.").

showing a revised date of March 6, 2010); Article A, Dkt. 24-1, at 5-6 (describing the suit and showing a revised date of March 14, 2010). Even if this evidence is sufficient to raise a triable issue as to whether there was a collusive arrangement to file the *Coman* lawsuit, DDI has not pointed to record evidence that any such collusive arrangement was made "***for the purpose of*** conferring" the fair report privilege on the defendants. In fact, DDI contends that the evidence shows that the purpose of the joint activity was to enable Barrett, Wilzig, and Baratz to generate income from the lawsuit. *See* Resp. to DMSJ, Dkt. 274, at 14, 39; *see also* Resp. to DMSJ, Dkt. 274, at 13 n.4. Accordingly, DDI has failed to establish that the "collusive arrangement" exception prevents the defendants from invoking the fair report privilege.

Since it is undisputed that statement (i) is a fair abridgement of the *Coman* complaint, and DDI has not shown that the fair report privilege is otherwise inapplicable to this statement, summary judgment is granted for the defendants on DDI's defamation claims with respect to statement (i).

### ***Statement (j)***

The last statement in Article A that DDI challenges is statement (j), which is an excerpt from the section labeled "The Bottom Line":

> The urine toxic metals test described above—whether provoked or not—is used to persuade patients they are toxic when they are not. I believe that several agencies can and should do something to stop this deception. . . . State laboratory licensing agencies could prohibit testing of provoked specimens or order Doctor's Data to raise its reference ranges and to stop comparing provoked test results to these non-provoked ranges.

First Supp. Resp., Dkt. 273-58, at 3 (alteration by DDI). DDI asserts that the suggestion in statement (j) about DDI's use of reference ranges for provoked test results is false. *See* First Supp. Resp., Dkt. 273-58, at 3. The defendants argue, *inter alia*, that there is no genuine issue of

material fact as to the falsity of the assertion that DDI's reports classify provoked test results by comparing them to non-provoked reference ranges. *See* DMSJ Mem., Dkt. 249, at 4, 11-12, 16-17 (discussing DDI's falsity theory based on the qualifying language in its reports). For the reasons stated in the discussion of statement (c), the Court agrees; the presence of qualifying language in DDI's report does not change the fact that the report compares provoked results to non-provoked reference ranges. Summary judgment is therefore granted for the defendants on DDI's defamation claims with respect to statement (j).

### 2. Article B—Statements (k), (l), and (m)

Article B is an online newsletter issue posted on www.ncahf.org titled "Consumer Health Digest #10-09"; the issue is dated March 5, 2010, but a line at the bottom indicates that the page was revised on March 6, 2010. *See* Article B, Dkt. 24-2. The first story in the newsletter is about the *Coman* lawsuit (which was also described in statement (i) in Article A). The story reads in its entirety as follows:

> **"Autism specialists" sued.** The father of a 7-year-old boy has filed suit against two self-styled "autism specialists," their clinics, and a laboratory that tests urine specimens for "toxic metals." The <u>complaint</u> states:
>
> - Defendants Anju Usman, MD, True Health Medical Center, Dan Rossignol, MD, Creation's Own, and Doctor's Data Laboratory conspired to induce patients to undergo unwarranted chelation therapy.
> - The scheme in this case centered around Usman's use of a "provoked" urine toxic metals test to falsely assert that the boy had accumulated dangerous levels of mercury and several other metals. Usman made this initial assessment when he was only two years old even though he had had no significant exposure to toxic metals.
> - Chelation therapy was administered with suppositories when the boy was four and included 41 intravenous sessions over an 18-month period, beginning when he was five.

- The inappropriate treatments also included dietary supplements, hyperbaric oxygen, hormones, and other drugs that were unnecessary, unapproved, and/or potentially dangerous.
- Whereas Usman examined and treated the boy at her office, Rossignol, without ever examining him, based his recommendations on telephone conversations with the mother over a 25-month period.

The provoked urine toxic metals test is a fraud. The suit asks for damages related to negligence, lack of informed consent, intentional misrepresentation, negligent misrepresentation, battery, and civil conspiracy.

Article B, Dkt. 24-2, at 1. DDI alleges that statements (k), (l), and (m), which appear within this story, are defamatory. *See* First Supp. Resp., Dkt. 273-58, at 3. For the reasons explained below, the Court grants summary judgment for the defendants on DDI's defamation claims with respect to all three statements.

### *Statements (k) and (m)*

Statement (k) is an excerpt from the first bulleted paragraph in the *Coman* lawsuit story. It reads: "Doctor's Data Laboratory conspired to induce patients to undergo unwarranted chelation therapy." First Supp. Resp., Dkt. 273-58, at 3. Statement (m) is the sentence at the end of the story which states: "The suit asks for damages related to negligence, lack of informed consent, intentional misrepresentation, battery, and civil conspiracy." First Supp. Resp., Dkt. 273-58, at 3. The defendants argue, *inter alia*, that these statements are a fair abridgment of the *Coman* complaint and are therefore protected by the fair report privilege. *See* DMSJ Mem., Dkt. 249, at 8-10.

DDI does not deny that the *Coman* lawsuit included the allegations and claims described in statements (k) and (m). *See, e.g.*, First Supp. Resp., Dkt. 273-58, at 3. DDI argues, however, that the fair report privilege does not protect the statement because of the "collusive

arrangement" exception to the fair report privilege and because statement (l), which also appears in Article B, is improper commentary imputing DDI's probable "guilt" of the allegations described in the *Coman* lawsuit story. *See* Resp. to DMSJ, Dkt. 274, at 13-15, 38-39; *see also* PSOAF, Dkt. 273, at 17-18, ¶¶ 35-40. *See generally Solaia Tech.*, 221 Ill. 2d at 588, 590, 852 N.E.2d at 844, 845 (discussing the "collusive arrangement" exception and noting that reporters are not privileged to make defamatory additions to reports of official proceedings). DDI's arguments are unavailing. As explained in the analysis of statement (i), *supra*, DDI has failed to establish that the defendants' reporting of the *Coman* lawsuit falls within the "collusive arrangement" exception. And as explained below, statement (l)—the basis for DDI's "improper commentary" argument regarding statements (k) and (m)—is an expression of opinion about tests of provoked urine, not a defamatory addition to the report of the *Coman* suit.[37] Summary judgment is therefore granted for the defendants on DDI's defamation claims with respect to statements (k) and (m).

### *Statement (l)*

Statement (l) is the sentence "The provoked urine toxic metals test is a fraud." First Supp. Resp., Dkt. 273-58, at 3. The defendants argue, *inter alia*, that this statement is an expression of opinion and is thus not actionable as defamation. *See* DMSJ Mem., Dkt. 249, at 13, 20-21, 35-36; Defenses Table, Ex. 2 to DSOF, Dkt. 250-2, at 7-8. As previously explained, a statement is not actionable as defamation if it cannot reasonably be interpreted as stating actual facts about the plaintiff, when viewed "from the perspective of an ordinary reader." *Imperial Apparel*, 227 Ill. 2d at 398, 882 N.E.2d at 1022; *see also Giant Screen Sports*, 553 F.3d at 535; *Hadley*, 2015

---

[37] To the extent DDI argues that statement (l) is improper commentary because it contains a hyperlink to Article A, *see* PSOAF, Dkt. 273, at 19, ¶ 41, that argument is unavailing for the reasons explained in the discussion of statement (cc), *infra*.

IL 118000, ¶ 33, 34 N.E.3d at 558. To determine whether a statement is factual in nature, Illinois courts consider "whether the statement has a precise and readily understood meaning; whether the statement is verifiable; and whether the statement's literary or social context signals that it has factual content." *Hadley*, 2015 IL 118000, ¶ 41, 34 N.E.3d at 559 (citing *Solaia Tech*, 221 Ill. 2d at 581, 852 N.E.2d. at 840); *see also Ludlow v. Nw. Univ.*, 79 F. Supp. 3d 824, 841 (N.D. Ill. 2015) (noting that when considering the first factor, courts must bear in mind that "the first amendment protects overly loose, figurative, rhetorical, or hyperbolic language, which negates the impression that the statement actually presents facts" (quoting *Hopewell v. Vitullo*, 299 Ill. App. 3d 513, 518, 701 N.E.2d 99, 103 (1998) (internal quotation marks omitted)).

In this case, the statement "The provoked urine toxic metals test is a fraud" does not have a precise and readily apparent meaning. As an initial matter, the term "fraud" has a broad scope; to speak of something as a "fraud" may mean it is criminally deceptive, but it may also mean simply that it is not what it purports to be. When H. L. Mencken famously opined that "All men are frauds," he did not incur universal liability for defamation.[38] As well, "fraud" is a term often used as hyperbole, trotted out in even the most inconsequential contexts—consider, for example, *Goalie Hyperbole, Part 1,542*, Brodeur Is a Fraud (Nov. 21, 2008), http://brodeurisafraud.blogspot.com/2008/11/goalie-hyperbole-part-1542.html (discussing the degree of influence goalies exert over the outcome of hockey games). That the term expressly refers here not to a person, or a knock-off designer purse, but to a test does nothing to make its meaning more clear; what does it mean for a test to be a fraud? The word "fraud" does not appear anywhere else in the *Coman* lawsuit story, there is no specific definition or explanation of

---

[38] Mencken's full quote, it should be noted, also introduces circularity that also defeats any argument that the statement was one of fact: "All men are frauds. The only difference between them is that some admit it. I myself deny it."

the term, and the other references to urine testing in the story do not suggest that the test itself is inaccurate or fake—rather, the story reports allegations that the use made by a specific doctor of DDI's test was improper. DDI reads statement (l) as suggesting that DDI is committing fraud through its urine tests, but if anything, the context here points not to DDI as the party responsible for "fraud" but to those who use DDI's test to deceive the public—that is to say, the physicians who buy DDI's testing services. Given these considerations, the Court cannot conclude that statement (l) has a precise and readily understood meaning. *Cf. Greenbelt Co-op. Pub. Ass'n v. Bresler*, 398 U.S. 6, 14 (1970) (holding that use of term "blackmail" to describe plaintiff's negotiating tactics was clearly "rhetorical hyperbole" that did not imply wrongdoing); *Manjarres v. Nalco Co.*, No. 09 C 4689, 2010 WL 918072, at *3-5 (N.D. Ill. Mar. 9, 2010) (finding that "short, vague statements" describing plaintiff as unprofessional, incompetent, unethical, and crazy did not have a precise and readily understood meaning); *Hopewell v. Vitullo*, 299 Ill. App. 3d 513, 519, 701 N.E.2d 99, 104 (1998) ("Regardless of the fact that 'incompetent' is an easily understood term, its broad scope renders it lacking the necessary detail for it to have a precise and readily understood meaning.").

Since statement (l) does not have a precise and readily understood meaning, it is also not verifiable. *Cf. Manjarres*, 2010 WL 918072, at *5 (finding that statements "d[id] not include facts sufficient to render them objectively verifiable"); *Solaia Tech*, 221 Ill. 2d at 583, 852 N.E.2d. at 841 ("The phrase 'deeply greedy people' has no precise meaning, and it is not verifiable."). Here, there is no authoritative and independent source of information that can be consulted to assess the truth or accuracy of the statement that DDI's test "is a fraud."

The statement's context also signals that it is not factual in nature; the rest of the sentences in the story neutrally describe the *Coman* lawsuit, while statement (l) expresses a

48

judgment about an item mentioned in the lawsuit summary (the urine toxic metals test). *Cf. Solaia Tech*, 221 Ill. 2d at 583, 852 N.E.2d. at 841 ("[T]he context in which [the] phrase appeared indicates that it may have been judgmental, but it was not factual."); *cf. also Frain Grp., Inc. v. Steves Frozen Chillers*, No. 14 C 7097, 2015 WL 1186131, at *4 (N.D. Ill. Mar. 10, 2015) ("Steve's commentary interspersed among its factual declarations do not support a defamation claim. The statements suggesting that Frain 'ripped off' Steve's and that the Prodo Pak Machine was a 'butchered piece of junk' are non-actionable statements of opinion incapable of being objectively verified."). Accordingly, the Court concludes that statement (l) is an expression of opinion, and summary judgment for the defendants is appropriate on DDI's defamation claims with respect to this statement. *Cf. Skolnick v. Corr. Med. Servs., Inc.*, 132 F. Supp. 2d 1116, 1127 (N.D. Ill. 2001) (finding statement describing plaintiff's conduct as "as dishonest, fraudulent and deceitful" to be protected opinion); *Kirk v. CBS, Inc.*, No. 83 C 2764, 1987 WL 11831, at *4-5 (N.D. Ill. June 4, 1987) (finding statements characterizing a type of cancer treatment as medically unsound to be protected opinion).

### 3. Article C—Statements (n), (o), (p), (q), (r), (s), (t), (u), (v), (w), (x), (y), (z), (zz), (aaa), (bbb), (ccc), (ddd), (eee), (fff), and (ggg)

Article C is an article published on www.casewatch.org titled "CARE Clinics, Doctor's Data, Sued for Fraud"; Barrett is credited as the author, and a line at the bottom indicates that the article was posted on July 15, 2009. *See* Article C, Dkt. 24-3. The article is about the *Stemp* lawsuit (which was also described in statement (h) in Article A); it consists of an introductory paragraph followed by a reproduction of the *Stemp* complaint.[39] The caption portion of the

---

[39] The defendants state that Article C "included a photocopy of the Petition." DMSJ Mem., Dkt. 249, at 9. That assertion—that the article included a photocopy of the *Stemp* complaint—is unsupported; there is no basis provided in the record to discern whether the reproduction of the complaint is a photocopied (or scanned) image or whether Barrett simply inserted the electronic text of the complaint file into the web page.

complaint reproduction shows the filing date—July 16, 2009—and the cause (case) number—lD-1-GN-09-00279—in typed text. *See* Article C, Dkt. 24-3, at 1. The paragraph that introduces the complaint reads as follows:

> CARE Clinics, of Austin Texas, its owner Kazuko Curtin, its subsidiaries, and Chicago-based Doctor's Data have been sued for fraud, negligence, and conspiracy in connection with the treatment of 43-year-old Ronald Stemp, who charges that he was improperly diagnosed and treated over a 10-month period. CARE Clinics specializes in the "biomedical treatment'" of autism, but it also treats adults. The suit petition (shown below) states that Stemp originally sought help for memory loss, inability to sleep, difficulty concentrating, and depression. After going through a battery of tests, he was told that he suffered from heavy metal poisoning and should undergo intravenous chelation therapy. The chelation caused Stemp to feel nauseous, lethargic, depressed, constantly drowsy, and weak. He subsequently learned that the diagnosis was incorrect and that the test used to diagnose it—Doctor's Data's urine toxic metals test—is a fraud. Stemp's insurance company was reportedly billed for a total of $180,000. The suit also named the clinic's medical director (Jesus Caquias, M.D.) and Jeff Baker (an unlicensed naturopath) as defendants. Caquias, who has been disciplined twice by the Medical Board of Texas, is under investigation for his treatment of other patients, and the clinic (now closed) is under investigation for submitting false insurance claims. A few days after the suit was filed, the FBI and the Internal Revenue Service raided the clinic.

Article C, Dkt. 24-3, at 1.

DDI alleges that 21 statements in Article C are defamatory; those statements consist of part of the article title—statement (n); an excerpt from the introductory paragraph—statement (o); and 19 statements in the reproduced *Stemp* complaint—statements (p), (q), (r), (s), (t), (u), (v), (w), (x), (y), (z), (zz), (aaa), (bbb), (ccc), (ddd), (eee), (fff), and (ggg). *See* First Supp. Resp., Dkt. 273-58, at 3-6; Second Supp. Resp., Dkt. 294-1, at 2-3. The defendants raise several broad arguments regarding all the challenged statements in Article C, plus additional arguments with respect to three of the statements.

The defendants maintain that most of the statements identified as defamatory by DDI do not fall within a defamation *per se* category. *See* DMSJ Resp., Dkt. 249, at 35-36. As previously noted, a statement that impugns a corporate plaintiff's competence or integrity qualifies as defamation *per se*. *See Neuros*, 698 F.3d at 519; *Republic Tobacco*, 254 F. Supp. 2d at 998-99 & n.16. DDI maintains that the challenged statements allege that it participated in a scheme to defraud, but in fact the statements merely report, accurately, that these allegations set forth in the *Stemp* suit. To that extent, the defendants' statements are accurate.

That said, DDI asserts that summary judgment based on the fair report privilege is inappropriate because there is a genuine issue of material fact as to whether Article C was posted **before** the *Stemp* complaint was filed, given that the article's stated posting date is July 15 and the filing date shown on the complaint reproduction is July 16. *See* Resp. to DMSJ, Dkt. 274, at 11. *See generally Solaia Tech.*, 221 Ill. 2d at 589, 852 N.E.2d at 844 (holding that fair report privilege applies to statements about a lawsuit made **after** filing of complaint). For their part, the defendants contend that "there is no question" that the *Stemp* complaint was filed before Article C was published because the reproduction of the complaint includes the cause number. Reply to DMSJ, Dkt. 292, at 28-29; *see also* Resp. to PSOAF, Dkt. 293, ¶ 30. That fact, however, does not conclusively establish that the *Stemp* complaint was filed before Article C was published, since there is no record evidence of the procedures for assigning cause numbers that applied at the time the *Stemp* lawsuit was initiated. Although an identifying number is often assigned to a lawsuit after a complaint has been filed,[40] that is not the procedure in all circumstances or jurisdictions. *See, e.g., Perry v. Accurate Staffing Consultants, Inc.*, No. 3:10-CV-201-FDW-

---

[40] Notably, the *Stemp* suit was filed in Texas state court, and under Texas law a complaint is deemed filed when it is tendered to the clerk or otherwise put under the clerk's custody or control. *See Mr. Penguin Tuxedo Rental & Sales, Inc. v. NCR Corp.*, 787 S.W.2d 371, 372 (Tex. 1990); *In re Smith*, 270 S.W.3d 783, 786 (Tex. App. 2008).

DCK, 2010 WL 2650881, at *4 (W.D.N.C. June 30, 2010) ("Plaintiff's counsel performed enough steps to receive an assigned docket number and to pay the filing fee, but no complaint was filed. . . . [T]he Clerk's office never had custody of the complaint within the limitations period."). Compounding the uncertain relationship between the timing of the complaint and the posting of the article is the fact that the last sentence of the paragraph introducing the *Stemp* complaint states: "A few days after the suit was filed, the FBI and the Internal Revenue Service raided the clinic." Article C, Dkt. 24-3, at 1. This sentence suggests that the *Stemp* lawsuit was filed several days before Article C was published, even though the article's posting date is shown as July 15 and the filing date listing on the complaint reproduction is July 16.

Accordingly, it is possible that Stemp's counsel obtained a cause number for the case prior to July 16 (without tendering the complaint to the clerk), thereafter completed the caption portion of the complaint with the cause number and planned filing date of July 16, and then provided a copy of the resulting document to Barrett, who posted it in Article C on July 15, **before** the complaint was filed. Of course, it is also possible, for example, that the complaint was tendered to the clerk on or before July 15 but Stemp's counsel put July 16 as the filing date because the filing process was anticipated to be completed on that date. *Cf. Farley v. Koepp*, 788 F.3d 681, 683 (7th Cir. 2015) (deeming a complaint to be filed on the day it was tendered to the clerk, even though the filing process was not yet complete under the local rules). The upshot of this factual uncertainty is that there is a genuine issue of material fact as to whether the *Stemp* complaint was filed before Article C was published. Therefore, the defendants are not entitled to summary judgment based on the fair report privilege with respect to Article C. *Cf. Computer Aid, Inc. v. Hewlett-Packard Co.*, 56 F. Supp. 2d 526, 533-34 (E.D. Pa. 1999) ("[Since] defamatory statements made in the absence of a judicial proceeding are not protected [by the fair report

52

privilege] . . . . a jury could find that Anderson Kill jumped the gun in issuing the Press Release the evening before the Complaint was filed . . . .").

The defendants are, however, entitled to summary judgment on the defamation *per quod* claim because DDI has not sufficiently established special damages. *See* DMSJ Mem., Dkt. 249, at 32-34, 36-37. As previously noted, in a defamation *per quod* action, the plaintiff must plead and prove special damages. *Tuite*, 224 Ill. 2d at 501, 866 N.E.2d at 121; *see also Imperial Apparel*, 227 Ill. 2d at 390, 882 N.E.2d at 1018 ("special damages [are] actual damages of a pecuniary nature"). In this case, the only evidence of damages caused by allegedly defamatory statements is the report of DDI's damages expert, Roger Grabowski. *See* Grabowski Report, Ex. 4 to DSOF, Dkts. 251-2 and 251-3; *see also, e.g.*, Resp. to DSOF, Dkt. 273, at 3, ¶ 6 (pointing only to Grabowski's report in denying defendants' assertion that DDI "suffered no damages whatsoever"). The defendants have filed a *Daubert* motion to bar Grabowski's testimony (Dkt. 232). In addition, the defendants argue that even if Grabowski's report is admissible, the report only attributes damages to the publication of Article A, so there is no evidence of damages based on statements in other publications. *See* DMSJ Mem., Dkt. 249, at 32-34, 36-37. In response, DDI contends: (1) that Grabowski's report "attributes damages more broadly" to "actions" of the defendants, including Article A's postings and distribution; and (2) that DDI need not prove damages through expert testimony. *See* Resp. to DMSJ, Dkt. 274, at 31; *see also* PSOAF, Dkt. 273, at 27, ¶ 69 (citing pages 2, 6, 15, and 25 of Grabowski's report). But, as the defendants point out, *see* Reply to DMSJ, Dkt. 292, at 21, DDI has not submitted any non-expert evidence of damages due to defamation, and Grabowski's report does not identify any actions that

53

contributed to DDI's purported damages other than the publication of Article A.[41] Accordingly, the defendants are entitled to summary judgment on DDI's defamation *per quod* claim with respect to the challenged statements in Article C (and with respect to all other allegedly defamatory statements in publications other than Article A).[42] *Cf. Kyung Hye Yano v. City Colleges of Chi.*, No. 08 CV 4492, 2013 WL 842644, at *7 (N.D. Ill. Mar. 6, 2013) (granting summary judgment for defendant on defamation *per quod* claim because there was "insufficient evidence of special damages in the record"); *Navistar Int'l Transp. Corp. v. Freightliner Corp.*, No. 97 C 3792, 1999 WL 569577, at *4 (N.D. Ill. July 30, 1999) (granting summary judgment

---

[41] Grabowski's damage calculations are clearly based exclusively on Article A. *See, e.g.*, Grabowski Report, Ex. 4 to DSOF, Dkt. 251-2, at 2-3 ("Based on my analyses of the financial data provided, analyses of economic and industry data, and other facts and data, DDI's elemental testing business unit ('Elemental Testing') was economically harmed in and around the first quarter of 2009 as a result of certain actions (as set forth below) of Dr. Barrett and QuackWatch. . . . Under Scenario A, I estimated damages assuming that a successful judgment of damages in favor of DDI would be accompanied by a retraction of the Article by Dr. Barrett and Quack Watch in and around the end of 2012. Under Scenario B, I estimated damages assuming that a successful judgment of damages in favor of DDI would not be accompanied by a retraction of the Article by Dr. Barrett and QuackWatch."); *id.* at 6 ("In February 2009, Dr. Barrett, by and through QuackWatch, authored and posted an article titled 'How the "Urine Toxic Metals" Test Is Used to Defraud Patients' (the 'Article')."); *id.* at 11 ("[I]n developing my lost profit damages calculations [I] . . . . "[c]alculated incremental expenses either incurred or expected to be incurred as a result of the Article" and "analyzed DDI's historical financial information for six years prior to the Article's issuance date"); *id.* at 15 ("Other than the Article, I have not been presented or discovered any evidence that would have caused such a significant decline in revenue."); *id.* at 18 ("As of the Measurement Date, DDI was continuing to experience losses in revenue as a result of the Article."). In fact, Grabowski's damages calculations are apparently based exclusively on the original February 2009 version of Article A, rather than on the March 2010 version referenced in DDI's complaints and identified as Article A for purposes of this opinion. Grabowksi's report cites DDI's complaint, however, *see* Grabowski Report, Ex. 4 to DSOF, Dkt. 251-2, at 6 nn.12-14, so Grabowski was presumably aware of the March 2010 version of the article. In any event, it is immaterial whether the report provides sufficient evidences of damages due to the March 2010 version of Article A, since the Court has already granted summary judgment for the defendants on DDI's defamation claims based on the challenged statements in that article, for the reasons explained above.

[42] In light of this ruling, the Court's analysis of DDI's defamation *per quod* claims involving publications other than Article A is not dependent on the outcome of the defendants' *Daubert* motion to bar Grabowski's testimony (Dkt. 232).

for defendant on defamation *per quod* claim based on plaintiff's "failure to prove special damages").

In addition to the broad arguments addressed above, the defendants raise statement-specific arguments regarding statements (n), (zz), and (aaa). Statement (n) is the phrase "Doctor's Data, Sued for Fraud," which is an excerpt from the title of Article C. *See* First Supp. Resp., Dkt. 273-58, at 3. The defendants assert that this statement is true or substantially true, *see* Defenses Table, Ex. 2 to DSOF, Dkt. 250-2, at 8, because it refers to the filing of the *Stemp* suit, but since the timing of that event is contested, there is a genuine dispute of material fact as to whether statement (n) was true or substantially true at the time Article C was published. Statement (zz) is a sentence from the reproduced *Stemp* complaint which reads: "Defendants collected two specimens, allegedly to test to determine if Mr. Stemp suffered from heavy metal poisoning as they "suspected."" *See* Second Supp. Resp., Dkt. 294-1, at 2. The defendants argue that this statement is not actionable as defamation because it is not about DDI. *See* Defenses Table, Ex. 2 to DSOF, Dkt. 250-2, at 30. But since DDI is listed as a defendant in the *Stemp* complaint, *see* Article C, Dkt. 24-3, at 1, the defendants' argument that statement (zz) does not concern DDI is unavailing; the statement does not differentiate between the "Defendants" it refers to and can reasonably be understood to suggest that DDI was involved in the collection of the specimens.

The third statement, statement (aaa), is the following passage from the reproduced *Stemp* complaint:

> A provoking agent is a compound administered to the patient that attaches to lead, mercury and other molecules in the blood and forces them to be excreted. The result is that after the patient is given a provoking agent, he/she will show elevated results of lead mercury and other metals in the urine.

*See* Second Supp. Resp., Dkt. 294-1, at 2. DDI contends that the statement is false to the extent it suggests that DDI's report provides classifications for provoked urine results. *See* Second Supp. Resp., Dkt. 294-1, at 2. The defendants argue, *inter alia*, that there is no genuine issue of material fact as to the falsity of this suggestion. *See* Defenses Table, Ex. 2 to DSOF, Dkt. 250-2, at 30; *see also* DMSJ Mem., Dkt. 249, at 4, 11-12, 16-17 (discussing DDI's falsity theory based on the qualifying language in its reports). For the reasons stated in the discussion of statement (c), the Court agrees that there is no genuine dispute regarding the falsity of the challenged aspect of statement (aaa). Therefore, although the defendants are not entitled to summary judgment based on their statement-specific arguments regarding statements (n) and (zz); they are entitled to summary judgment on DDI's defamation claims with respect to statement (aaa).

To summarize the Court's holdings on the challenged statements in Article C: With respect to statement (aaa), the Court grants summary judgment for the defendants on both the *per se* and *per quod* claims. As for the remaining 20 statements in the article—statements (n), (o), (p), (q), (r), (s), (t), (u), (v), (w), (x), (y), (z), (zz), (bbb), (ccc), (ddd), (eee), (fff), and (ggg)—the Court grants the defendants' motion for summary judgment on the *per quod* claim but denies the motion with respect to the *per se* claim.

### 4. Article D—Statements (bb) and (cc)

Article D is an online newsletter issue posted on www.ncahf.org titled "Consumer Health Digest #09-29"; the issue is dated July 16, 2009, but a line at the bottom indicates that the page was posted on July 17, 2009. *See* Article D, Dkt. 24-4. The first story in the newsletter is about the *Stemp* lawsuit (which was also the subject of Article C and statement (h) in Article A). The story reads as follows:

> **Shady clinic and lab under legal assault.** <u>CARE Clinics</u>, of Austin Texas, its owner Kazuko Curtin, its subsidiaries, and

56

> Chicago-based Doctor's Data have been sued for fraud, negligence, and conspiracy in connection with the treatment of 43-year-old Ronald Stemp, who charges that he was improperly diagnosed and treated over a 10-month period. CARE Clinics specializes in the "biomedical treatment" of children with autism, but it also treats adults. The <u>suit petition</u> states that Stump originally sought help for memory loss, inability to sleep, difficulty concentrating, and depression. After going through a battery of tests, he was told that he suffered from heavy metal poisoning and should undergo intravenous chelation therapy. The chelation caused Stemp to feel nauseous, lethargic, depressed, constantly drowsy, and weak. He subsequently learned that the diagnosis was incorrect and that the test used to diagnose it—<u>Doctor's Data's urine toxic metals test</u>—is a fraud. Stemp's insurance company was billed for a total of $180,000. The suit also named the clinic's medical director (Jesus Caquias, M.D.) and Jeff Baker (another employee who is an unlicensed naturopath) as defendants. <u>Caquias</u>, who has been disciplined twice by the Medical Board of Texas, is under investigation for his treatment of other patients, and the clinic (now closed) is under investigation for submitting false insurance claims. A few days after the suit was filed, the FBI and the Internal Revenue Service raided the clinic.

Article D, Dkt. 24-4, at 1. With the exception of the title at the start of the story, this material is nearly identical to the introductory paragraph of Article C, discussed above. DDI alleges that statements (bb) and (cc), which appear within the story, are defamatory. *See* First Supp. Resp., Dkt. 273-58, at 6. For the reasons explained below, the Court grants summary judgment for the defendants on DDI's defamation claims with respect to both statements.

### *Statement (bb)*

DDI identifies statement (bb) as the title of the *Stemp* lawsuit story, "Shady clinic and lab under legal assault." First Supp. Resp., Dkt. 273-58, at 6. DDI asserts that this statement is false to the extent it suggests that DDI is a shady lab. *See* First Supp. Resp., Dkt. 273-58, at 6; *see also* Resp. to DMSJ, Dkt. 274, at 25. The defendants argue, *inter alia*, that the "shady lab" suggestion in statement (bb) is not factual in nature and is thus not actionable as defamation. *See* DMSJ Mem., Dkt. 249, at 21-22. As previously explained, to determine whether a statement can

reasonably be interpreted as stating actual facts about the plaintiff, Illinois courts consider "whether the statement has a precise and readily understood meaning; whether the statement is verifiable; and whether the statement's literary or social context signals that it has factual content." *Hadley*, 2015 IL 118000, ¶ 41, 34 N.E.3d at 559 (citing *Solaia Tech*, 221 Ill. 2d at 581, 852 N.E.2d. at 840).

Numerous courts have found that the term "shady" does not have a precise meaning such that a statement using the term can be objectively verified. *See, e.g.*, *DuBoff v. Playboy Enters. Int'l, Inc.*, No. Civil No. 06-358-HA, 2007 WL 1876513, at *9-10 (D. Or. June 26, 2007) (dismissing that statement about plaintiff's "shady past" was not actionable as defamation since plaintiff could not show that statement was anything more than rhetorical hyperbole, parody, or loose or figurative speech (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 16-17 (1990)); *Arista Records, Inc. v. Flea World, Inc.*, 356 F. Supp. 2d 411, 425-26 (D.N.J. 2005) (finding that statement about "shady vendors" was rhetorical hyperbole and thus not actionable as defamation); *Owens v. DRS Auto. Fantomworks, Inc.*, 87 Va. Cir. 30 (2013) ("Defendants do not provide any statements that could be objectively characterized as true or false. Words or phrases such as "shady" or "overcharged" are clearly dependent on the Plaintiffs' viewpoint."); *cf. Manjarres*, 2010 WL 918072, at *3-5 (finding that "short, vague statements" describing plaintiff as unprofessional, incompetent, unethical, and crazy did not have a precise and readily understood meaning and were not objectively verifiable); *Skolnick*, 132 F. Supp. 2d at 1127 (finding statement describing plaintiff's conduct as "as dishonest, fraudulent and deceitful" to be protected opinion). In addition, the context in which the term "shady" appears in Article D—in the dramatically-phrased headline "Shady clinic and lab under legal assault"—signals that statement (bb) is not factual in nature, but rather is rhetorical hyperbole intended to introduce the

*Stemp* lawsuit story in an attention-grabbing manner. Accordingly, statement (bb) is not factual in nature, and summary judgment for the defendants is appropriate on DDI's defamation claims with respect to this statement.

### Statement (cc)

Statement (cc) consists of two sentences excerpted from the text of the *Stemp* lawsuit story:

> [CARE and] Chicago-based Doctor's Data have been sued for fraud, negligence, and conspiracy in connection with the treatment of 43-year-old Ronald Stemp, who charges that he was improperly diagnosed . . . He subsequently learned that the diagnosis was incorrect and that the test used to diagnose it—Doctor's Data's urine toxic metals test—is a fraud.

First Supp. Resp., Dkt. 273-58, at 6 (alterations by DDI). DDI challenges the portion of this statement suggesting that DDI's test is a fraud. *See* First Supp. Resp., Dkt. 273-58, at 6. The defendants argue, *inter alia*, that the statement is protected by the fair report privilege. *See* DMSJ Mem., Dkt. 249, at 8-10. DDI does not deny that the *Stemp* lawsuit was filed as described and that it contained the fraud allegations summarized in statement (cc). *See, e.g.*, First Supp. Resp., Dkt. 273-58, at 6. DDI contends, however, that the fair report privilege does not protect the statement for two reasons.

First, DDI argues that the fair report privilege does not apply to statement (cc) because there is a genuine issue of material fact as to whether the defendants' report of the *Stemp* lawsuit in Article C was published before the filing of the *Stemp* complaint. *See* Resp. to DMSJ, Dkt. 274, at 11. But the fact that **Article C** may not be protected by the fair report privilege does not raise a triable issue as to whether the privilege is applicable to **Article D**. And DDI does not contend that Article D was published before the filing of the *Stemp* complaint. Therefore, DDI's timing argument does not prevent application of the fair report privilege to statement (cc).

DDI's second argument is that the fair report privilege does not protect statement (cc) because Article D contains improper commentary imputing DDI's probable "guilt" of the allegations described in the *Stemp* lawsuit story. *See* Resp. to DMSJ, Dkt. 274, at 12. *See generally Solaia Tech.*, 221 Ill. 2d at 590, 852 N.E.2d at 845 ("The reporter is not privileged . . . to make additions of his own that would convey a defamatory impression . . . ." (quoting *Restatement (Second) of Torts* § 611 cmts. f (1977)) (internal quotation marks omitted)). DDI does not clearly identify what portions of Article D it considers to be improper defamatory additions, but the Court construes DDI to base its argument on: (1) the fact that the article includes statement (bb), which DDI believes to be defamatory; and (2) the purported fact that statement (cc) contains a hyperlink to Article A, which DDI believes to contain defamatory statements accusing DDI of fraud.[43] Statement (bb) does not support DDI's argument since the Court has found that statement to be non-actionable as defamation. The same holds true, with some nuances, for the hyperlink to Article A; since none of the challenged statements in that article are actionable as defamation, as explained above, a reference back to Article A would not constitute an improper defamatory addition to Article D.[44] In any event, DDI has not cited any

---

[43] Although DDI's response brief implies that the underlined phrase "Doctor's Data's urine toxic metals test" in statement (cc) is a hyperlink to Article A, DDI has not established that this is an undisputed fact (which would be its burden in seeking to negate as a matter of law the defendants' fair report privilege affirmative defense). *See* Resp. to DMSJ, Dkt. 274, at 12 (noting that the same underlined phrase *in Article C* is a hyperlink to Article A, and citing that fact in arguing that the defendants cannot rely on the fair report privilege with respect to two statements in Article C and statement (cc)). Nevertheless, the Court briefly discusses DDI's argument based on this "fact" since the discussion does not ultimately affect the Court's ruling with respect to statement (cc).

[44] At the time Article D was published in July 2009, the hyperlink in question would have taken readers to a different version of Article A, namely, the version that was revised in April 2009. *See* Reply to PMSJ, Dkt. 294, at 23-24 (describing the content and publication dates of various versions of Article A); *see also* Ex. 63 to Reply to PMSJ, Dkt. 294-6 (version of Article A revised on April 15, 2009). And subsequent to Article D's publication, Article A was further revised in January 2010, in March 2010 (the version identified as Article A for purposes of this

case law indicating that a hyperlink to a separate publication can constitute an improper defamatory addition impacting application of the fair report privilege, and the Court's own research has not revealed any courts that have considered hyperlinked material for that purpose when applying Illinois defamation law.[45]

---

opinion), and on several dates subsequent to March 2010. *See* Reply to PMSJ, Dkt. 294, at 23-24; Second Supp. Resp., Dkt. 294-1, at 6-7; *see also, e.g.*, Pl.'s DMSJ Ex. 26, Dkt. 273-26 (version of Article A revised on October 14, 2011). DDI does not challenge any statements in the April 2009 or January 2010 versions of the article as defamatory, but it does challenge a number of statements in the March 2010 version and in seven subsequent versions. *See* First Supp. Resp., Dkt. 273-58, at 1-2; Second Supp. Resp., Dkt. 294-1, at 1-2, 6-7. DDI's argument regarding the hyperlink in statement (cc), however, is explicitly (and exclusively) premised on the fact that the hyperlink directed readers to the March 2010 version. *See* Resp. to DMSJ, Dkt. 274, at 12 (citing PSOAF, Dkt. 273, at 16, ¶ 31); PSOAF, Dkt. 273, at 16, ¶ 31 (citing the March 2010 version). Although the Court has limited its analysis of this issue accordingly, it bears noting that since the hyperlink would link to the version of Article A in existence at the time the hyperlink was opened, a full analysis would require reviewing and analyzing every version of Article A that the hyperlink could have ever connected to in order to determine definitively if that version contained any material that could qualify as an improper defamatory addition to Article D. The Court has not undertaken that analysis, and the problem presented by the ephemeral and changing nature of hyperlinked content provides a significant argument against treating a hyperlink to a separate publication as a potential improper defamatory addition impacting application of the fair report privilege.

[45] The Court's research did reveal that a small number of courts have treated hyperlinked material as part of the context of allegedly defamatory statements when applying the defamation law of other states. *See, e.g.*, *Abbas v. Foreign Policy Grp., LLC*, 975 F. Supp. 2d 1, 16 (D.D.C. 2013), *aff'd*, 783 F.3d 1328 (D.C. Cir. 2015); *Amaretto Ranch Breedables, LLC v. Ozimals, Inc.*, No. CV 10-5696 CRB, 2013 WL 3460707, at *4-5 (N.D. Cal. July 9, 2013); *Pisani v. Staten Island Univ. Hosp.*, 440 F. Supp. 2d 168, 173-74 (E.D.N.Y. 2006); *Wallace v. Geckosystems Int'l Corp.*, No. CV K11C-03-018 JTV, 2013 WL 4054147, at *7 (Del. Super. July 31, 2013). The only potentially relevant case involving Illinois defamation law that the Court found, however, is *Hubbert v. Dell Corp.*, 359 Ill. App. 3d 976, 835 N.E.2d 113 (2005), in which an Illinois appellate court held that an online contract for the purchase of computer equipment included the defendant's "Terms and Conditions of Sale," based on the facts that: (1) the defendant's website stated that all sales were subject to the defendant's terms and conditions, and (2) those terms and conditions were accessible through hyperlinks that appeared on the website. *See id.* at 983-84, 835 N.E.2d at 121-22. The facts and claims at issue in *Hubbert*, however, are too dissimilar from the present matter to provide insight into whether the Illinois Supreme Court would find that a hyperlink to a separate publication can constitute an improper defamatory addition impacting application of the fair report privilege.

Since it is undisputed that statement (cc) is a fair abridgement of the *Stemp* complaint, and DDI has not shown that the fair report privilege is otherwise inapplicable to this statement, summary judgment is granted for the defendants on DDI's defamation claims with respect to statement (cc).

### 5. Article E—Statements (dd) and (ee)

Article E is an article published on www.autism-watch.org titled "Be Wary of CARE Clinics and the Center for Autistic Spectrum Disorders (CASD)"; Barrett is credited as the author, and a line at the bottom indicates that the article was revised on December 31, 2009. *See* Article E, Dkt. 24-5. The introductory paragraph explains that the article describes "the history of CARE Clinics and the events related to its apparent demise." Article E, Dkt. 24-5. Although it largely focuses on CARE Clinics, the article contains three references to DDI. The first such reference appears in a section labeled "Biomedical Treatment," which explains the concept of biomedical treatment for autism and includes the following material:

> CARE literature claimed that its Biomarkers evaluation "helps to identify subtle abnormalities that may prevent the ability to achieve optimal health" and is the "most comprehensive lab testing available" . . . .
> All patients underwent a provoked "urine toxic metals test" in which a urine sample is obtained after the patient receives a chelating agent. The chelating agent temporarily increases the excretion of mercury, lead, and/or other metallic substances that are present in trace amounts within the body. The test report, which typically states that the reported levels are elevated, is then used to claim that the child needs to be "detoxified" with chelation therapy [6].
> In 2008, the minimum charge for people without insurance appears to have been $8,500 for the CARE BioMarkers evaluation plus $500 for a "first-time patient fee." The charges for insured care, however, appear to be much higher. In one case I investigated, the insurance company received bills for screening tests totaling approximately $49,000 for the child and $41,000 for the mother! The records indicate clear-cut fraud because many of the tests that were billed for were not done.

> CARE's "personalized" treatment plan was said [sic as to omission of quotation marks] To include amino acid therapy; vitamin, mineral, and antioxidant supplementation; intravenous nutrient therapy; "IV detoxification" (<u>chelation therapy</u>); diet modification; hyperbaric oxygen; ultraviolet light therapy; far infrared sauna; steam ozone sauna; and gastrointestinal treatments (enzymes, probiotics) [1]. . . .
>
> The labs processing CARE's tests included Doctors Data, Genovation, and The Great Plains Laboratory.

Article E, Dkt. 24-5, at 1-2. The remaining two references to DDI appear toward the end of the article, in a section labeled "More Legal Troubles":

> In July 2009, a civil suit for fraud, negligence, and conspiracy was filed against CARE Clinics, Curtin, Caquias, Baker, and Chicago-based Doctor's Data, the lab that performed urine toxic metal tests. The plaintiff, 43-year-old Ronald Stemp, charges that he was improperly diagnosed and treated over a 10-month period. The suit petition states that Stemp originally sought help for memory loss, inability to sleep, difficulty concentrating, and depression. After going through a battery of tests, he was told that he suffered from heavy metal poisoning and should undergo intravenous chelation therapy 2-4 times a week. The chelation caused Stemp to feel nauseous, lethargic, depressed, constantly drowsy, and weak. He subsequently learned that the diagnosis was incorrect and that the urine test used to diagnose it was a fraud. . . .
>
> In Spetember [sic] 2009, Doctor's Data sued Curtin for defaulting on payments for lab tests ordered through Nutrigenomics.

Article E, Dkt. 24-5, at 5. DDI alleges that two statements within Article E, statements (dd) and (ee), are defamatory. *See* First Supp. Resp., Dkt. 273-58, at 6. For the reasons explained below, the Court grants summary judgment for the defendants on DDI's defamation claims with respect to both statements.

### *Statement (dd)*

Statement (dd) is a sentence from the "Biomedical Treatment" section of the article: "The test report, which typically states that the reported levels are elevated, is then used to claim that the child needs to be 'detoxified' with chelation therapy [6]." First Supp. Resp., Dkt. 273-58, at

6. DDI asserts that this statement is false to the extent it suggests that DDI's reports classify provoked test results and that DDI recommends chelation therapy to patients. *See* First Supp. Resp., Dkt. 273-58, at 6.

The defendants argue, *inter alia*, that there is no genuine issue of material fact as to the falsity of the suggestion about the classifications in DDI's provoked test reports. *See* Defenses Table, Ex. 2 to DSOF, Dkt. 250-2, at 15; *see also* DMSJ Mem., Dkt. 249, at 4, 11-12, 16-17 (discussing DDI's falsity theory based on the qualifying language in its reports). For the reasons stated in the discussion of statements (c), the Court agrees; the presence of qualifying language in DDI's report does not change the fact that the report displays classifications for provoked test results.

With respect to the assertion regarding chelation therapy, the defendants argue, *inter alia*, that this aspect of statement (dd) is not about DDI. *See* DMSJ Mem., Dkt. 249, at 30-31. In response, DDI contends that the statement concerns DDI because Article E mentions that DDI is one of three labs that process tests for CARE Clinics and because the call number at the end of the statement directs readers to a footnote that hyperlinks to Article A, a publication which "prominently castigate[s]" DDI (in DDI's view). Resp. to DMSJ, Dkt. 274, at 30; *see also* Article E, Dkt. 24-5, at 6 n.6 (containing the citation "Barrett S. How the 'urine toxic metals test' is used to defraud patients. Quackwatch, April 29, 2009").[46] But given that Article E indicates

---

[46] The defendants deny that the underlined text in footnote 6 hyperlinks to Article A, apparently based on the facts that the footnote cites to the April 2009 version of the article and the hyperlink would in fact have taken readers to that version at the time Article E was published in December 2009. *See* Reply to PSOAF, Dkt. 293, ¶ 67 (denying that footnote 6 contains a hyperlink to "the article alleged as Complaint Exhibit A"); Reply to PSOAF, Dkt. 293, ¶ 28 (responding to DDI's statement that Article B, Article C, and Article E hyperlink to Article A with an admission that the publications "speak for themselves"); *see also* Reply to PMSJ, Dkt. 294, at 23-24 (describing the content and publication dates of various versions of Article A); Ex.

that DDI's role is to process CARE Clinics' tests and that it is CARE Clinics' treatment plan which includes chelation therapy, the facts that DDI processes tests for CARE Clinics and that another publication allegedly casts DDI in a negative light do not make it reasonable to read statement (dd) as suggesting that **DDI** uses the test report to recommend chelation therapy.

Accordingly, summary judgment is granted for the defendants on DDI's defamation claims with respect to statement (dd).

### _Statement (ee)_

The material DDI identifies as statement (ee) consists of a section title ("More Legal Troubles") grafted onto an excerpt of the description of the _Stemp_ lawsuit (which was also the subject of Articles C and D and statement (h) in Article A). The statement reads as follows:

> **More Legal Troubles.** In July 2009, a civil suit for fraud, negligence, and conspiracy was filed against CARE Clinics, Curtin, Caquias, Baker, and Chicago-based Doctor's Data, the lab that performed urine toxic metal tests. The Plaintiff, 43-year-old Ronald Stemp, charges that he was improperly diagnosed and treated over a 10-month period. . . . He subsequently learned that the diagnosis was incorrect and that the urine test used to diagnose it was a fraud.

First Supp. Resp., Dkt. 273-58, at 6 (alterations by DDI).

The defendants argue, _inter alia_, that this statement is protected by the fair report privilege. _See_ DMSJ Mem., Dkt. 249, at 8-10. DDI does not deny that the _Stemp_ lawsuit was filed as described and that it contained the factual allegations summarized in statement (ee). _See, e.g._, First Supp. Resp., Dkt. 273-58, at 6. DDI contends, however, that the fair report privilege does not protect the statement because the material in statement (dd) and the footnote at the end of that statement constitute improper commentary imputing DDI's probable "guilt" of the fraud

---

63 to Reply to PMSJ, Dkt. 294-6 (version of Article A revised on April 15, 2009). But, again, these issues are not material to the Court's analysis.

allegations described in the *Stemp* lawsuit summary. *See* Resp. to DMSJ, Dkt. 274, at 12; PSOAF, Dkt. 273, at 16, ¶ 33. Statement (dd), however, cannot reasonably be construed as additional defamatory material since it does not state anything false concerning DDI, as explained above. DDI's argument based on the footnote following statement (dd) is also unavailing. To the extent it is premised on the fact that the footnote contains a hyperlink that would take readers to the version of Article A in existence at the time the hyperlink was opened, the argument is rejected for the reasons explained in the context of statement (cc). To the extent the argument is premised on the fact that the footnote contains a ***citation*** to the April 2009 version of Article A, it is rejected since: (1) DDI has not specifically challenged any statements within the April 2009 version as defamatory or otherwise identified portions of that version that could be deemed to impute DDI's probable "guilt" of the fraud allegations described in the *Stemp* lawsuit summary in Article E; (2) although many of the ten challenged statements in the March 2010 of Article A version also appear in the April 2009 version of the article, the Court has found that none of the challenged statements in the March 2010 version are actionable as defamation; and (3) DDI has not identified, and the Court has not found, any relevant cases suggesting that the presence of a citation to a separate allegedly defamatory publication can prevent application of the fair report privilege.

Since it is undisputed that statement (ee) is a fair abridgement of the *Stemp* complaint, and DDI has not shown that the fair report privilege is otherwise inapplicable to this statement, summary judgment is granted for the defendants on DDI's defamation claims with respect to statement (ee).

### 6. Article F—Statement (ff)

Article F is an online newsletter issue posted on www.ncahf.org titled "Consumer Health Digest #09-14"; the issue is dated April 2, 2009, and a line at the bottom indicates that the page was posted on that date. *See* Article F, Dkt. 24-6. The second story in the newsletter discusses a *Slate* magazine article about urine toxic metals testing as well as the February 2009 version of Article A. The story reads in its entirety as follows; the italicized text represents the portion that DDI claims to be defamatory (statement (ff)):

> **Slate article blasts the urine toxic metals test**. *Slate magazine has published new information about the urine toxic metals test done by Doctors Data Laboratory. In February, Quackwatch posted a close look at how the "Urine Toxic Metals" test is used to trick people into thinking that they have lead or mercury poisoning and need "detoxification" with chelation therapy. [Barrett S. How the "Urine Toxic Metals" test is used to defraud patients. Quackwatch, Feb 18, 2009] The heart of the process is "provoked" testing in which a chelating agent is given before the specimen is obtained. This artificially raises the levels of heavy metals in the urine. The test report, a copy of which is given to the patient, states that its "reference values" are for non-provoked specimens. However, if a test level exceeds the reference values, it is reported as 'elevated" even though it should be considered insignificant.* In March 2009, Arthur Allen, a prominent science writer, tried to interview an official at Doctor's Data but received no response to his request. However, he did manage to talk with someone at the company who said that the lab was doing about 100,000 of the tests per year. When he asked about the reference range problem, he was told there was no way to establish a reference range for provoked specimens, because provocation might be done with various chelating agents, at varying doses. "The tests are ordered by physicians, so they can interpret the results," the employee said. "They do what they want with this information." [Allen A. Treating autism as if vaccines caused it: The theory may be dead, but the treatments live on. Slate, April 1, 2009]

Article F, Dkt. 24-6, at 1-2 (bracketed material in original); First Supp. Resp., Dkt. 273-58, at 7.

DDI asserts that statement (ff) is false to the extent it suggests that DDI's reports provided classifications for provoked specimens and that DDI uses its urine toxic metals test to trick or defraud patients. *See* First Supp. Resp., Dkt. 273-58, at 7; *see also* DMSJ Resp., Dkt. 274, at 25. The defendants argue, *inter alia*, that the suggestion regarding tricking or defrauding patients is not about DDI and that there is no genuine issue of material fact as to the falsity of the suggestion about DDI's report classifications. *See* DMSJ Mem., Dkt. 249, at 22-23; Defenses Table, Ex. 2 to DSOF, Dkt. 250-2, at 16-17; *see also* DMSJ Mem., Dkt. 249, at 4, 11-12, 16-17 (discussing DDI's falsity theory based on the qualifying language in its reports).

As previously explained in the discussion of statement (c), there is no genuine issue of material fact as to the falsity of the suggestion that DDI provides classifications for provoked test results. With respect to the suggestion regarding tricking or defrauding patients, DDI argues that although the phrases stating that the test "is used to trick people" and "is used to defraud patients" do not explicitly mention DDI, they implicate DDI when read in the context of Article F as a whole.[47] *See* Resp. to DMSJ, Dkt. 274, at 25. But the rest of Article F states that: (1) DDI processes toxic metals tests on provoked urine specimens, (2) the tests are ordered by physicians, (3) those physicians "interpret the results" and "do what they want with th[e] information," and (4) the information on the test report includes a statement indicating that DDI's reference levels are for non-provoked specimens. Article F, Dkt. 24-6, at 1-2. When read in this context, the suggestion that urine testing is used to trick patients into thinking they need chelation therapy is not about DDI; rather, it is about **physicians** who order the testing of provoked urine specimens and subsequently make use of the information reported by DDI. There is no suggestion that the

---

[47] The phrase "is used to defraud patients" appears in the bracketed citation to the February 2009 version of Article A (within the article title).

test is used *by DDI* "to trick people" or "to defraud patients."[48] The defendants are therefore

entitled to summary judgment on DDI's defamation claims based on statement (ff).

> **7. Statements in Other Publications—Statements (gg), (hh), (ii), (jj), (kk), (ll), (mm), (nn), (oo), (pp), (qq), (rr), (ss), (tt), (uu), (vv), (ww), (xx), (yy), (hhh), (iii), (jjj), (kkk), (lll), (mmm), (nnn), (ooo), (ppp), (qqq), (rrr), (sss), (ttt), (uuu), (vvv), (www), (xxx), (yyy), (zzz), (aaaa), (bbbb), (cccc), (dddd), (eeee), (ffff), (gggg), and (hhhh)**

As explained above, during discovery DDI identified a number of allegedly defamatory

statements in publications other than the original seven articles referenced in the Complaint.

Those statements are grouped by publication in the discussion below, with the exception of the

statements consisting only of hyperlinks, which are analyzed together in the first subsection.

### *Statements (gg), (nn), (oo), (pp), (rr), (uu), (vv), (ww), (yy), (hhh), (iii), (jjj), (kkk), (lll), (mmm), (nnn), (rrr), (sss), (ttt), (uuu), (vvv), (www), (xxx), (yyy), (zzz), (aaaa), (bbbb), (cccc), and (dddd)*

Twenty-nine of the additional "statements" identified as defamatory by DDI are not in

fact statements, but rather are hyperlinks in items published by the defendants that allegedly

"republish" certain of the challenged statements discussed above. Specifically, DDI asserts that:

- statement (oo) republished through hyperlink statements (k), (n), (bb), (dd), and (ff);

- statement (jjj) republished through hyperlink statement (d);

- statement (mmm) republished through hyperlink statement (dd); and

- the remaining 26 hyperlink statements—statements (gg), (nn), (pp), (rr), (uu), (vv), (ww), (yy), (hhh), (iii), (kkk), (lll), (nnn), (rrr), (sss), (ttt), (uuu), (vvv), (www), (xxx), (yyy), (zzz), (aaaa), (bbbb), (cccc), and (dddd)—republished through hyperlink statement (a).

---

[48] DDI asserts that various emails show that Barrett intended statement (ff) to impute that DDI defrauds patients. *See* Resp. to DMSJ, Dkt. 274, at 25. But as explained in the discussion of statements (a) and (b), the relevant question is whether the statement can be reasonably construed to accuse DDI of defrauding patients, not whether Barrett *intended* the statement to do so.

*See* First Supp. Resp., Dkt. 273-58, at 7, 9-11; Second Supp. Resp., Dkt. 294-1, at 3-6. The defendants argue, *inter alia*, that "mere" hyperlinks cannot support a defamation claim. *See* Defenses Table, Ex. 2 to DSOF, Dkt. 250-2, at 17, 22-23, 25, 27-29, 34-44 (arguing that challenged statements that are "hyperlink[s] only" are "not defamation"); DMSJ Mem., Dkt. 249, at 7 (suggesting, in attempting to invoke the single publication rule, that "republication" of a statement by hyperlink does not qualify as a separate publication of the statement).

"Publication" is an essential element of a defamation claim under Illinois law. *Green*, 234 Ill. 2d at 491, 917 N.E.2d at 459; *Missner*, 393 Ill. App. at 763, 914 N.E.2d at 552. "Any act by which defamatory matter is communicated to someone other than the person defamed is a publication." *Missner*, 393 Ill. App. 3d at 763, 914 N.E.2d at 552. A hyperlink, however, does not duplicate the content of a prior publication; rather, it identifies the location of an existing publication and, if selected, instructs a search engine to retrieve that publication. Although the Illinois Supreme Court has not ruled on whether a hyperlink counts as a publication of the material found at the hyperlinked location, several other courts have ruled that hyperlinks do not fulfill the publication element of a defamation claim. *See, e.g.*, *Clark v. Viacom Int'l Inc.*, --- F. App'x ---, No. 14-5709, 2015 WL 4098320, at *10 (6th Cir. July 8, 2015) (collecting relevant cases); *U.S. ex rel. Klein v. Omeros Corp.*, 897 F. Supp. 2d 1058, 1073-74 (W.D. Wash. 2012) ("This Court holds that Washington courts would agree . . . that a mere reference or URL is not a **publication** of the contents of the materials referred to."); *see also In re Phila. Newspapers, LLC*, 690 F.3d 161, 175 (3d Cir. 2012) (finding that although a hyperlink facilitated access to a webpage, it did not amount to a restatement of the allegedly defamatory material on that webpage). In addition, an Illinois court has ruled that a "verification"—that is, "a communication to the court that the verifier attests, under penalty of perjury, that the statements contained in a

pleading are true"—is not a publication of the statements being verified because it does not itself communicate those statements; they are contained only in the pleading. *Missner*, 393 Ill. App. 3d at 763, 914 N.E.2d at 552. In keeping with this logic and the conclusions of other courts, it seems likely that the Illinois Supreme Court would find that a hyperlink does not qualify as a publication.[49] Therefore, the Court grants summary judgment for the defendants on DDI's defamation claims based on statements (gg), (nn), (oo), (pp), (rr), (uu), (vv), (ww), (yy), (hhh), (iii), (jjj), (kkk), (lll), (mmm), (nnn), (rrr), (sss), (ttt), (uuu), (vvv), (www), (xxx), (yyy), (zzz), (aaaa), (bbbb), (cccc), and (dddd).[50]

### *Statements (hh), (ii), (jj), (kk), (ll), and (mm)*

DDI challenges six statements that appear in an article published on www.quackwatch.org titled "Doctor's Data Facing Multiple Lawsuits"; the article is attributed to Barrett and dated August 28, 2011. *See* First Supp. Resp., Dkt. 273-58, at 7-9 (identifying statements (hh), (ii), (jj), (kk), (ll), and (mm)). Notably, the August 2011 version of this article is not in the record, and the parties have not provided information about how that version differs, if at all, from the April 2010 version of the article that is in the record. *See* Ex. 3.8 to DSOF, Dkt.

---

[49] This conclusion underscores the weakness of DDI's theory, discussed and rejected in the course of analyzing statements (cc) and (ee), that a hyperlink or citation to a separate allegedly defamatory publication can constitute an improper defamatory addition affecting application of the fair report privilege.

[50] It is also appropriate to grant summary judgment for the defendants with respect to most of these statements on an additional basis. Since the Court has granted summary judgment for the defendants on DDI's defamation claims involving statements (a), (d), (k), (bb), (dd), and (ff), any "republications" of those statements are also not actionable as defamation. That reasoning entitles the defendants to summary judgment with respect to 28 of the statements— statements (gg), (nn), (pp), (rr), (uu), (vv), (ww), (yy), (hhh), (iii), (jjj), (kkk), (lll), (mmm), (nnn), (rrr), (sss), (ttt), (uuu), (vvv), (www), (xxx), (yyy), (zzz), (aaaa), (bbbb), (cccc), and (dddd). That same reasoning entitles the defendants to summary judgment on DDI's defamation claims with respect to statement (oo), except to the extent that statement (oo) "republishes" statement (n), since the Court has not granted summary judgment for the defendants on DDI's defamation *per se* claim based on statement (n).

250-10 (version posted on April 20, 2010); Pl.'s DMSJ Ex. 24, Dkt. 273-24 (same). As a result, the Court cannot consider any of the defendants' summary judgment arguments that require the Court to view statements (hh), (ii), (jj), (kk), (ll), and (mm) in context. The defendants raise two broad arguments regarding all these statements, plus additional statement-specific arguments.

The specific arguments pertaining to statements (hh), (ii), and (jj) can be addressed together. Statement (hh) reads: "Doctor's Data, Inc. (DDI), a laboratory whose hair and urine tests have been used for decades to mislead consumers, is finally getting the negative attention it deserves. Since 2008, four lawsuits by aggrieved patients have included DDI as a co-defendant." First Supp. Resp., Dkt. 273-58, at 7. Statement (ii) reads: "DDI's tests include several types of hair and urine tests that provide little or no medically useful information about the patient but serve as marketing tools for the practitioners who order them." First Supp. Resp., Dkt. 273-58, at 7. And statement (jj) reads:

> The company's Web site states that neither test should be considered a stand-alone diagnostic but should be "used in conjunction with patient symptoms and other laboratory tests." As far as I can tell, however, practitioners who order these tests use them to justify the use of the products and services they recommend. The test reports include several pages of biochemical tidbits and speculations that practitioners can interpret for patients. Chiropractors, "nutrition consultants," naturopaths, and other offbeat practitioners use the nutrient-related test results as the basis for prescribing dietary supplements, and practitioners who offer chelation therapy or other "detoxification" methods use the "toxic element" levels to persuade people to be "detoxified."

First Supp. Resp., Dkt. 273-58, at 7-8. DDI asserts that all three statements are false to the extent they accuse DDI of conspiring to defraud patients or using its tests to defraud patients. *See* First Supp. Resp., Dkt. 273-58, at 7-8. With respect to the challenged aspects of statements (hh), (ii), and (jj), the defendants argue that the statements cannot reasonably be construed as accusing DDI of conspiring to defraud patients or as suggesting that DDI uses its hair and urine tests to

72

mislead or defraud patients. *See* DMSJ Mem., Dkt. 249, at 23, 31-32; Defenses Table, Ex. 2 to DSOF, Dkt. 250-2, at 18-19. This argument does not entitle the defendants to summary judgment, however, because the Court cannot properly evaluate the meaning conveyed by these statements without considering them in the context of the article, which is not before the Court.

The next challenged statement in the article, statement (kk), reads as follows:

> The sample report on DDI's Web site includes three pages of measurements and three pages of clinically useless biochemical tidbits, diagnostic speculations, pseudoscientific blather, and recommendations for further testing. Unfortunately for patients, amino acid analysis of urine does not provide basic information about the individual's general health, metabolism, nutrient status, or dietary adequacy, and the supplement recommendations lack a rational basis. It is not possible, for example, to figure out what people eat by looking at what they excrete. And finding a substance does not mean that it came from a single source or metabolic pathway.

First Supp. Resp., Dkt. 273-58, at 8. DDI alleges that this statement falsely disparages the quality of DDI's testing. *See* First Supp. Resp., Dkt. 273-58, at 8. In response, the defendants argue that the negative comments about DDI's testing in statement (kk) are not factual in nature and are thus not actionable as defamation. *See* DMSJ Mem., Dkt. 249, at 24. As explained above, one of the factors that Illinois courts consider when determining whether a statement is an expression of opinion is "whether the statement's literary or social context signals that it has factual content." *Hadley*, 2015 IL 118000, ¶ 41, 34 N.E.3d at 559 (citing *Solaia Tech*, 221 Ill. 2d at 581, 852 N.E.2d. at 840). Therefore, although it appears likely that at least some of the negative comments in statement (kk) cannot reasonably be interpreted as stating actual facts, the defendants are not entitled to summary judgment on that basis because the Court is unable to fully evaluate the defendants' argument without considering the statement in context.

Statement (ll) consists of the following text:

> Tests done after administering a "metal detoxification" (chelating) agent are called "provoked" tests and are bogus. So is the concept of "hidden body stores." Many people have harmless amounts of lead or mercury in their body. Provoked urine testing forces them to be excreted over a short period of time, which raises urine levels artificially and temporarily. The standard way to measure urinary mercury and lead levels is by collecting a non-provoked urine sample over a 24-hour period. Because most of the extra excretion takes place within a few hours after the chelating agent is administered, using a shorter collection period will yield a higher concentration. DDI's reports compare the artificially raise [sic] values to reference range that it says represents a healthy population under nonprovoked conditions. As a result many of its reports say that the patient's level is "elevated" or "very elevated" when no problem exists. Practitioners use this deceptive presentation to frighten patients into undergoing chelation therapy. Several state licensing board [sic] have disciplined practitioners for using provoked testing, and at least three lawsuits by victims are under way.

First Supp. Resp., Dkt. 273-58, at 8. DDI contends that this statement is false to the extent it suggests (1) that DDI's reports classify provoked test results based on reference ranges, (2) that DDI manipulates test results by using a shorter collection period, and (3) that DDI conspired to defraud patients. *See* First Supp. Resp., Dkt. 273-58, at 8. The defendants assert that there is no genuine issue of material fact as to the falsity of the description of DDI's reports in statement (ll), and that the statement cannot reasonably be construed to accuse DDI of manipulating test results or conspiring to defraud patients. *See* DMSJ Mem., Dkt. 249, at 24-25; Defenses Table, Ex. 2 to DSOF, Dkt. 250-2, at 20; *see also* DMSJ Mem., Dkt. 249, at 4, 11-12, 16-17 (discussing DDI's falsity theory based on the qualifying language in its reports). For the reasons explained in the discussion of statement (c), the Court agrees with the defendants that there is no genuine dispute as to the falsity of the description of DDI's reports, and grant summary judgment for the defendants on DDI's defamation claims with respect to that aspect of statement (ll). The defendants' argument regarding the other aspects of statement (ll), however, does not entitle

them to summary judgment since that argument requires considering the statement in the broader context of the article.

The final challenged statement in the "Doctor's Data Facing Multiple Lawsuits" article is statement (mm):

> **Victims Strike Back.** Since 2008, four people who were victimized by chelationists using DDI's urine toxic metals test have filed lawsuits against DDI as well as the practitioners.
>
> - In 2008, Rick Pfister filed a class action suit charging that he was improperly given chelation therapy after being improperly diagnosed with a urine toxic metals test. The complaint states that his urine was tested after he received an injection of DMPS and alleges that the test report was "negligent or fraudulent" because it compared his results to unprovoked sample ranges. The defendants are Doctor's Data, the Medical Wellness Institute, and the doctor who administered the test.
> - In July 2009, 43-year-old Ronald Stemp sued in a suit against a clinic and two staff members, charged Doctor's Data with fraud and conspiracy. The suit spells out in detail how the urine toxic metals test was used to falsely diagnose Stemp with heavy metal poisoning and persuade him to undergo intravenous chelation therapy. Stemp's insurance company was reportedly billed for a total of $180,000.
> - In November 2009, Ardis Morschladt, in a suit against several practitioners and a clinic in California, charged Doctor's Data with negligence, intentional misrepresentation, and conspiracy to commit fraud because its test report compared a provoked test result with a nonprovoked standard.
> - In March 2010, James Coman filed suit on behalf of his 7-year-old son against two physicians and Doctor's Data. Among other things, the complaint indicated that—based on the results of provoked urine testing—the boy was inappropriately treated for nonexistent metal toxicity for more than four years.

First Supp. Resp., Dkt. 273-58, at 8-9.

DDI asserts that statement (mm) is false to the extent it accuses DDI of victimizing or conspiring to defraud patients. *See* First Supp. Resp., Dkt. 273-58, at 8-9. The defendants argue

that the statement is protected by the fair report privilege. *See* DMSJ Mem., Dkt. 249, at 8-10. DDI does not deny that the four lawsuits are accurately described, *see, e.g.*, First Supp. Resp., Dkt. 273-58, at 9, but instead argues that the fair report privilege does not protect statement (mm) because the phrase "Victims Strike Back" at the start of the statement is improper commentary imputing DDI's "guilt" of the allegations described in the lawsuit summaries. *See* Resp. to DMSJ, Dkt. 274, at 12; *see also* PSOAF, Dkt. 273, at 17, ¶ 34.[51] *See generally Solaia Tech.*, 221 Ill. 2d at 590, 852 N.E.2d at 845 ("The reporter is not privileged . . . to make additions of his own that would convey a defamatory impression . . . ." (quoting *Restatement (Second) of Torts* § 611 cmts. f (1977)) (internal quotation marks omitted)). Although the sentence immediately following the phrase "Victims Strike Back" states that the individuals were "victimized *by chelationists*," that sentence and the bulleted paragraphs below it indicate that the referenced lawsuits included claims against DDI. Thus, when read as a whole, statement (mm) can be construed as suggesting that the plaintiffs in the described lawsuits were also "victimized *by DDI*" and that the allegations against DDI summarized in the lawsuit descriptions are true. Accordingly, a reasonable jury could find that the defendants abused the fair report privilege by including additional defamatory material, and the defendants are not entitled to summary judgment with respect to statement (mm) based on the fair report privilege. *Cf. Eubanks v. Nw. Herald Newspapers*, 397 Ill. App. 3d 746, 750, 922 N.E.2d 1196, 1200 (2010) (suggesting that abuse of fair report privilege is a jury question if fairness and accuracy of report at issue can reasonably be disputed (citing *Solaia Tech.*, 221 Ill. 2d 558, 852 N.E.2d 825)).

---

[51] DDI also argues that the *Coman* lawsuit description is not protected because of the "collusive arrangement" exception to the fair report privilege. *See* Resp. to DMSJ, Dkt. 274, at 13-15. As explained in the analysis of statement (i), however, DDI has failed to establish that the defendants' reporting of the Coman lawsuit falls within the "collusive arrangement" exception.

In addition to their statement-specific arguments, the defendants advance two broader arguments. First, the defendants argue that most of the statements identified as defamatory by DDI do not fall within a defamation *per se* category. *See* DMSJ Resp., Dkt. 249, at 35-36. But if statements (hh), (ii), (jj), (kk), (ll), and (mm) can reasonably be construed to convey the accusations alleged by DDI, a reasonable jury could find that they fall within an applicable defamatory *per se* category. *See, e.g.*, *Experian Info. Solutions, Inc. v. Carfax, Inc.*, No. 11 CV 08927, 2012 WL 2597915, at *3 (N.D. Ill. July 5, 2012) (finding that statement was defamatory *per se* under Illinois law since it accused plaintiff of offering a substandard report which used highly flawed data); *Hackman*, 520 F. Supp. 2d at 970 (noting that statements attacking a corporate plaintiff's financial or business methods or accusing the plaintiff of fraud qualify as defamation *per se* under Illinois law). Second, the defendants argue that they are entitled to summary judgment on the defamation *per quod* claim with respect to statements (hh), (ii), (jj), (kk), (ll), and (mm) because DDI has not sufficiently established special damages. *See* DMSJ Mem., Dkt. 249, at 32-34, 36-37. For the reasons explained in the discussion of the *per quod* claim with respect to Article C, the Court agrees.

Accordingly, the Court grants summary judgment for the defendants on DDI's defamation *per se* and defamation *per quod* claims with respect to the suggestion in statement (ll) that DDI's reports classify provoked test results based on reference. As for statements (hh), (ii), (jj), (kk), (mm), and the remaining challenged aspects of statement (ll), the Court grants the defendants' motion for summary judgment on DDI's *per quod* claim but denies the motion with respect to the *per se* claim.

### *Statement (qq)*

Statement (qq) appears in an online newsletter issue posted on www.ncahf.org titled "Consumer Health Digest #10-26"; the issue is dated July 1, 2010, but a line at the bottom indicates that the page was posted on July 5, 2010. *See* Pl.'s DMSJ Ex. 30, Dkt. 273-30. The first story in the newsletter reports the filing of the instant lawsuit and provides additional relevant information and commentary, including a description of Article A; DDI identifies this story as statement (qq):

> **Dr. Barrett sued**. Doctor's Data, a lab that performs tests for many chelation therapists, has sued Dr. Stephen Barrett. [Barrett S. Why Doctor's Data is trying to muzzle me. Quackwatch, (7/2010)]. The suit is primarily concerned about Barrett's article, "How the urine toxic metals test is used to defraud patients," which describes how chelationists mislead patients into believing that they need treatment for heavy metal toxicity. The heart of the deception is "provoked" testing, in which the practitioner administers a chelating agent before the urine specimen is obtained. This artificially raises the levels of lead, mercury, and/or other heavy metals in the urine. The test report states that its "reference values" are for non-provoked specimens. However, if a provoked test level exceeds the reference valuesâ€" [*sic*] which it usually doesâ€"it [*sic*] is reported as "elevated," even though it should not be considered significant. Dr. Barrett's article also tabulates disciplinary actions, court decisions, and lawsuits related to provoked testing. Doctor's Data is asking for damages exceeding $10 million and a sweeping injunction against further criticism. Although it is unlikely to prevail, defending against the lawsuit could be costly. Contributions to Barrett's defense can be made through the Quackwatch donations page.

First Supp. Resp., Dkt. 273-58, at 10 (bracketed material in original).

DDI asserts that statement (qq) is false to the extent it accuses DDI of conspiring to defraud patients, comparing provoked test results to non-provoked reference ranges, or using provoked testing to deceive patients. *See* Resp. to DMSJ, Dkt. 274, at 26; First Supp. Resp., Dkt. 273-58, at 10. The defendants argue, *inter alia*, that the statement does not mention conspiracy or

otherwise suggest that DDI conspired with chelationists to defraud patients, that there is no genuine issue of material fact as to the falsity of the description of DDI's reports, and that the assertions about deceiving patients are clearly about how chelationists—not DDI—deceive patients. *See* DMSJ Mem., Dkt. 249, at 26; Defenses Table, Ex. 2 to DSOF, Dkt. 250-2, at 24; *see also* DMSJ Mem., Dkt. 249, at 4, 11-12, 16-17 (discussing DDI's falsity theory based on the qualifying language in its reports).

The Court agrees that statement (qq) cannot reasonably be construed to accuse DDI of conspiracy. The statement indicates: (1) that DDI performs tests for many chelation therapists; (2) that DDI has filed a lawsuit against Barrett that primarily concerns Article A, which DDI believes to express "criticism" of DDI; and (3) that Article A explains that chelationists mislead patients through provoked testing, that "[t]he test report" classifies provoked test levels that exceed non-provoked reference ranges as elevated, that provoked test levels that exceed non-provoked reference ranges should not be considered significant, and that there have been disciplinary and judicial actions related to provoked testing. Statement (qq) does not, however, assert (or repeat any assertions) that DDI acts in concert with chelationists to mislead patients. Nor does it indicate that the referenced disciplinary and judicial actions included conspiracy claims.

With respect to the sentences suggesting that DDI's report compares provoked test results to non-provoked reference ranges, there is no genuine issue of material fact as to the falsity of this suggestion, for the reasons explained in the discussion of statement (c).

Finally, the references in statement (qq) to misleading, deceiving, and defrauding patients appear in sentences that are about practitioners, not about DDI. *See* Pl.'s DMSJ Ex. 30, Dkt. 273-30 ("Barrett's article, 'How the urine toxic metals test is used to ***defraud*** patients,' . . . describes

how *chelationists mislead* patients into believing that they need treatment for heavy metal toxicity. The heart of the *deception* is "provoked" testing, in which the *practitioner* administers a chelating agent before the urine specimen is obtained." (emphases added)). Thus, statement (qq) does not suggest that DDI uses provoked testing to deceive patients.

Accordingly, summary judgment is granted for the defendants on DDI's defamation claims with respect to statement (qq).

### *Statement (ss)*

Statement (ss) appears in an online newsletter issue posted on www.ncahf.org titled "Consumer Health Digest #10-30"; the issue is dated July 29, 2010, but a line at the bottom indicates that the page was posted on August 2, 2010. *See* Pl.'s DMSJ Ex. 23, Dkt. 273-23, at 2076-78. The first story in the newsletter begins as follows:

> **CDC blasts improper hair and urine tests**. The U.S. Centers for Disease Control and Prevention (CDC) has severely criticized the misuse of hair and urine tests to diagnose heavy metal toxicity. Last year, investigators from its National Institute for Occupational Safety and Health (NIOSH) evaluated a suspected outbreak of antimony toxicity among fire fighters in Boca Raton, Florida who had been wearing fire-retardant pants that contained various chemicals. The investigation was triggered by hair analysis and urine toxic metal tests that had been ordered by a chelationist (Leonard Haimes, M.D.) and performed by a commercial laboratory (Doctor's Data). Doctor's Data's reports alleged that all 30 of the fire fighters who had undergone hair analysis had antimony levels much higher than the "reference range" and that 23 who also had urine toxic metal testing showed "high" mercury levels. After a thorough evaluation found no real evidence of toxicity, the investigators advised:
>
> > The decision to perform laboratory testing for heavy metals, including antimony and mercury, should be based on whether or not documented health symptoms are consistent with overexposure to these metals. It is important to use reliable and recommended testing methods with well-validated reference ranges to measure the concentration of

> heavy metals in the body. Because results from elemental hair analysis and post-chelation-challenge urine tests do not provide sufficient evidence of heavy metal toxicity, they should not be used to justify searching the workplace for exposures or to treat heavy metal toxicity. In particular, they should not be used to justify chelation therapy, which can be potentially harmful to a patient. [dePerio MA, Durgam S. Evaluation of antimony and mercury exposure in firefighters. [Health Hazard Evaluation Report HETA 2009-0025 and HETA 2009-0076-3085. National Institute for Occupational Safety and Health, June 2009]

Pl.'s DMSJ Ex. 23, Dkt. 273-23, at 2076 (bracketed material in original).

DDI identifies the following excerpt from the story about the CDC report as statement (ss):

> **CDC blasts improper hair and urine tests**. . . . Doctor's Data's reports alleged that all 30 of the fire fighters who had undergone hair analysis had antimony levels much higher than the "reference range" and that 23 who also had urine toxic metal testing showed "high" mercury levels.

First Supp. Resp., Dkt. 273-58, at 10 (alteration in original). DDI asserts that this statement is false to the extent that it suggests that DDI's tests are improper and that DDI has reference ranges for provoked test results. *See* First Supp. Resp., Dkt. 273-58, at 10.

The defendants argue, *inter alia*, that the CDC story is a fair abridgment of the CDC report and is therefore protected by the fair report privilege. *See* DMSJ Mem., Dkt. 249, at 8-10. *See generally* Restatement (Second) of Torts § 611, cmt. d (1977) (stating that the fair report privilege extends to reports of actions or reports by "agenc[ies] of the government of the United States" and "organizations that are by law authorized to perform public duties"). The story cannot be characterized as a fair abridgment of the CDC report, however, since the CDC report does not mention DDI by name; it states only that a "commercial laboratory" conducted the hair

and urine testing. Health Hazard Evaluation Report, U.S. Dep't of Health & Human Servs., HETA Nos. 2009-0025 & 2009-0076-3085, at v, 1, 7, 14 (2009), *available at* http://www.cdc.gov/niosh/hhe/reports/pdfs/2009-0025-0076-3085.pdf. *See generally Michigan v. U.S. Army Corps of Engineers*, 758 F.3d 892, 899 (7th Cir. 2014) (indicating that courts may take judicial notice of governmental reports). The Court need not consider whether the story would otherwise qualify as a fair report, since the discrepancy regarding naming DDI is sufficient to preclude the defendants from obtaining summary judgment based on the fair report privilege.

The defendants also argue that there is no genuine issue of material fact as to the falsity of the sentence describing the content of DDI's reports on the firefighters' samples. *See* Defenses Table, Ex. 2 to DSOF, Dkt. 250-2, at 25-26. It appears, however, that DDI does not challenge the truthfulness of the sentence itself, but instead contends that it falsely suggests that DDI has reference ranges for provoked test results. Even assuming that the sentence conveys this suggestion, no reasonable jury could find that suggestion to fall within a defamatory *per se* category, since—unlike Article A—the story containing statement (ss) does not indicate that it is in any way improper or nonstandard for a laboratory to have reference ranges for provoked test results. Thus, the defendants' broad argument regarding defamation *per se* categories, *see* DMSJ Resp., Dkt. 249, at 35-36, entitles them to summary judgment on DDI's defamation *per se* claim based on this aspect of statement (ss). That argument, however, does not entitle the defendants to summary judgment on DDI's defamation *per se* claim as it relates to the suggestion that DDI's tests are improper, since a reasonable jury could find that suggestion to fall within a defamation *per se* category. *See, e.g.*, *Experian*, 2012 WL 2597915, at *3 (finding that statement was defamatory *per se* under Illinois law since it accused plaintiff of offering a substandard report

which used highly flawed data); *Hackman*, 520 F. Supp. 2d at 970 (noting that statements attacking a corporate plaintiff's business methods qualify as defamation *per se* under Illinois law).

Finally, the defendants argue that they are entitled to summary judgment on the defamation *per quod* claim with respect to statements (ss) because DDI has not sufficiently established special damages. *See* DMSJ Mem., Dkt. 249, at 32-34, 36-37. For the reasons explained in the discussion of the *per quod* claim with respect to Article C, the Court agrees.

Accordingly, the Court denies the defendants' motion for summary judgment on DDI's defamation *per se* claim based on the suggestion in statement (ss) that DDI's tests are improper, but otherwise grants their motion for summary judgment on DDI's defamation claims based on statement (ss).

### *Statement (tt)*

Statement (tt) appears in an online newsletter issue posted on the NCAHF website titled "Consumer Health Digest #10-16"; the issue is dated April 22, 2010, and a line at the bottom indicates that the page was posted on that date. *See* Ex. 3.9 to DSOF, Dkt. 250-11. The second story in the newsletter reads in its entirety as follows:

> **Nonstandard lab criticized.** Quackwatch has posted an investigative report on Doctor's Data, Inc. (DDI), an Illinois-based laboratory whose hair and urine tests have been used for decades to mislead consumers. The article focuses on tests that purport to measure the levels of nutrients and toxic metals. Chiropractors, "nutrition consultants," naturopaths, and other offbeat practitioners use the nutrient-related test results as the basis for prescribing dietary supplements. Practitioners who offer chelation therapy or other "detoxification" methods use the "toxic element" levels to persuade people to be "detoxified." Dr. Stephen Barrett urges consumer [sic] to avoid such practitioners and to complain to state licensing boards if misled. During the past year, at least three lawsuits by aggrieved patients have included DDI as a co-

> defendant. [Barrett S. <u>Doctor's Data facing multiple lawsuits</u>.
> Quackwatch, April 20, 2010]

Ex. 3.9 to DSOF, Dkt. 250-11, at 2-3 (bracketed material in original). DDI identifies this story as statement (tt), and asserts that it is false to the extent it accuses DDI of conspiracy and of not complying with accepted industry standards. *See* First Supp. Resp., Dkt. 273-58, at 10-11.

The defendants argue, *inter alia*, that the statement does not accuse DDI of conspiracy. *See* Defenses Table, Ex. 2 to DSOF, Dkt. 250-2, at 26-27. The Court agrees that statement (tt) cannot reasonably be construed to convey this accusation. The statement indicates: (1) that DDI is a "[n]onstandard" lab; (2) that DDI's tests are used by "offbeat practitioners" to persuade patients to take dietary supplements or be detoxified; and (3) that three lawsuits by patients of such practitioners have included DDI as a co-defendant. Statement (tt) does not, however, assert that DDI acts in concert with the practitioners described in the story, nor does it indicate that the referenced lawsuits included conspiracy claims.

The defendants do not advance a specific argument regarding the aspect of statement (tt) that describes DDI as "[n]onstandard," which DDI reads as accusing DDI of not complying with accepted industry standards. And the defendants' broad argument regarding defamation *per se* categories, *see* DMSJ Resp., Dkt. 249, at 35-36, does not entitle them to summary judgment on DDI's defamation *per se* claim relating to this aspect of statement (tt), since a reasonable jury could find the description of DDI as "[n]onstandard" to fall within a defamation *per se* category. *See, e.g.*, *Experian*, 2012 WL 2597915, at \*3 (finding that statement was defamatory *per se* under Illinois law since it accused plaintiff of offering a substandard report which used highly flawed data); *Hackman*, 520 F. Supp. 2d at 970 (noting that statements attacking a corporate plaintiff's business methods qualify as defamation *per se* under Illinois law). For the reasons explained in the discussion of the *per quod* claim with respect to Article C, however, the

defendants' argument that DDI has not sufficiently established special damages, *see* DMSJ Mem., Dkt. 249, at 32-34, 36-37, entitles them to summary judgment on the defamation *per quod* claim with respect to statement (tt).

Accordingly, the Court denies the defendants' motion for summary judgment on DDI's defamation *per se* claim based on the suggestion in statement (tt) that DDI is a nonstandard laboratory, but otherwise grants their motion for summary judgment on DDI's defamation claims based on statement (tt).

### *Statement (xx)*

Statement (xx) appears in an email sent by Barrett to a health fraud listserv with the subject line "[healthfraud] 'Autism specialists' sued"; the email was sent on March 6, 2010. *See* Ex. 3.12 to DSOF, Dkt. 251-1. The body of the email reads as follows:

> This week's Consumer Health Digest describes a lawsuit against two leading proponents of "biomedical treatment" for autism. The complaint and affidavit lay bare what tens of thousands of families with an autistic child can experience at the hands of chelationists.
>
> ===
>
> The father of a 7-year-old boy has filed suit against two self-styled "autism specialists," their clinics, and a laboratory that tests urine specimens for "toxic metals."
> http://www.casewatch.org/civil/coman/complaint.shtml
>
> The complaint states:
>
> **Defendants Anju Usman, MD, True Health Medical Center, Dan Rossignol, MD, Creation's Own, and Doctor's Data Laboratory conspired to induce patients to undergo unwarranted chelation therapy.
>
> **The scheme in this case centered around Usman's use of a "provoked" urine toxic metals test to falsely assert that the boy had accumulated dangerous levels of mercury and several other metals. Usman made this initial assessment when he was only two years old even though he had had no significant exposure to toxic metals.

> **Chelation therapy was administered with suppositories when the boy was four and included 41 intravenous sessions over an 18-month period, beginning when he was five.

> **The inappropriate treatments also included dietary supplements, hyperbaric oxygen, hormones, and other drugs that were unnecessary, unapproved, and/or potentially dangerous. http://www.casewatch.org/civil/coman/affidavit.pdf

> **Whereas Usman examined and treated the boy at her office, Rossignol, without ever examining him, based his recommendations on telephone conversations with the mother over a 25-month period.

> The provoked urine toxic metals test is a fraud. http://www.quackwatch.org/t The suit asks for damages related to negligence, lack of informed consent, intentional misrepresentation, negligent misrepresentation, battery, and civil conspiracy.

Ex. 3.12 to DSOF, Dkt. 251-1 (formatted as in original). Statement (xx) is the sentence in the last paragraph of the email that reads "The provoked urine toxic metals test is a fraud." *See* First Supp. Resp., Dkt. 273-58, at 11.

The defendants argue, *inter alia*, that statement (xx) is an expression of opinion. *See* DMSJ Mem., Dkt. 249, at 35-36; Defenses Table, Ex. 2 to DSOF, Dkt. 250-2, at 29. Notably, the email in which statement (xx) appears is nearly identical to the story in which statement (l) appears, *see* Article B, Dkt. 24-2, at 1, and statement (xx) is a verbatim duplicate of statement (l). Therefore, for the reasons stated above in determining that statement (l) is protected opinion, the Court finds that statement (xx) is an expression of opinion and is not actionable as defamation. Summary judgment is therefore granted for the defendants on DDI's defamation claims based on this statement.

### Statements (ooo), (ppp), and (qqq)

DDI challenges three statements that appear in an article published on www.casewatch.org titled "'Autism Specialists' Sued"; the article is attributed to Barrett and dated October 14, 2011. *See* Second Supp. Resp., Dkt. 294-1, at 4 (identifying statements (ooo), (ppp), and (qqq)). Notably, this article is not in the record. As a result, the Court cannot rule based on any of the defendants' summary judgment arguments that require the Court to view statements (ooo), (ppp), and (qqq) in context. The defendants raise two broad arguments regarding all these statements, plus additional statement-specific arguments.

The specific arguments pertaining to statements (ooo) and (qqq) (which are the same statements as (k) and (m)) can be addressed together. Statement (ooo) is "Doctor's Data Laboratory conspired to induce patients to undergo unwarranted chelation therapy," while statement (qqq) states "The suit asks for damages related to negligence, lack of informed consent, intentional misrepresentation, battery, and civil conspiracy." Second Supp. Resp., Dkt. 294-1, at 4. The defendants argue that these statements are fair abridgments of the allegations and claims in the *Coman* complaint. *See* DMSJ Mem., Dkt. 249, at 8-10; Defenses Table, Ex. 2 to DSOF, Dkt. 250-2, at 37-38. DDI does not contest that the statements are fair abridgements, *see, e.g.*, Second Supp. Resp., Dkt. 294-1, at 4, but instead argues that the fair report privilege does not protect statements (ooo) and (qqq) because the "'Autism Specialists' Sued" article includes improper commentary imputing DDI's probable "guilt" of the allegations in the *Coman* lawsuit. *See* Resp. to DMSJ, Dkt. 274, at 13, 15.[52] Since the article is not in the record, however, the Court cannot determine whether application of the fair report privilege is potentially

---

[52] DDI also argues that the *Coman* lawsuit description is not protected because of the "collusive arrangement" exception to the fair report privilege. *See* Resp. to DMSJ, Dkt. 274, at 13-15. As explained in the analysis of statement (i), however, DDI has failed to establish that the defendants' reporting of the *Coman* lawsuit falls within the "collusive arrangement" exception.

precluded due to the inclusion of improper commentary. Accordingly, the defendants are not entitled to summary judgment with respect to statements (ooo) and (qqq) based on the fair report privilege.

Statement (ppp) is the sentence "The provoked urine toxic metals test is a fraud." Second Supp. Resp., Dkt. 294-1, at 4. The defendants argue that it is true or substantially true to describe the "provoked urine toxic metals test" as a fraud, or alternatively, that expressing such a sentiment is protected opinion. *See* Defenses Table, Ex. 2 to DSOF, Dkt. 250-2, at 37-38; DMSK, Dkt. 248, ¶ 3; DMSJ Mem., Dkt. 249, at 13, 20-21, 35-36; *see also* DMSJ Mem., Dkt. 249, at 7 (noting that statement (ppp) is a verbatim duplicate of statements (l) and (xx)).[53] The defendants' arguments regarding truthfulness depend, in part, on considering the sentence "The provoked urine toxic metals test is a fraud" in context. *See, e.g.*, DMSJ Mem., Dkt. 249, at 21. Similarly, determining whether a statement is an expression of opinion requires considering the statement in context. Since the article is not in the record and the Court is therefore unable to consider the statement in context, the defendants' arguments regarding truthfulness and lack of factual nature do not entitle them to summary judgment based on statement (mmm).

As noted, the defendants also argue that most of the statements identified as defamatory by DDI do not fall within a defamation *per se* category. *See* DMSJ Resp., Dkt. 249, at 35-36. But based on the text of statements (ooo), (ppp), and (qqq)—which is all the information that is before the Court, a reasonable jury could find that the statements fall within an applicable defamatory *per se* category. *See, e.g.*, *Hackman*, 520 F. Supp. 2d at 970 (noting that statements attacking a corporate plaintiff's financial or business methods or accusing the plaintiff of fraud

---

[53] The defendants also argue that this statement is not actionable under the single publication rule. *See* DMSJ Mem., Dkt. 249, at 6-8; Defenses Table, Ex. 2 to DSOF, Dkt. 250-2, at 37-38. As previously explained, however, the single publication rule cannot provide a basis for granting the defendants' motion for summary judgment.

qualify as defamation *per se* under Illinois law). Second, the defendants argue that they are entitled to summary judgment on the defamation *per quod* claim with respect to statements (ooo), (ppp), and (qqq) because DDI has not sufficiently established special damages. *See* DMSJ Mem., Dkt. 249, at 32-34, 36-37. For the reasons explained in the discussion of the *per quod* claim with respect to Article C, the Court agrees.

Accordingly, the Court denies summary judgment for the defendants on DDI's defamation *per se* claim based on statements (ooo), (ppp), and (qqq) but grants the defendants' motion for summary judgment on the defamation *per quod* claim with respect to those statements.

### Statement (eeee)

Statement (eeee) appears in an article on the Quackwatch website titled "'Autism Specialist' Blasted by Omnibus Special Master"; Barrett is credited as the article's author, and a line at the bottom indicates that the article was revised on March 15, 2009. *See* Ex. 3.14 to DSOF, Dkt. 250-15. The introductory section of the article reads as follows:

> A report by a Special Master of the U.S. Court of Federal Claims suggests that Jeffrey Bradstreet, M.D., of Melbourne, Florida, habitually misdiagnoses and mistreats autistic children [l]. The 293-page report dissects Bradstreet's management of Colten Snyder, whose family petitioned the court for compensation based on their belief that vaccines caused the boy to develop autism. The court ruled that no such connection exists. This article describes how Special Master Denise K. Vowell concluded that Bradstreet had improperly diagnosed and treated Colten for "mercury toxicity."

Ex. 3.14 to DSOF, Dkt. 250-15, at 2.[54] DDI is mentioned in a subsequent paragraph, which reads in relevant part:

---

[54] The bracketed [1] after the first sentence directs readers to a footnote containing the following citation to the Special Master's decision: "Vowell DK. <u>Decision</u>. Snyder v Secretary,

Vowell's report tore Bradstreet's "mercury toxicity" activities to shreds:

- Colten's first mercury test was a hair test, conducted on April 29, 2000. . . . The April 29, 2000 hair test for mercury demonstrated a low level of mercury in Colten's hair, but one within the reference range of normal for the laboratory, and one well below the 90th percentile for U.S. children ages six to eight [1:240]

- Colten's first urine test for mercury exposure was a post-provocation challenge test conducted on July 21, 2000. Prior to collecting the urine, Colten was administered 100 mg of DMSA, a chelating agent. The results were reported by Doctor's Data laboratory as "very elevated," at 11 μg/g creatinine. . . . However, the reference ranges for this test were based on subjects who were not chelated before measurement of their urinary mercury. Although the Doctor's Data laboratory reported Colten's results as "very elevated," applying the correct reference range placed Colten's post-chelation mercury level in the range of normal pre-chelation [l:240-241].

Ex. 3.14 to DSOF, Dkt. 250-15, at 2-3 (alterations and bracketed material in original). Statement

(eeee) consists of the last few sentences of the material quoted above:

The results were reported by Doctor's Data laboratory as "very elevated," at 11 μg/g creatinine. . . . However, the reference ranges for this test were based on subjects who were not chelated before measurement of their urinary mercury. Although the Doctor's Data laboratory reported Colten's results as "very elevated," applying the correct reference range placed Colten's post-chelation mercury level in the range of normal pre-chelation [l:240-241].

Second Supp. Resp., Dkt. 294-1, at 6.

DDI asserts that statement (eeee) is false to the extent it suggests that DDI's report

indicated that Colten's provoked test levels were elevated. *See* Second Supp. Resp., Dkt. 294-1,

at 6. The defendants argue, *inter alia*, that the statement is a fair abridgment of the Special

Master's decision in Snyder's case. *See* DMSJ Mem., Dkt. 249, at 8-10; Defenses Table, Ex. 2 to

Dept. of Health and Human Services, U.S. Court of Federal Claims, Office of Special Masters, Case No. 01-162V, filed Feb 12, 2009." Ex. 3.14 to DSOF, Dkt. 250-15, at 4.

DSOF, Dkt. 250-2, at 44-45.[55] The Court takes judicial notice of the *Snyder* decision, which states in relevant part:

> Colten's first urine test for mercury exposure was a post-provocation challenge test conducted on July 21, 2000. Prior to collecting the urine, Colten was administered 100 mg of DMSA, a chelating agent. The results were reported by Doctor's Data laboratory as "very elevated," at 11 μg/g creatinine. Converting this figure to parts per billion (g/L) would yield a result of 2.2 μg/L of urine. No baseline urinary mercury level was determined before administration of the chelating agent.
>
> However, the reference ranges for this test were based on subjects who were not chelated before measurement of their urinary mercury levels. Based on Dr. Woods' research, urinary mercury levels in adults not occupationally exposed to mercury were 3.0 μg/L, prechelation; Colten had a lower result, post-chelation. Although the Doctor's Data laboratory reported Colten's results as "very elevated," applying the correct reference range placed Colten's *post-chelation* mercury level in the range of normal *pre-chelation* levels.

*Snyder ex rel. Snyder v. Sec'y of Dep't of Health & Human Servs.*, No. 01-162V, 2009 WL 332044, at *169-70 (Fed. Cl. Feb. 12, 2009) (footnotes and citations omitted). *See generally Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1073 (7th Cir. 2013) ("We may take judicial notice of documents that are part of the public record . . . .").

A comparison of statement (eeee) with the *Snyder* decision makes it clear that the statement is essentially a direct quote from the decision, with some minor and insubstantial alterations. Moreover, the statement accurately conveys the Special Master's findings regarding DDI's report on Colten's urine test. *See generally Solaia Tech.*, 221 Ill. 2d at 590, 852 N.E.2d at 844-45 ("A fair abridgment means that the report must convey to readers 'a substantially correct account' . . . . In this regard, a court must determine if the sting of the defamatory statement in

---

[55] DDI does not make any specific arguments against applying the fair report privilege to statement (eeee). *See* Resp. to DMSJ, Dkt. 274, at 10-16 (raising specific arguments only with respect to defendants' reporting of the *Stemp* and *Coman* lawsuits).

the proceeding is the same as the sting of the defamatory statement in the report.' (quoting *Tepper v. Copley Press, Inc.*, 308 Ill. App. 3d 713, 720, 721 N.E.2d 669, 675 (1999)). The defendants are therefore entitled to summary judgment on DDI's defamation claims based on statement (eeee).

### *Statements (ffff) and (hhhh)*

DDI's allegations regarding statements (ffff) and (hhhh) involve several later versions of Article A. *See* Second Supp. Resp., Dkt. 294-1, at 6-7. Statement (ffff) appears in the version of the article that was revised on June 14, 2012. *See* Second Supp. Resp., Dkt. 294-1, at 6.[56] The statement reads: "Doctor's Data's reports alleged that all 30 of the fire fighters who had undergone hair analysis had antimony levels much higher than the 'reference range' and that 23 who also had urine toxic metal testing showed 'high' mercury levels." Second Supp. Resp., Dkt. 294-1, at 6. DDI asserts that this statement is false to the extent that it suggests that DDI provides classifications for provoked test results. The defendants argue, *inter alia*, that there is no genuine issue of material fact as to the falsity of this suggestion. *See* Defenses Table, Ex. 2 to DSOF, Dkt. 250-2, at 46; *see also* DMSJ Mem., Dkt. 249, at 4, 11-12, 16-17 (discussing DDI's falsity theory based on the qualifying language in its reports). For the reasons explained in the discussion of statement (c), the Court agrees. Accordingly, summary judgment is granted for the defendants on DDI's defamation claims with respect to statement (ffff).

Statement (hhhh) relates to seven later versions of Article A that were published on April 8, 2010, September 12, 2010, March 29, 2011, April 24, 2011, June 1, 2011, October 14, 2011,

---

[56] The June 2012 version of Article A is not in the record before the Court. The text identified as statement (ffff), however, appears in another version of Article A which is in the record. *See* Ex. 3.15 to DSOF, Dkt. 250-16, at 7 (version of Article A revised on October 14, 2011); Pl.'s DMSJ Ex. 26, Dkt. 273-26, at 6 (same). Moreover, given the basis for the Court's ruling on statement (ffff), there is no need to review the June 2012 version of Article A.

and June 14, 2012. DDI asserts that statement (a)—which appears in Article A—was "republished" in these later versions of the article, and identifies those seven "republications" as statement (hhhh). *See* Second Supp. Resp., Dkt. 294-1, at 7. As previously explained, statement (a) is the title of the article, "How the 'Urine Toxic Metals' Test Is Used to Defraud Patients." *See* First Supp. Resp., Dkt. 273-58, at 1. In its discovery responses, DDI asserted that the republications of statement (a)—like the original statement—are false to the extent they suggest that DDI uses the urine toxic metals test to defraud patients. *See* Second Supp. Resp., Dkt. 294-1, at 7 (incorporating falsity allegations regarding statement (a) by reference); First Supp. Resp., Dkt. 273-58, at 1 (containing falsity allegations regarding statement (a)).

Notably, however, the defendants have not re-raised or incorporated by reference their arguments regarding statement (a) in moving for summary judgment on DDI's defamation claims based on statement (hhhh).[57] Rather, the defendants' only specific argument regarding statement (hhhh) is that the statement is not actionable under the single publication rule. *See* DMSJ Mem., Dkt. 249, at 6-8. As previously explained, however, the single publication rule cannot provide a basis for granting the defendants' motion for summary judgment. And the defendants' broad argument regarding defamation *per se* categories, *see* DMSJ Resp., Dkt. 249, at 35-36, does not entitle them to summary judgment on DDI's defamation *per se* claim relating to statement (hhhh), since a reasonable jury could find that the suggestion that DDI uses the urine toxic metals test to defraud patients falls within a defamation *per se* category. *See, e.g.*,

---

[57] Even if the defendants had reasserted their statement (a) arguments in the context of statement (hhhh), the Court would be largely unable to rule for the defendants based on those arguments since: (1) the necessary analysis would require consideration of the statement in context, *see* DMSJ Mem., Dkt. 249, at 13, 29, 35-36; and (2) of the seven later versions of Article A at issue for purposes of statement (hhhh), only one is in the record, *see* Ex. 3.15 to DSOF, Dkt. 250-16 (version revised on October 14, 2011); Pl.'s DMSJ Ex. 26, Dkt. 273-26 (same).

*Hackman*, 520 F. Supp. 2d at 970 (noting that statements attacking a corporate plaintiff's financial or business methods or accusing the plaintiff of fraud qualify as defamation *per se* under Illinois law).

With respect to the defendants' argument that DDI has not sufficiently established special damages, *see* DMSJ Mem., Dkt. 249, at 32-34, 36-37, as explained in the discussion of Article C, the only evidence in the record of damages resulting from defamation is Grabowski's expert report, which calculated damages based exclusively on the original February 2009 version of Article A. While Grabowski was presumably aware of the March 2010 version of the article since it was attached to DDI's complaints, there is certainly no indication in the report that he considered the impact of subsequent versions of the article when calculating damages. Accordingly, there is insufficient evidence of special damages to support DDI's defamation *per quod* claims based on statement (hhhh).

Accordingly, the Court denies the defendants' motion for summary judgment on DDI's defamation *per se* claim based on statement (hhhh), but otherwise grants their motion for summary judgment on DDI's defamation claims based on statements (ffff) and (hhhh).

### *Statement (gggg)*

DDI's allegations regarding statement (gggg) involve two later versions of Article E that were published on July 1, 2010, and April 12, 2011; neither of these later versions is in the record. DDI asserts that statement (dd)—which appears in Article E—was "republished" in the 2010 and 2011 versions of the article, and identifies those two "republications" as statement (gggg). *See* Second Supp. Resp., Dkt. 294-1, at 7. As previously explained, statement (dd) reads: "The test report, which typically states that the reported levels are elevated, is then used to claim that the child needs to be 'detoxified' with chelation therapy [6]." First Supp. Resp., Dkt. 273-58,

94

at 6. DDI asserts that the republications of statement (dd)—like the original statement—are false to the extent they suggest that DDI's reports classify provoked test results and that DDI recommends chelation therapy to patients. *See* Second Supp. Resp., Dkt. 294-1, at 7 (incorporating falsity allegations regarding statement (dd) by reference); First Supp. Resp., Dkt. 273-58, at 6 (containing falsity allegations regarding statement (dd)).

Notably, the defendants have not re-raised or incorporated by reference their arguments regarding statement (dd) in moving for summary judgment on DDI's defamation claims based on statement (gggg).[58] But their general argument that there is no genuine issue of material fact as to the falsity of the assertion that DDI's reports classify provoked test results, *see* DMSJ Mem., Dkt. 249, at 4, 11-12, 16-17 (discussing DDI's falsity theory based on qualifying language in its reports), entitles the defendants to summary judgment on DDI's defamation claims involving the classifying aspect of statement (gggg), for the reasons stated in the discussion of statement (c).

As for the chelation therapy aspect of statement (gggg), the defendants' only specific argument is that statement (gggg) is not actionable under the single publication rule. *See* DMSJ Mem., Dkt. 249, at 6-8. As previously explained, however, the single publication rule cannot provide a basis for granting the defendants' motion for summary judgment. And the defendants' broad argument regarding defamation *per se* categories, *see* DMSJ Resp., Dkt. 249, at 35-36, does not entitle them to summary judgment on DDI's defamation *per se* claim relating to this aspect of statement (gggg), since without being able to read the statement in context, the Court cannot say that no reasonable jury could deem the chelation therapy assertion to fall within a

---

[58] Even if the defendants had reasserted their statement (dd) arguments in the context of statement (gggg), the Court would be unable to rule for the defendants based on those arguments since: (1) the necessary analysis would require consideration of the statement in context, *see* DMSJ Mem., Dkt. 249, at 30-31; and (2) the 2010 and 2011 versions of Article E—which provide the relevant context for statement (gggg)—are not in the record.

defamation *per se* category. For the reasons explained in the discussion of the *per quod* claim with respect to Article C, however, the defendants' argument that DDI has not sufficiently established special damages, *see* DMSJ Mem., Dkt. 249, at 32-34, 36-37, entitles them to summary judgment on the defamation *per quod* claim with respect to statement (gggg).

Accordingly, the Court denies the defendants' motion for summary judgment on DDI's defamation *per se* claim based on the assertion regarding chelation therapy in statement (gggg), but otherwise grants their motion for summary judgment on DDI's defamation claims based on statement (gggg).[59]

---

[59] In light of the above holdings, DDI's defamation *per se* claim (Count V) survives only with respect to:

(1) 20 of the challenged statements in Article C—statements (n), (o), (p), (q), (r), (s), (t), (u), (v), (w), (x), (y), (z), (zz), (bbb), (ccc), (ddd), (eee), (fff), and (ggg);

(2) five statements and part of the sixth challenged statement in the August 2011 article titled "Doctor's Data Facing Multiple Lawsuits"—statements (hh), (ii), (jj), (kk), (mm), and the aspects of statement (ll) suggesting that DDI manipulates test results and conspires to defraud patients;

(3) the aspect of statement (ss) suggesting that DDI's tests are improper;

(4) the aspect of statement (tt) suggesting that DDI is a nonstandard laboratory;

(5) the three challenged statements in the October 2011 article titled "'Autism Specialists' Sued"—statements (ooo), (ppp), and (qqq);

(6) statement (hhhh); and

(7) the aspect of statement (gggg) suggesting that DDI recommends chelation therapy to patients.

The defendants' motion for summary judgment on the *per se* claim is granted in all other respects. In addition, summary judgment is granted for the defendants on DDI's defamation *per quod* claim (Count VI) with respect to all 85 challenged statements.

DDI alleges that Barrett is responsible for all of these remaining statements. For some of the statements, DDI alleges that NCAHF and/or Quackwatch are also responsible. *See* Second Supp. Resp., Dkt. 294-1, at 7-9. Specifically, the surviving statements in items (1) and (5) in this footnote are attributed solely to Barrett. The surviving statements in items (2), (6), and (7) are attributed to Barrett and Quackwatch. Statement (ss) is attributed to Barrett and NCAHF. Statement (tt) is attributed to Barrett, NCAHF, and Quackwatch.

### D. DDI's Motion for Partial Summary Judgment—Count V (Defamation *Per Se*) and Affirmative Defenses Asserted in Answer

In its motion for partial summary judgment (Dkt. 242), DDI seeks summary judgment on its defamation *per se* claim with respect to six statements that appear in the articles referenced in the Complaint. *See* PMSJ Mem., Dkt. 243, at 4 ("DDI moves for summary judgment on some of the more prominent of the . . . *per se* libelous statements, all of which appear in at least one of the exhibits referenced in DDI's complaint"); PSOF, Dkt. 244, ¶ 12 (setting out the text of the six challenged statements along with citations to the relevant exhibits).[60] DDI also seeks summary judgment on the two affirmative defenses asserted in the defendants' answer, namely, the Illinois statute of limitations for defamation actions and the doctrine of laches. For the reasons explained below, the Court denies DDI's motion for partial summary judgment in all respects.

Five of the six statements at issue for purposes of DDI's motion correspond to the statements identified as statements (a), (b), (l), (bb), and (ff) in DDI's interrogatory responses. *See* PSOF, Dkt. 244, ¶ 12; First Supp. Resp., Dkt. 273-58, at 1, 3, 6, 7. In light of the Court's holdings in the preceding section granting summary judgment for the defendants on DDI's defamation *per se* claim based on statements (a), (b), (l), (bb), and (ff), DDI's motion is denied with respect to those five statements. The remaining statement on which DDI seeks summary judgment is an excerpt from Article A indicating that DDI's "provoked [urine] testing is a scam." PSOF, Dkt. 244, ¶ 12; *see also* Article A, Dkt. 24-1, at 1. Notably, DDI did not identify this statement in its interrogatory responses, a fact which DDI's reply brief implicitly acknowledges.

---

[60] DDI groups two statements within one bullet point when setting out the text of the challenged statements, *see, e.g.*, PSOF, Dkt. 244, ¶ 12, and therefore sometimes refers to five—rather than six—statements as being at issue for purposes of its motion, *see, e.g.*, PMSJ Mem., Dkt. 242, at 2.

*See* Reply to PMSJ, Dkt. 294, at 2 (stating that DDI identified the statement "in all three of its filed complaints"). Since Judge Chang ordered DDI to specifically identify all statements alleged to be defamatory in its interrogatory responses, *see* 5/9/12 Order, Dkt. 121, and further declared that the statements so identified would form "the universe of defamatory statements" for later stages of the case, 5/9/12 Hearing Transcript, Dkt. 130, at 6-7, the statement that DDI's "provoked [urine] testing is a scam" is not at issue for purposes of DDI's defamation claims. Accordingly, DDI's motion is denied with respect to all six statements.

As for the two affirmative defenses in question, the defendants asserted those defenses only with respect to Article A, Article F, and Article G. *See* Answer to TAC, Dkt. 225, at 41-42. For the reasons stated in the preceding section, the Court has granted summary judgment for the defendants on DDI's defamation claims based on the challenged statements in Article A and Article F. And as previously explained, Article G is no longer at issue for purposes of DDI's defamation claims. DDI's request for summary judgment on the defendants' statute of limitations and laches defenses is therefore denied as moot.

### E. Defendants' Motion for Summary Judgment—Count VII (Tortious Interference)

Count VII of the Complaint alleges that the defendants tortiously interfered with DDI's prospective business relationships and tortiously interfered with its existing contracts. These torts, though closely related, are distinct and are addressed separately below.

#### 1. Tortious Interference with Prospective Business Relationships

Under Illinois law, the elements of a tortious interference with prospective business relationships claim are: "(1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy,

and (4) damage to the plaintiff resulting from the defendant's interference." *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 685 (7th Cir. 2014) (quoting *Voyles v. Sandia Mortgage Corp.*, 196 Ill. 2d 288, 300-01, 751 N.E.2d 1126, 1133-34 (2001)) (internal quotation marks omitted). A reasonable expectancy requires "more than the hope or opportunity of a future business relationship." *Bus. Sys. Eng'g, Inc. v. Int'l Bus. Machines Corp.*, 520 F. Supp. 2d 1012, 1022 (N.D. Ill. 2007) (citing *Anderson v. Vanden Dorpel*, 172 Ill. 2d 399, 408, 667 N.E.2d 1296, 1300 (1996)), *aff'd*, 547 F.3d 882 (7th Cir. 2008); *see also Davidson v. Schneider*, No. 10 C 2101, 2014 WL 656780, at *6 (N.D. Ill. Feb. 20, 2014) ("Davidson's 'mere hope' of additional business with Hill does not constitute a reasonable expectancy."). Furthermore, a plaintiff must identify a reasonable business expectancy with a "specific third party" in order to survive summary judgment. *Ali v. Shaw*, 481 F.3d 942, 945-46 (7th Cir. 2007); *Tamburo v. Dworkin*, 974 F. Supp. 2d 1199, 1211 (N.D. Ill. 2013).

The record reveals only one specific third party—a health care practitioner named Max Tensler[61]—with whom DDI allegedly had a reasonable expectancy that failed to materialize. *See* 2012 Fields Dep., Ex. 14 to DSOF, Dkt. 250-25, at 80-81 (identifying Tensler as "a potential customer" and stating that DDI had a "prospective contract" with him); 2013 Fields Dep., Ex. J to Reply to DMSJ, Dkt. 292-1, at 54-56 (describing the defendants' alleged interference with DDI's relationship with Tensler). DDI's tortious interference with prospective business relationships claim thus rests solely on the alleged expectancy with Tensler. *See generally Ali*, 481 F.3d at 945-46. The information in the record about this alleged expectancy comes from the deposition testimony of DDI executive Doug Fields:

---

[61] Max Tensler's last name sometimes appears as "Tenscher" in the parties' briefs and exhibits.

**Q.** Okay. So what was the basis of your expectancy of a -- of contracts with [Tensler]?

**A.** His clinic had already done a bit of business with us, and we were hopeful of additional work from him . . . .

**Q.** So did he tell you he would have brought you -- brought you additional business and he wouldn't now because he read Dr. Barrett's work?

**A.** I did not discuss that with him. . . .

**Q.** So how do you know that he would have brought any additional work to you?

**A.** In my experience, as a clinic begins to do business with us, most of them over time end up doing significant additional work with us. Not all, but most.

**Q.** So you hoped he would do work with you?

**A.** That's correct.

**Q.** Is there any -- any document evidencing his intent to do work with you in the future?

**A.** No, sir.

2012 Fields Dep., Ex. 14 to DSOF, Dkt. 250-25, at 80-81.

The defendants argue that DDI cannot establish that it had a reasonable expectancy, that the defendants' actions constituted interference with any such expectancy, that the alleged interference was unjustified, or that DDI suffered any damages specifically attributable to the defendants' alleged interference. *See* DMSJ, Dkt. 248, at 3; DMSJ Mem., Dkt. 249, at 32-34, 38-40. With respect to the reasonable expectancy element, the defendants contend that Fields' testimony reveals DDI had a "mere hope" that Tensler would use its testing services in the future. DMSJ Mem., Dkt. 249, at 39-40. In response, DDI argues that there is a genuine issue of material fact on this element since (1) the lost profit calculations in Grabowski's expert report were partly based on DDI's "reasonable expectation" of future profits in light of its past testing revenues, and (2) DDI produced multiple emails from customers expressing "concern or hesitancy" about continuing to use DDI's services because of the defendants' publications. Resp. to DMSJ, Dkt. 274, at 36; PSOAF, Dkt. 273, at 28, ¶¶ 74, 75; *see also* Grabowski Report, Ex. 4 to DSOF, Dkt. 251-2; Customer Emails, Pl.'s DMSJ Ex. 46, Dkt. 273-49.

The fact that Grabowski's expert report indicates that DDI had a "reasonable expectation" of future profits from its testing business says nothing about whether DDI had a reasonable expectancy of future business *from Tensler*.[62] And even assuming that the cited emails suggest that DDI had a reasonable expectancy of future business from the customers who sent the emails, DDI has not asserted or provided evidence that any of the messages were from Tensler, so the emails do not raise a genuine issue of material fact with respect to the alleged reasonable expectancy *with Tensler*. Accordingly, the evidence in the record does not suggest that DDI had anything more than a "hope" of additional testing orders from Tensler. *Cf. U.S. Data Corp. v. RealSource, Inc.*, 910 F. Supp. 2d 1096, 1109 (N.D. Ill. 2012) (noting that "[a] history of filling orders for a particular customer does not, by itself, satisfy the requirement of establishing a reasonable expectancy of receiving additional orders from that customer" and granting summary judgment for the defendant since the plaintiff 'ha[d] identified no other evidence of the reasonableness of its expectancy"). Because DDI there is no genuine issue of material fact with respect to the first element of a claim for tortious interference with prospective business relationships, the Court grants summary judgment for the defendants on this claim.[63]

## 2. Tortious Interference with Existing Contracts

Under Illinois law, the elements of a tortious interference with existing contracts claim are: "(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused

---

[62] In light of this finding, the Court's analysis of DDI's tortious interference with prospective business relationships claim is not dependent on the outcome of the defendants' *Daubert* motion to bar Grabowski's testimony (Dkt. 232).

[63] Since DDI has not established that it had a reasonable expectancy, the Court declines to address the defendants' other summary judgment arguments regarding this claim.

by the defendant's wrongful conduct; and (5) damages." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 154-55, 545 N.E.2d 672, 676 (1989) (quoting *Prudential Ins. Co. of Am. v. Van Matre*, 158 Ill. App. 3d 298, 304, 511 N.E.2d 740, 744 (1987)) (internal quotation marks omitted). A defendant may be subject to liability for this tort if it "induc[ed] or otherwise caus[ed] the third party not to perform the contract." *Europlast, Ltd. v. Oak Switch Sys., Inc.*, 10 F.3d 1266, 1273 (7th Cir. 1993) (quoting Restatement (Second) of Torts § 766 (1979)) (internal quotation marks omitted). The plaintiff must show, however, that the defendant *intended* that result; the intentional inducement element is not met if the defendant merely knew that its conduct was certain or substantially certain to result in the third party breaching the contract. *See R.E. Davis Chem. Corp. v. Diasonics, Inc.*, 826 F.2d 678, 685-87 (7th Cir. 1987); *see also* Restatement (Second) of Torts § 766, cmt. h (1979) ("The essential thing is the intent to cause the result."); *DSM Desotech, Inc. v. 3D Sys. Corp.*, No. 08 CV 1531, 2013 WL 214677, at *3 (N.D. Ill. Jan. 18, 2013) (citing *R.E. Davis*, 826 F.2d at 686), *aff'd*, 749 F.3d 1332 (Fed. Cir. 2014).

The defendants argue that DDI has not sufficiently established the existence of a contract that was breached, intentional inducement of a breach by the defendants, or damages. *See* DMSJ, Dkt. 248, at 3; DMSJ Mem., Dkt. 249, at 32-34, 37-38. In response to the defendants' motion, DDI asserts that there is a genuine issue of material fact on this claim because Fields identified "two existing contracts"—one with Tensler and one with CARE Clinics—and because DDI produced a copy of the CARE Clinics contract. Resp. to DMSJ, Dkt. 274, at 34-35; Resp. to DSOF, Dkt. 273, at 4, ¶ 10; PSOAF, Dkt. 273, at 27-28, ¶¶ 72-73; *see also* CARE Clinics Contract, Pl.'s DMSJ Ex. 58, Dkt. 273-61. Since Fields' deposition testimony clearly indicated that DDI had hopes for a contract with Tensler but no existing contract with him, *see* 2012 Fields

Dep., Ex. 14 to DSOF, Dkt. 250-25, at 80-81, and since DDI has not otherwise pointed to evidence of a contract with Tensler, the purported agreement with Tensler cannot form the basis of a tortious interference with existing contracts claim. The following analysis therefore considers only the CARE Clinics contract.

With respect to that contract, the record sufficiently demonstrates that DDI had a written agreement with CARE Clinics and that CARE Clinics breached that agreement. Fields' deposition testimony included the following exchanges discussing the contract with CARE Clinics and DDI's dealings with CARE Clinics owner Kazuko Curtin[64]:

> **Q.** Plaintiff claims to have had a contract with a Dr. Curtain; is that correct?
> **A.** We had a business relationship with Ms. Curtain. There ultimately was, in fact, a written contract with her entity, which you have been provided a contract with.

2013 Fields Dep., Pl.'s DMSJ Ex. 44, Dkt. 273-47, at 45.

> **Q.** What was the contract with Dr. Curtin?
> **A.** You have the contract. The contract was merely providing her with volume-based pricing for future testing in response for her agreement to purchase that testing from us exclusively in the future. Part of the reason of entering into that contract is that at the same time, we got her to sign a personal guarantee for any moneys that she owes or might owe, which was important to us at the time because we speculated that we might have to take her to court to collect.
> **Q.** Curtin didn't follow through, she didn't pay everything, did she?
> **A.** We took her to court, she didn't appear, we got a default judgment in federal court. We attempted to locate her and find assets and collect on that. We have been unsuccessful to date.

---

[64] Kazuko Curtin's last name sometimes appears as "Curtain" in the parties' briefs and exhibits.

2013 Fields Dep., Ex. J to Reply to DMSJ, Dkt. 292-1, at 120-21.[65] In addition to this testimony, DDI produced a contract with CARE Clinics that, *inter alia*, calls for CARE Clinics to pay invoices from DDI within 30 days.[66] CARE Clinics Contract, Pl.'s DMSJ Ex. 58, Dkt. 273-61. Drawing all reasonable inferences in DDI's favor, the evidence in the record sufficiently establishes that CARE Clinics breached its contract with DDI through nonpayment.

The evidence before the Court is insufficient, however, to establish that the defendants' conduct caused CARE Clinics to breach its contract with DDI, much less that the defendants *intentionally induced* CARE Clinics' breach.[67] The information relevant to these elements of DDI's claim again comes primarily from Fields' deposition testimony:

> **Q.** Do you have any evidence that Dr. Barrett interfered with the Curtin . . . contract[] that you alleged to earlier?

---

[65] DDI designated this testimony as "Confidential," but the Court concludes that there is not an adequate basis to redact this excerpt.

[66] The contract DDI produced indicates that the agreement is between DDI and a corporation called Nutrigenomics, Inc. Drawing all reasonable inferences in DDI's favor, however, the Court construes Fields' testimony and the contract to pertain to the same entity, which apparently operates under the name CARE Clinics. *See* Texas Complaint Materials, Pl.'s DMSJ Ex. 45, Dkt. 273-48, at 2 (email from Barrett providing information about CARE Clinics and stating "Nutrigenomics is the name of the lab in the Austin clinic").

[67] Although the evidence in the record can be construed to indicate that CARE Clinics breached its contract through nonpayment, DDI does not actually assert that the contract was breached in this manner or point to relevant evidence regarding the details of the breach. In fact, DDI states only that the contract with CARE Clinics "ended." Resp. to DMSJ, Dkt. 274, at 34 ("With respect to CARE Clinics, DDI produced a contract . . . which ended after Barrett submitted a complaint to the Texas Medical Board . . . ."); *see also* Resp. to DSOF, Dkt. 273, at 4-5, ¶ 10 (referring to "cancelation of" the CARE Clinics contract and stating that the contract "ended"). Further, the portions of the record cited by DDI merely substantiate the existence of the CARE Clinics contract, not the specifics of its purported breach. *See* PSOAF, Dkt. 273, at 27, ¶¶ 72-73 (citing the contract and portions of Fields' deposition testimony indicating that DDI had a contract with CARE Clinics). Notably, the contract itself and Fields' testimony reveal that the contract could end by its own terms if CARE Clinics went out of business or otherwise ceased having a need for testing services. *See* CARE Clinics Contract, Pl.'s DMSJ Ex. 58, Dkt. 273-61; 2013 Fields Dep., Ex. J to Reply to DMSJ, Dkt. 292-1, at 120-21. Thus, DDI's failure to clearly describe or point to evidence of CARE Clinics' breach further highlights the lack of evidence that any action by the defendants caused the breach.

104

[Objection]

**A.** Subject to lack of certainty, I believe that we have evidence that shows that Dr. Barrett was very active in complaining to the Texas Medical Board and/or insurance companies with respect to Ms. Curtin's activities and her medical director Jesus Caquias' activities that very much led to business problems for her and hence our loss of a customer.

2013 Fields Dep., Ex. J to Reply to DMSJ, Dkt. 292-1, at 55-56.

**Q.** Do you know why [Ms. Curtin] did not pay you?

[Objection]

**A.** I don't know why she didn't pay us.

**Q.** Do you have any evidence that she didn't pay you because of anything that Dr. Barrett or any other defendant did?

[Objection]

**A.** It's our belief that her business collapsed because of activities of Dr. Barrett complaining to the Texas board about her and her medical director and to the insurance companies, and hence it rendered her incapable of paying and continuing her business.

. . . .

**Q.** So, there's no correspondence between Doctor's Data and Dr. Curtin where she states she can't pay because of the insurance investigations against her?

[Objection]

**A.** I don't recall whether there are or aren't, Mr. Botts. That's a long time ago.

**Q.** After you entered into the contract with Dr. Curtin, what specifically did Dr. Barrett or any other defendant do to interfere with that contract?

[Objection]

**A.** I don't know whether anything was done in that regard or not.

2013 Fields Dep., Ex. J to Reply to DMSJ, Dkt. 292-1, at 121-23. In addition to Fields'

testimony, DDI has provided documentation showing that Barrett submitted a complaint about

Dr. Caquias and CARE Clinics to the Texas Medical Board in December 2008. *See* PSOAF, Dkt.

273, at 27-28, ¶ 73; Texas Complaint Materials, Pl.'s DMSJ Ex. 45, Dkt. 273-48.

Drawing all reasonable inferences in DDI's favor, the evidence in the record establishes

that Barrett complained to the Texas Medical Board about CARE Clinics, that CARE Clinics

later developed financial problems, and that CARE Clinics subsequently did not pay DDI

(thereby breaching the contract). But DDI has not alleged or pointed to evidence that Barrett's complaint to the Texas Medical Board about CARE Clinics caused its financial problems or its failure to pay DDI, or that Barrett made his complaint *with the intent* to cause CARE Clinics to breach its contract with DDI. *See generally R.E. Davis*, 826 F.2d at 685-87. Therefore, DDI has not sufficiently established that the defendants intentionally induced CARE Clinics to breach its contract with DDI,[68] and summary judgment for the defendants is appropriate on this claim.

### F. Defendants' Motion for Summary Judgment—Count IX (Civil Conspiracy)

Count IX alleges that the defendants conspired to commit various torts against DDI, including defamation and tortious interference with economic advantage. Under Illinois law, the elements of civil conspiracy are: "(1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Fritz v. Johnston*, 209 Ill. 2d 302, 317, 807 N.E.2d 461, 470 (2004); *see also Credit Ins. Consultants, Inc. v. Gerling Global Reinsurance Corp. of Am.*, 210 F. Supp. 2d 980, 986 (N.D. Ill. 2002) ("Under Illinois law, a civil conspiracy claim must include allegations of an agreement and a tortious act committed in furtherance of that agreement." (citing *McClure v. Owens Corning Fiberglas Corp.,* 188 Ill. 2d 102, 133, 720 N.E.2d 242, 258 (1999))).

Since liability for conspiracy requires an underlying tort, "if a 'plaintiff fails to state an independent cause of action underlying his conspiracy allegations, the claim for conspiracy also fails.'" *Jones v. City of Chi.*, No. 08 C 3501, 2011 WL 1898243, at *6 (N.D. Ill. May 18, 2011) (quoting *Thomas v. Fuerst*, 345 Ill. App. 3d 929, 936, 803 N.E.2d 619, 626 (2004)). In addition,

---

[68] Given this finding, it is unnecessary to address the defendants' remaining argument that DDI has not sufficiently established the damages element of a tortious interference with existing contracts claim.

because a successful conspiracy claim enables a plaintiff to hold co-conspirators jointly liable for actions by other members of the conspiracy, *see Geinosky v. City of Chi.*, 675 F.3d 743, 750 (7th Cir. 2012); *Walton v. Diamond*, No. 12-CV-4493, 2013 WL 1337334, at *6 (N.D. Ill. Mar. 29, 2013) (citing *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 62, 645 N.E.2d 888, 894 (1994)), a conspiracy claim is only actionable if it is based on new facts or seeks to extend liability for the underlying tort to new defendants. *See Davis Cos., Inc. v. Emerald Casino, Inc.*, No. 99 C 6822, 2003 WL 22113414, at *9 (N.D. Ill. Sept. 11, 2003) ("'[U]nless the plaintiff adds another defendant or new facts, a conspiracy count would merely result in another attempt to recover the same damages.'" (quoting *Real Colors, Inc. v. Patel*, 974 F. Supp. 645, 651 (N.D. Ill. 1997))); *see also Powell v. City of Berwyn*, 68 F. Supp. 3d 929, 950 (N.D. Ill. 2014) (dismissing a conspiracy claim as duplicative because plaintiff failed to "allege any additional defendants or facts in the conspiracy claim as compared to the [underlying tort claim]"); *cf. Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 486, 693 N.E.2d 358, 371 (1998) (stating that dismissal of conspiracy claim naming a new defendant was not warranted).

Given that conspiracy is not an independent tort and that the defendants are entitled to summary judgment on all of DDI's tort claims except for part of one claim, the Court need only consider Count IX with respect to the surviving aspects of DDI's defamation *per se* claim. DDI alleges that Barrett is responsible for publishing all of the surviving defamatory *per se* statements and that Quackwatch and NCAHF are each also responsible for publishing some of those statements. *See* Second Supp. Resp., Dkt. 294-1, at 7-9 (listing which defendants are alleged to have been responsible for each challenged statement) and Note 59, *supra*. To the extent that is so, a successful conspiracy claim would make Quackwatch and NCAHF potentially liable for all of the surviving defamatory *per se* statements, rather than just the statements they are alleged to

have published themselves. However, DDI acknowledges that Quackwatch was dissolved after publication of Article A, PRDSJM, Dkt. 274, at 40, and since none of the allegedly defamatory statements from Article A give rise to liability, there is no basis to support any judgment for conspiratorial liability between DDI and Quackwatch. As for NCAHF, DDI similarly concedes, *id.*, that defendant Barret was an officer of NCAHF and does not dispute that the Illinois intra-corporate conspiracy doctrine holds that an agent acting within the scope of his employment cannot conspire with its principal or with other agents of that principal. *See, e.g., Buckner v. Atl. Plant Maint., Inc.*, 182 Ill. 2d 12, 24, 694 N.E.2d 565, 571 (1998) ("because the acts of an agent are considered in law to be the acts of the principal, there can be no conspiracy between a principal and an agent"). That bar precludes a finding of conspiratorial agreement between Barret and NCAHF, but DDI argues instead that there is evidence that Wilzig's involvement in the conspiracy saves the claim.  NCAHF conspired with Wilzig, but since Wilzig is not a defendant, even if true, the conspiracy with Wilzig would add nothing to DDI's recovery. In short, Barrett could not have conspired with Quackwatch or NCAHF concerning any of the statements that have survived its summary judgment motion, so there is no basis to allow the conspiracy claim to continue.

Even if the intracoporate conspiracy doctrine did not bar the conspiracy claim, there is insufficient evidence to support it. The defendants argue, *inter alia*, that there is no evidence in the record indicating that the defendants conspired to defame DDI. *See* DMSJ Mem., Dkt. 249, at 45-48; *see also* Reply to DMSJ, Dkt. 292, at 25-28. In response, DDI points to evidence that the defendants conspired with each other—and with attorney David Wilzig and medical expert Robert Baratz—to foment lawsuits against DDI and thereby generate income for Barrett, Wilzig, and Baratz. *See* PSOAF, Dkt. 273, at 28-29, ¶¶ 78-80 (citing evidence that Barrett provided

Wilzig with information about individuals who had contacted him and who might be viable plaintiffs for a class action lawsuit); Resp. to DMSJ, Dkt. 273, at 37-41 ("[L]ibel *per se*, which is the tort DDI believes to be the foundation of the conspiracy, . . . has been wielded by Barrett as a sword . . . . Barrett would routinely forward [emails from individuals who read his articles] to Baratz and Wilzig, in an effort to foment litigation and generate money-making possibilities for them all. . . . Defendants (through Barrett's conduct and Defendants' websites) with Wilzig and Baratz engaged in 'concerted action' to accomplish their objective by 'unlawful means' . . . . [Wilzig, Baratz, Barrett, NCAHF, and Quackwatch] all labored in concert, relying on Defendants' commission of libel to attract potential business."); *see also* Resp. to DMSJ, Dkt. 273, at 14 (discussing Barrett's "conspiracy with Baratz and Wilzig" to profit from the *Coman* lawsuit); Resp. to DMSJ, Dkt. 273, at 31-32 (stating that Article A "is a centerpiece of DDI's conspiracy count as it is the tortious act that gives rise to litigation against DDI brought by Barrett, Wilzig, and Baratz").

Evidence of concerted action **to profit from** Barrett's previously published articles, however, does not raise a genuine issue of material fact as to the existence of an agreement **to publish** defamatory material about DDI.[69] Accordingly, summary judgment is granted for the

---

[69] Construed in DDI's favor, the record does contain evidence that could give rise to an inference that Wilzig or Stemp conspired with Barrett to publish the allegedly defamatory statements in Article C, since—as explained in the defamation *per se* section of this opinion— Article C may have been published before the *Stemp* complaint was filed, a possibility that suggests that Barrett may have acquired a copy of the complaint from Wilzig or Stemp rather than through public records. But evidence suggesting that Barrett was part of a conspiracy with Wilzig or Stemp to publish Article C does not support DDI's conspiracy claim, since (1) DDI's defamation claims based on Article C are already directed at Barrett, *see* Second Supp. Resp., Dkt. 294-1, at 7-9; and (2) Wilzig and Stemp are not named as defendants in this case. Thus, a claim that Barrett conspired with Wilzig or Stemp to defame DDI by publishing Article C would not add anything to DDI's potential recovery. And in any event, DDI does not argue that its

defendants on DDI's conspiracy claim. *Cf. Avila v. Pappas*, No. 06 CV 2947, 2009 WL 528798, at *7 (N.D. Ill. Mar. 3, 2009) (granting summary judgment for defendants on conspiracy claim since plaintiff cited no evidence of the requisite agreement), *vacated for lack of jurisdiction,* 591 F.3d 552 (7th Cir. 2010); *Henderson v. Harthsorn*, No. 08-CV-2086, 2011 WL 11464, at *8 (C.D. Ill. Jan. 4, 2011) (granting summary judgment for defendants on conspiracy claim due to absence of evidence "establishing or even suggesting an agreement among Defendants" to injure plaintiff).

### G. Defendants' Motion for Summary Judgment—Count X (Corporate Officer and Board Member Personal Liability)

Count X seeks to hold Barrett liable as a former director of Quackwatch who carried on business on the corporation's behalf after the date of its dissolution liable for any damages owed by Quackwatch as a result of this lawsuit.[70] *See generally* 805 ILCS 5/8.65(3) ("[T]he directors of a corporation that carries on its business after the filing by the Secretary of State of articles of dissolution . . . otherwise than as necessary or appropriate to wind up and liquidate its business and affairs, shall be jointly and severally liable to the creditors of such corporation for all debts and liabilities of the corporation incurred in so carrying on its business."). Although the defendants seek summary judgment on the entirety of the Complaint, they have not presented *any* arguments in support of their motion with respect to Count X. And since DDI alleges that Quackwatch is responsible for publishing several of the statements which survive the defendants'

---

conspiracy claim is premised on a conspiracy to publish the allegedly defamatory statements in Article C.

[70] Count X purports to hold all former directors liable, but no others are identified or named as defendants.

motion for summary judgment on DDI's defamation *per se* claim,[71] Count X has continuing relevance for this suit. Therefore, the defendants are not entitled to summary judgment on this count. *See generally Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014) ("[Rule] 56 imposes an initial burden of production on the party moving for summary judgment to inform the district court why a trial is not necessary." (quoting *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013)) (internal quotation marks omitted)).

\*　　\*　　\*

For the reasons stated above, Count I of the TAC is dismissed with prejudice and the defendants' motion for summary judgment (Dkt. 248) as to that count is denied as moot. The defendants' motion is granted as to Counts II, VI, VII, and IX, denied as to Count X, and granted in part and denied in part as to Count V.[72] DDI's motion for partial summary judgment on Count V (Dkt. 242) is denied.

Date: March 21, 2016

John J. Tharp, Jr.
United States District Judge

---

[71] The defamation *per se* claim (Count V) survives with respect to all or part of nine statements allegedly attributable to Quackwatch, namely, statements (hh), (ii), (jj), (kk), (ll), (mm), (tt), (gggg), and (hhhh). *See* Second Supp. Resp., Dkt. 294-1, at 7-9 (listing which defendants are responsible for each challenged statement). DDI effectively concedes that Quackwatch was dissolved shortly after publication of Article A, but to the extent that it has alleged that Barrett continued to conduct the corporation's affairs even after the dissolution—and the defendants have not provided an argument in support of its motion for judgment on that claim—the claim survives.

[72] Again, Counts III, IV, VIII, and XI were previously dismissed by Judge Chang.